UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE FAY,

                        Petitioner,

                                          No. 20 Civ. 187 (PAE)(SLC)

          v.

ANTHONY J. ANNUCCI, Commissioner,
New York State Department of Corrections
and Community Supervision,

                        Respondent.

## MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Respondent
28 Liberty Street
New York, New York 10005
(212) 416-6072

Dated: July 10, 2020

NIKKI KOWALSKI
  *Deputy Solicitor General*
  *for Criminal Matters*
MATTHEW KELLER
  *Assistant Attorney General*
  *of Counsel*

# TABLE OF CONTENTS

Page

**INTRODUCTION** ......................................................................... 3

**FACTUAL AND LEGAL BACKGROUND** ................................................. 6

    A.    Indictment ............................................................... 6

    B.    The Trial ................................................................. 6

    C.    Direct Appeal ......................................................... 16

**ARGUMENT** .................................................................................. 19

The expert testimony claim is procedurally barred on adequate and
independent state law grounds.  In any event, the Appellate Division's
rejection of the claim on the merits was a reasonable application of
clearly-established Supreme Court law. ................................................. 19

    A.    The expert testimony claim is procedurally barred ............................... 19

    B.    The expert testimony claim is meritless ................................................ 33

**CONCLUSION** .............................................................................. 53

## INTRODUCTION

Early in the morning of July 9, 2016, victim S.D. awoke to the feeling of something being placed in her mouth and someone's hand behind her head and, shortly thereafter, a penis being placed inside her vagina.[1]  When she opened her eyes, she saw George Fay ("petitioner") – a man she had never met before – having sex with her.  S.D. jumped out of the bed and woke up the man she had fallen asleep next to the previous night, a friend of petitioner's who had taken S.D. to the apartment where he was staying for the weekend.  The friend observed that S.D. was "physically shaking," "convulsing," "very upset" and "screaming."

In this 28 U.S.C. § 2254 habeas corpus action, petitioner seeks review of the resulting 2018 judgment of Supreme Court, New York County, convicting him upon a jury verdict of Rape in the First Degree (N.Y. Penal Law §130.35(2)), Criminal Sexual Act in the First Degree (Penal Law §130.50(2)), and Sexual Abuse in the First Degree (Penal Law §130.65(2)); and sentencing him to an aggregate prison term of ten years, followed by five years of post-release supervision.  (ECF #1, "Pet." at 1-2.)[2]  The Appellate Division, First Department, affirmed the conviction and on August 20,

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(d) and the Court's prior sealing order in this matter (ECF #5), the sex offense victim's name in this case is confidential.

[2] Citations to the Petition refer to the page numbers generated by ECF appearing at the top-right corner of each page.

3

2019, the New York Court of Appeals denied leave to appeal. *People v. Fay*, 170 A.D.3d 404 (1st Dep't), *leave denied*, 34 N.Y.3d 930 (2019).

The Petition asserts as a sole claim that petitioner's right to present a defense was "undermined" by the trial court's preclusion of expert testimony. Late in the trial, after petitioner and the other defense witnesses had testified, counsel announced for the first time that he wanted to call an expert in "the pharmacological effects of alcohol on sleep" to opine that, based on S.D.'s testimony that she had consumed alcohol the previous night, she might either have appeared to consensually participate in sex with petitioner while in fact remaining asleep or have thought she was asleep when she was awake. The trial court precluded the testimony on the ground that petitioner had failed to give the People or the court the notice required to determine either the scientific reliability of the proffered testimony or the proposed witness's qualifications to render it. (Pet. at 5, 7, 43-50; Pet. Memo. of Law, ECF #10 ("MOL").)

The Petition should be denied. Petitioner's right to present a defense claim is barred from habeas review on adequate and independent state law grounds, because the Appellate Division denied the claim based on petitioner's failure to comply with New York's contemporaneous objection rule. Indeed, at trial petitioner argued only that he had provided sufficient notice of the expert testimony, not that preclusion of the testimony would violate petitioner's right to present a defense. Application of the procedural bar here furthers the state's legitimate interests in requiring parties to timely alert trial judges that preclusion of evidence would harm petitioner's ability to

4

present his defense and result in an unfair trial, ensuring that only scientifically sound expert evidence is heard, and preventing the party who fails to raise a timely constitutional objection from sandbagging the opposing party and the trial court.

Even if this Court were to excuse the procedural default, it should conclude that petitioner is not entitled to habeas relief. The trial court's preclusion of the expert as a matter of "state evidentiary law and trial management," *Fay*, 170 A.D.3d at 406, did not deprive petitioner of his right to present a defense. As the Appellate Division held, on this record there was nothing to establish that the proffered scientific opinion was admissible under state law or that, even if admissible, that the witness was qualified to render that opinion. In any event, preclusion of the expert did not prevent petitioner from presenting his defense that the victim consented to the sexual encounter. Petitioner cannot demonstrate that the Appellate Division's rejection of the expert testimony claim on the merits was an objectively unreasonable application of clearly-established Supreme Court law, as he is required to do under the rigorous requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

Accordingly, the Petition should be dismissed and no certificate of appealability should issue.

## FACTUAL AND LEGAL BACKGROUND

**A.      Indictment**

In September 2016, a New York County Grand Jury indicted petitioner on charges of first-degree rape, first-degree criminal sexual act and first-degree sexual abuse.  (ECF #1-1 at 4-6.)

**B.      The Trial**

Petitioner's trial before State Supreme Court Justice Melissa Jackson began on January 19, 2018.  The jury delivered its verdict on February 2.

**1.      The People's Case**

Petitioner's childhood friends, Charles "Jack" Slye and Don Sobell, testified that, on Friday, July 8, 2016, they travelled from Boston, where they were both working for the summer, to New York City to spend the weekend with petitioner.  The purpose of the trip was to celebrate Slye's twenty-second birthday.[3]  (Slye: 22-23, 25-26; Sobell: 480-82).

After posting his weekend plans on social media, Slye was contacted by S.D., a friend with whom he was then attending college in Delaware.  (Slye: 17-18, 21, 79; S.D.: 103, 168, 173-74).  Although Slye and S.D. were not dating, they engaged in sexual intercourse two or three times a month.  (Slye: 21-22, 79-86; S.D.: 168-69.)

---

[3] A comprehensive rendition of the facts can be found in the People's brief to the Appellate Division.  (SR95-109.)

S.D. was working at an internship in Manhattan that summer.  (S.D.: 170.) Throughout the evening of July 8, Slye and S.D. texted about meeting up at a bar later that night.  (Slye: 33-37, 104-07, 115-16; S.D.: 173-77.)  S.D. did not know petitioner.  (Slye: 40-41; S.D.: 192.)

At around 9:00 p.m., Slye, Sobell, and another friend arrived at Grand Central Station where they were met by petitioner.  The four men proceeded to the two-bedroom apartment petitioner was living in for the summer, which belonged to friends of petitioner's family.  (Slye: 25-26, 95-97; Sobell: 451, 485-86, 490.)  The men spent a couple of hours drinking at the apartment; however, Slye and Sobell could not remember what type of alcohol petitioner was drinking, nor how much he consumed.  (Slye: 32, 101-02; Sobell: 451, 485-86, 490-91.)  S.D. spent the evening with friends, and had 2 or 3 beers and 2 or 3 shots of vodka.  (S.D.: 170, 172-73, 226-28).

At around midnight, S.D. arrived at the bar where she and Slye had agreed to meet.  Slye bought her a mixed drink, which she did not finish.  (SD:182-83.)  Very soon after S.D. arrived at the bar, Slye found petitioner and his other friends to tell them that he was leaving.  (Slye: 39-40, 115; S.D.: 179-81, 183.)  Slye asked petitioner for the keys to his apartment, telling petitioner "he wanted to bring a girl" there. (Slye: 40; Sobell: 461, 494, 496.)  Slye retrieved the keys from petitioner and then texted S.D., "[l]et's go I got the key." (Slye: 40, 118; S.D.: 215, 233-34; People's Exh. 2H.)  While at the bar, S.D. did not meet petitioner or any of Slye's other friends. (Slye: 40-41; S.D.: 182; Sobell: 456, 470.)

7

Slye and S.D. returned to petitioner's apartment, proceeded to the bedroom that had bunk beds, took off their clothes and had sex on the bottom bunk. Afterwards, they fell asleep.  (Slye: 29-30, 42-44, 122-24; S.D.: 185, 187-88, 225-26.) A few hours later, petitioner and Sobell arrived at the apartment.  Because petitioner had given Slye his key, and because Slye did not respond to petitioner's phone calls and knocking on the door, petitioner retrieved a spare key from the doorman.  (Sobell: 457-59, 472, 492, 494-98; Queen: 721-25, 734-37.)   Once inside the apartment, petitioner and Sobell observed Slye and a woman in the bottom bunk.   They attempted to wake Slye, but could not do so.  (Sobell: 459-60.)  Sobell and petitioner returned to the living room, smoked marijuana and watched television, until Sobell fell asleep on one of the two couches in that room.  (Sobell: 462-63, 498-500, 506-08.)

S.D. awoke early in the morning to the feeling of "something put in [her] mouth" and "someone's hand behind [her] head."  She thought she was dreaming until she felt someone insert his penis inside her vagina.  Thinking that Slye might be having sex with her she opened her eyes, only to see that it was a stranger on top of her.  She looked to her left and saw Slye asleep next to her. (S.D.: 188-90, 193-94, 215-16, 233-34, 238-39.)  S.D. jumped out of the bed and, in a state of "fully hysterical panic," grabbed her clothes and woke up Slye.  (S.D.: 190-91.)  Upon waking, Slye saw that S.D. was "physically shaking," "convulsing," "very upset" and "screaming." (Slye: 45-47, 239).  S.D. told Slye that they had to leave.  (S.D.: 191-92.)

Meanwhile, petitioner had left the bedroom and walked into the kitchen. When S.D. saw him standing there, she screamed, "who are you," and shouted that

petitioner was "scum." (S.D.: 192; Sobell: 466, 515.) Petitioner did not respond. (Sobell: 515.) However, at some point before S.D. and Slye left the apartment, petitioner told Slye, "It's not what it seems." (Slye: 47-48, 129.) After S.D. and Slye left, petitioner told Sobell that he had climbed into the bottom bunk where S.D. and Slye were sleeping and that, after he fell asleep, S.D. "kissed [his] neck, so [he] started going with it and then one thing led to another and she was giving [him] a blow job." (Sobell: 464-65, 509, 513-14.)

In the lobby of the building, S.D., still "very very emotional" and "crying hysterically," asked the doorman for the location of the nearest police station. (S.D.: 239-40; Queen: 727.) S.D. and Slye then left the building and stood out front, talking. When the doorman walked outside to see if everything was okay, S.D. told him to call the police because "she had been raped." (S.D.: 194; Queen: 727-28, 731.) Police arrived and arrested petitioner inside the apartment. (Slye: 54, 139-41; Ponce: 395, 418; Sobell: 518-19; Polanco: 531-32, 555; Cebulski: 646-48, 674-75.)

S.D. was transported by ambulance to Lenox Hill Hospital. In the ambulance, her blood pressure was 144 over 80, indicating stress and anxiety, and her heart rate was 125, which was high enough to "require medical intervention if it doesn't correct on its own." (O'Brien: 340-42.) At the hospital, S.D. spoke with an emergency room nurse who observed that S.D., while "visibly upset" and "anxious," was "completely alert, oriented" and "aware of her surroundings." S.D. did not seem drunk. (S.D.: 195; O'Brien: 330-31, 346, 360, 364-65.)

9

## 2.    The Defense Case

Petitioner testified that, at the time of trial, he was 23 years old.  (Fay: 784.)  Petitioner claimed that, on the night in question, he had briefly met S.D. at the bar when he gave Slye the keys to the apartment.  He had never met S.D. prior to that.  (Fay: 800.)  After returning home from the bar and finding Slye and S.D. asleep in his bed, petitioner and Sobell returned to the living room, turned on the television and smoked marijuana.  (Fay: 803-05.)  After Sobell fell asleep, petitioner decided to climb into the bed where S.D. and Slye were sleeping.  The top bunk of that bed – as well as a second living room couch – were unoccupied.  (Fay: 848-49.)  However, petitioner explained that he selected the bottom bunk because he was "tired," "a bit high," and "just wanted to go to sleep in [his] own bed."[4]  (Fay: 806-07, 848-49, 868.)  At that point, petitioner had been staying in the apartment for approximately one month.  (Fay: 792.)

Petitioner testified that, at some point, he woke up and turned over to get more comfortable.  When he did so, S.D. "grabbed [his] arm and pulled it into her chest."  (Fay: 807-08.)  In response, petitioner "leaned over and kissed her right shoulder."  S.D. then rolled onto her back and looked at petitioner.  The two started kissing and

---

[4] Initially, the trial court had denied the People's application to introduce evidence that, before petitioner went to bed, his phone had been used to make several telephone calls to numbers associated with prostitution services.  However, following petitioner's direct examination, the court ruled that his testimony regarding his reasons for climbing into bed with S.D. and Slye opened the door to that evidence of intent.  (T.827-33.)  During a brief cross-examination on the subject, petitioner denied making the phone calls at issue.  (Fay: 871-72.)

touching one another.  Petitioner testified that he removed S.D.'s bra, both of them touched each other's genitals and, then, petitioner removed his sweatpants and S.D. put "her mouth on [his] penis."  Petitioner also "lick[ed] [S.D.'s] vagina for a little bit." (Fay: 808-09.)

Petitioner asked S.D. if she wanted to have intercourse, and S.D. said yes. When their initial attempt to do so failed, petitioner obtained a pack of surgical lubricant from the bathroom, put some on his penis and had intercourse with S.D.[5] (Fay: 809-10.)  After having sex for 30 seconds or a minute, S.D. looked over at Slye asleep on the bed and, petitioner testified, her "demeanor kind of change[d]."  (Fay: 810-11, 880.)  Petitioner asked S.D. if she was okay, and she replied, "[y]ou should probably go."  (Fay: 811).  Petitioner went into the living room; shortly thereafter, he heard crying from the bedroom.  Petitioner went into the bedroom and saw that S.D. was "crying" and "upset." (Fay: 812-13.)  Soon, sadness gave way to anger and S.D. became "more animated."  (Fay: 813-14.)  Petitioner was "freaked out" and "confused" because he could not understand S.D.'s behavior.  (Fay: 815.)

Petitioner's high school advisor and lacrosse coach testified that petitioner had a reputation for peacefulness, and that petitioner had been truthful in all his dealings with him. (Flanagan: 921, 923-25, 927.)  A family friend who had known petitioner

---

[5] Shortly after the incident, petitioner's private investigator recovered a package of surgical lubricant from between the mattress of the bed and the wall. (McCreight: 968-69.)

since early childhood testified that petitioner was "straightforward," "honest" and "not at all violent." (Tarn: 949-51.)

### 3.    Preclusion of the Defense's Expert

During jury selection, the prosecutor asked the court to order disclosure of defense witness information, including any reports generated by Dr. Michael Thorpe, a potential defense expert in the area of sleep disorders.[6] (1/17/2018 Tr. at 2.) The prosecutor stated that she had spoken with Dr. Thorpe and that, based on that discussion, she wanted to know if petitioner would be presenting a "sleepwalking defense." As the People later explained, because counsel had only provided the proposed expert's name and description as a "sleep expert," the prosecutor assumed that he was being called to discuss petitioner's state of mind, not S.D.'s.[7] (SR255-56.) *See*, *e.g.*, *Boyce v. Soto*, No. 15 Civ. 2700, 2017 U.S. Dist. LEXIS 7081 (N.D. Cal. Jan. 18, 2017) (discussing expert testimony in support of sexual assault defendant's testimony that he was sleepwalking when he assaulted his victim).

Rather than providing details of the proposed expert opinion, counsel merely denied that he was contemplating a sleepwalking defense and offered that Dr.

---

[6] In the state court record, the proposed expert's name is spelled variously as "Thorby," "Thorpy," and "Thorpe." The People used "Thorpy" throughout the state appellate proceedings. However, petitioner spelled the name "Thorpe," and continues to use that name in this Court. This memorandum adopts petitioner's formulation to avoid confusion.

[7] The People provided this explanation in their opposition to petitioner's motion to reargue the appeal.

Thorpe's area of expertise included "pharmacological affects [sic] on sleep [of] alcohol, drugs, things like that." Counsel promised to send Dr. Thorpe's C.V. to the prosecutor. (*Id*.)

One week later, in the middle of the People's case in chief, the prosecutor reported that she still had not received Dr. Thorpe's C.V. from defense counsel. Counsel apologized and said he would get it to the prosecutor that night. (T. 568 (Jan. 24, 2018).) The following week, after petitioner's other witnesses had testified, counsel attempted to call Dr. Thorpe as an expert on sleep disorders and the pharmacological effects of alcohol on sleep. Counsel's description of the expert's proposed testimony was unclear about whether the opinion would rest on the assumption that the victim was awake or asleep during the encounter. At first, he stated that Dr. Thorpe would testify that, based on S.D.'s testimony that she had consumed alcohol, she could have participated in "physical activities" while asleep, but during which she appeared "to be awake and conscious." (T. 983 (Jan. 30, 2018).) When the court asked counsel to repeat the defense theory, counsel stated that, due to intoxication, a person could "think they are sleeping but they can physically participate in physical activities while thinking . . . the only way I can say it is while thinking they're asleep. I don't know."[8] (T.983.)

---

[8] The defense argued in opening statements and on summation that S.D. was not asleep during the encounter. (T.13-14, 1035, 1045-46.)

13

Counsel explained that he would "probably pose hypothetical questions [to Dr. Thorpe] based on some of the evidence that's been brought out at trial," and argued that he had given the People sufficient notice of the testimony by informing the prosecutor "at least a couple of weeks ago" that a witness might testify as to "the pharmacological effects of alcohol."  (T.984-85.)

The prosecutor opposed Dr. Thorpe's testimony on grounds of both insufficient notice and lack of qualification.[9]  The prosecutor noted that counsel had told her "months ago" that "he might be hiring his sleep expert," but had provided no additional information at that time.  (T. 985.)  Counsel had provided Dr. Thorpe's C.V. only the previous week, and had not responded at all to the prosecutor's follow-up email inquiring into the opinions the proposed expert would be offering and the basis of those opinions.  (T. 985.)  As to qualification, the prosecutor argued that, while Dr. Thorpe seemed to have extensive experience in the area of sleep disorders,

---

[9] Unlike federal courts where admissibility of expert testimony is governed by Federal Rule of Evidence 702, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), New York courts continue to rely on the *Frye* standard, *see Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).  Under *Frye*, testimony from an expert based on a novel scientific theory or method is admissible where "the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally."  *Sullivan v. Lee*, No. 10 Civ. 425, 2017 U.S. Dist. LEXIS 134256, at *27 n.6 (E.D.N.Y. Aug. 22, 2017).

The accepted practice in New York is to conduct a *Frye* hearing before trial in order to avoid lengthy mid-trial adjournments for that purpose.  *See, e.g., People v. Bedessie*, 19 N.Y.3d 147, 152-53 (2012) (discussing defendant's pretrial motion for *Frye* hearing on admissibility of false confession expert testimony); *People v. Almonor*, 93 N.Y.2d 571, 575-77 (1999).

14

he did not appear to be an expert on the pharmacological effects of alcohol.  The prosecutor also noted that she was aware of no studies to support either articulation of the proffered defense theories that, due to the effects of alcohol, S.D. could have apparently consented to sex with petitioner while asleep or, conversely, that she could have believed herself to be asleep during the encounter. (T. 985-86.)

The trial court precluded the testimony based on "inadequate notice to both the prosecution [and] to the Court." (T.986-87.)   Specifically, by seeking to call the expert only at the end of the defense case, defense counsel had not provided sufficient opportunity for the court to hold a hearing and rule on whether petitioner's theory "that someone can actually be intoxicated and not be aware they're participating" was generally accepted in the relevant scientific community and, if so, whether Dr. Thorpe was qualified to present that testimony.

### 4.   Verdict and Sentence

The jury found petitioner guilty as charged of first-degree rape (Penal Law §130.35(2)), first-degree criminal sexual act (Penal Law §130.50(2)), and first-degree sexual abuse (Penal Law §130.65(2)).

At the April 2018 sentencing, after petitioner stated that he "stood by" his testimony that the sex was consensual, the court responded that, like the jury, the court found that testimony "implausible and unbelievable based on the evidence that was presented at the trial."  Rather, the court stated, the evidence demonstrated that petitioner got into bed with S.D. "prepared" and "knowing full well what [he was]

going to get," and that he raped her "in a cold, calculating manner."  (S.20-21.)  The court sentenced petitioner to 10 years in prison plus 5 years' post-release supervision on both the rape and criminal sexual act convictions, and to 7 years in prison plus 5 years' post-release supervision on the sexual abuse conviction, all sentences to run concurrently.  (ECF #1-1 at 28.)

## C.    Direct Appeal

Petitioner, through retained counsel, filed a brief in the Appellate Division, First Department.  As relevant to the Petition, he claimed that the court's preclusion of Dr. Thorpe's testimony "undermined" petitioner's Sixth Amendment right to present a defense.[10]  (SR51-61.)  The People filed an opposing brief (SR85-154) and petitioner filed a reply (SR155-87.)

In March 2019, the Appellate Division unanimously affirmed.  *People v. Fay*, 170 A.D.3d 404 (1st Dep't 2019) (ECF #1-3 at 22-26).  The court held that petitioner had failed to preserve a federal claim that the preclusion of the sleep disorder expert had deprived petitioner of his right to present a defense.  "Because [petitioner] never asserted that, as a matter of constitutional law, he was entitled to introduce the expert testimony," the court concluded, "his request to do so only raised questions of

---

[10] Petitioner also argued that the jury's verdict was against the weight of the evidence or not supported by legally sufficient evidence, that cumulative error had deprived petitioner of a fair trial, and that the sentence was excessive.  (SR 41-51, 61-81.)  However, none of these claims are asserted in the Petition.

state evidentiary law and trial management." *Id*. at 406.  The court declined to review the federal claim in the interest of justice but, "[a]s an alternative holding," rejected the claim on the merits. *Id*. (citing *Crane v. Kentucky*, 476 U.S. 683 (1986)).

With respect to the state law claim, the court held that the trial court had not abused its discretion in denying petitioner's mid-trial request to call the expert. *Id*. at 405-06.  The court concluded that the "untimeliness of the request by itself . . . warranted denial" because, prior to allowing the proposed expert to testify, the lower court would have had to conduct a *Frye* hearing and to permit the People additional time to obtain their own expert for purposes of rebuttal.  The court rejected as unpreserved petitioner's argument that no *Frye* hearing was required because the proffered opinion testimony was based solely on the witness's personal experience, "rather than explanation of a scientific theory."

The court further noted that, to whatever extent petitioner had provided the People with prior notice of intent to call a sleep expert, it was "inadequate under the circumstances," and that, in any event, petitioner had not offered "any scientific basis" for the expert's testimony.  *Id*.  As an alternative holding, the court concluded that "there is no evidence that the proposed expert had any experience with the proffered theory." *Id*. at 406.

Shortly after affirmance, petitioner moved for reargument of the appeal based on the January 17, 2018 jury selection transcript containing a brief discussion of Dr. Thorpe's testimony, *see supra* at 12-13, which counsel had "recently acquired." (SR194-249.)  Counsel explained that, when perfecting the appeal, he had omitted

17

transcripts of voir dire from the record on appeal after confirming with trial counsel that there were no appealable issues as to jury selection.   Counsel did so, he explained, in order to mitigate the mounting costs of the appeal.  (SR202-03.) Following affirmance, however, counsel had obtained the relevant transcript after being informed by petitioner's mother that the expert issue had been discussed during jury selection.

Counsel argued that the transcript supported preservation of the state law claim regarding preclusion of the expert witness. (SR205-06.)  Separately, counsel argued that the Appellate Division had overlooked petitioner's argument, raised for the first time in a reply brief, that a constitutional claim was "inherent" in any challenge to the exclusion of expert testimony.   (SR207.)   The People opposed reargument (SR250-63) and, in July 2019, the Appellate Division denied the motion (SR264).

Petitioner filed a counseled application to the New York Court of Appeals seeking leave to appeal three issues related to the preclusion of expert testimony: (1) whether petitioner was required to explicitly preserve a constitutional claim, or whether any challenge to preclusion of an expert "ipso facto implicates the Sixth Amendment and" New York State Constitution (SR266, 275-78); (2) whether a *Frye* hearing was necessary in light of petitioner's proffer that the expert would testify solely based on his personal experience (SR266, 278-79); and (3) whether the trial court should have considered a sanction short of preclusion (SR266, 279-80).  The

People opposed leave (SR305-09) and, on August 20, 2019, the Court of Appeals denied the leave application. *People v. Fay*, 34 N.Y.3d 930 (2019) (SR310).

## ARGUMENT

**The expert testimony claim is procedurally barred on adequate and independent state law grounds. In any event, the Appellate Division's rejection of the claim on the merits was a reasonable application of clearly-established Supreme Court law.**

Petitioner's claim that the trial court's preclusion of Dr. Thorpe's testimony violated his right to present a defense is procedurally barred on adequate and independent state law grounds because the Appellate Division's holding that the claim was unpreserved was a straightforward application of well-established state law. This Court should decline to reach the merits of the claim on that basis.

In any event, petitioner is not entitled to habeas relief because the trial court's preclusion of the expert was correct as a matter of state law and the state rule is not disproportionate to the purpose it is designed to serve. Further, the state court reasonably concluded that preclusion of the proffered expert did not deprive petitioner of his constitutional right to present a defense. Accordingly, petitioner is not entitled to habeas relief.

## A.    The expert testimony claim is procedurally barred

The Appellate Division expressly rejected petitioner's constitutional claim as procedurally barred under state law. Specifically, the Appellate Division held that

19

petitioner "never asserted that, as a matter of constitutional law, he was entitled to introduce the expert testimony." *Fay*, 170 A.D.3d at 406.   Petitioner offers no legitimate basis for excusing this firmly established procedural bar, which is regularly followed in New York courts with respect to claims similar to petitioner's. Accordingly, the Court should reject the claim as procedurally barred.

### 1. The Appellate Division's reliance on the contemporaneous objection rule was an adequate and independent state law bar.

At trial, petitioner did not argue that his right to present a defense required that he be permitted to call the expert witness.  Instead, petitioner's argument was limited to the sufficiency of the notice he had previously provided to the People.[11] Specifically, trial counsel argued that he had told the prosecutor "at least a couple of weeks" prior that Dr. Thorpe would potentially be called to opine on "the pharmacological effects of alcohol."  (T.984-85.)

Because petitioner framed his objection solely in terms of state evidentiary law requiring sufficient notice of novel expert testimony, he did not call upon the trial court to consider whether his constitutional right to present a defense provided a separate basis to admit the testimony.  Accordingly, he did not comply with N.Y.

_____

[11] As the trial court explained to experienced defense counsel, the novel theories underlying the proffered expert testimony clearly would require a hearing to determine whether they satisfied the state standard for admissibility. *See supra* at 14 n.9. Accordingly, counsel was required to make the proffer to the court "in a written form with plenty of notice. . . ." (T.986-87.)  *See, e.g.*, *Bedessie*, 19 N.Y.3d at 152-53; *People v. LeGrand*, 8 N.Y.3d 449 (2007).

C.P.L. § 470.05(2), which provides that a claim of error can be preserved for appellate review on the law only if the objecting party: makes a specific protest at a time when the trial court has an opportunity to correct the error; lodges a protest and the trial court expressly decides the issue later raised on appeal, or; either expressly or impliedly sought or requested a particular ruling or instruction.

As a general rule, a federal habeas court will not review a claim rejected by a state court when that court's decision is based on a state law ground that is both independent of the federal question and adequate to support the judgment. *See Walker v. Martin*, 562 U.S. 307, 315 (2011); *Beard v. Kindler*, 558 U.S. 53, 55 (2009); *Coleman v. Thompson*, 501 U.S. 722, 720 (1991). Here, the Appellate Division's holding that petitioner failed to comply with New York's contemporaneous objection, or preservation, rule constituted a state law ground that was independent of the federal issue. *See Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011); *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) ("the Appellate Division's express reliance on the state's contemporaneous objection rule in rejecting [petitioner's] appeal constitutes an 'independent' state law ground for that decision") (*citing Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999).

The Appellate Division's ruling was also consistent with settled state law, and its application here was adequate to preclude review of the federal claim. A state law ground supporting a decision will generally be deemed adequate to foreclose habeas review if it is "firmly established and regularly followed" in the state. *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *James v. Kentucky*, 466 U.S 341, 348 (1984). The Supreme

Court has applied the adequate and independent state law doctrine to state contemporaneous objection rules similar to New York's. *See Osborne v. Ohio*, 495 U.S. 103, 123 (1990) (habeas petitioner's failure to comply with Ohio's contemporaneous objection rule "constitutes an independent and adequate state-law ground" preventing merits review of due process claim); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (habeas petitioner who has failed to comply with a State's contemporaneous objection rule at trial must satisfy cause and prejudice test to obtain review of defaulted constitutional claim); *accord Murray v. Carrier*, 477 U.S. 478, 485-92 (1986). Similarly, the Second Circuit has long recognized that New York's contemporaneous objection rule is a firmly established and regularly followed procedural rule. *See*, *e.g.*, *Downs*, 657 F.3d at 104 (2d Cir. 2011); *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007); *Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir. 1991).

**2.    Application of the contemporaneous objection rule to the circumstances here was straightforward and in no way "exorbitant".**

Contrary to petitioner's claim, the Appellate Division's application of the contemporaneous objection rule to his right to present a defense claim was not

22

"exorbitant" and, therefore, inadequate to bar the claim.[12]   (MOL at 14-37.)   To be sure, an exorbitant application of a state rule – that is, an application not "well within the parameters of [the rule's] routine and generally unquestionable" scope – is inadequate to preclude habeas review of a federal claim.   *Whitley*, 642 F.3d at 288; *accord Orr v. Hulihan*, No. 11 Civ. 0501 (RMB)(THK), 2012 U.S. Dist. LEXIS 90122, at *28-29 (S.D.N.Y. Jan. 23, 2012).   However, the trial court's application of the preservation rule here was a straightforward application of well-established state law.

The Second Circuit has identified three "guideposts" – as opposed to "exclusive 'factors'" – for assessing a state court's application of a generally sound rule.   *Pierotti v. Walsh*, 834 F.3d 171, 177 (2d Cir. 2016); *accord Whitley*, 642 F.3d at 287-88; *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).   These guideposts are: (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner "substantially complied" with the rule given "the realities of trial," and, therefore, whether

---

[12] To the extent that petitioner challenges the Appellate Division's conclusion that the offer of expert testimony was untimely (MOL at 10-14), that finding was made with respect to the "state evidentiary law and trial management" claim petitioner actually raised through his general objection, *Fay*, 170 A.D.3d at 406, not the Sixth Amendment claim asserted in the Petition.

demanding perfect compliance with the rule would serve a legitimate governmental interest. *Id*.

Here, the first guidepost is inapplicable because "the violation of the contemporaneous objection [rule] did not occur until petitioner attempted to raise his Sixth Amendment claim before the Appellate Division." *Polk v D.O.C.C.S. Commr.*, No. 15 Civ. 4979 (VSB)(HBP), 2018 U.S. Dist. LEXIS 52304, at *20-21 (S.D.N.Y. Mar. 27, 2018) (citing *Garvey v. Duncan*, 485 F.3d 709, 719 (2d Cir. 2007)).

As to the second guidepost, New York case law requires compliance with the contemporaneous objection rule to preserve a claimed violation of the constitutional right to present a defense claim for review on the law. *See, e.g.*, *People v. Every*, 29 N.Y.3d 1103-04 (2017) (defendant's claim that trial court "deprived him of his constitutional right to present a defense by excluding certain evidence" was unpreserved); *People v. Lane*, 7 N.Y.3d 888, 889 (2006) (although challenge to trial court's evidentiary ruling limiting defendant's testimony was preserved for appeal, claim that the ruling violated defendant's constitutional rights to a fair trial and to present a defense was unpreserved); *People v. Angelo*, 88 N.Y.2d 217, 222 (1996) (defendant failed to preserve claim that trial court ruling limiting testimony of defense expert violated his constitutional due process rights and his right to present a defense); *People v. Gonzalez*, 54 N.Y.2d 729, 730 (1981) (constitutional claim based

on preclusion of grand jury testimony of unavailable witness "not preserved for our review by timely objection").[13]

Indeed, the Second Circuit has held specifically that application of the contemporaneous objection statute to a "constitutional right to present a defense" claim suffices to bar habeas review. *Liggan v. Senkowski*, 652 F. App'x 41, 42-44 (2d Cir. 2016) (petitioner's "general objections were insufficient to preserve his constitutional claims under New York law") (citations omitted); *accord Grant v. Racette*, No. 14 Civ. 3446, 2019 U.S. Dist. LEXIS 35269, at *31-32 (E.D.N.Y. Mar. 4, 2019) (contemporaneous objection rule "is firmly established and regularly followed with respect to the claim that the petitioner has been denied the constitutional right to present a defense"); *Schafer v. LaVallee*, No. 12 Civ. 0419, 2013 U.S. Dist. LEXIS 132870, at *20-21 (W.D.N.Y. Sept. 17, 2013) (same).

Third, petitioner did not substantially comply with the requirement that he advise the court that Dr. Thorpe's testimony was necessary for the presentation of his defense. Indeed, petitioner did not comply at all: his arguments concerning Dr. Thorpe's testimony were limited exclusively to the timeliness of the request, not the

---

[13] *Accord People v. Goldstein*, 14 A.D.3d 32, 35 (1st Dep't 2004), *rev'd on other grounds*, 6 N.Y.3d 119 (2005) (constitutional claim based on trial court's preclusion of expert witness "was never raised below and is thus unpreserved"); *People v. Garcia*, 170 A.D.3d 462, 464 (1st Dep't 2019) (holding that petitioner failed to preserve constitutional claims regarding preclusion of expert witness); *People v. McCullough*, 141 A.D.3d 1125, 1126 (4th Dep't 2016) (same); *see generally People v. Bruno*, 111 A.D.3d 488, 491 (1st Dep't 2013) ("general" or "evidentiary" objections to the preclusion of evidence insufficient to preserve a constitutional claim).

importance of the proffered testimony to petitioner's defense.   (T.984-87.)
Accordingly, despite having ample opportunity to do so, counsel failed to alert the
trial court that preclusion of the testimony would impair the defense.

Petitioner's attempts to establish that this was an exorbitant application of the
preservation requirement are unpersuasive.  He argues first that he was not required
to explicitly invoke the Sixth Amendment or the right to present a defense in order
to comply with New York's contemporaneous objection rule.  (MOL at 18-19.)  To be
sure, no specific talismanic language was required to inform the court that counsel
believed Dr. Thorpe's testimony was crucial to a fair trial.  However, as noted, counsel
did not say *anything* to the trial court that conveyed this idea.  Rather, counsel argued
perfunctorily that he had satisfied whatever duty he had to fairly notify his adversary
and the court of the nature of the proffered defense.  (T.984-86.)

Next, petitioner contends that there was "nothing to be gained" from alerting
the court to his claim because, six days earlier, trial counsel had explicitly invoked
petitioner's right to present a defense – and cited *Chambers v. Mississippi*, 410 U.S.
284 (1973) – in connection with objections to the exclusion of unrelated hearsay
evidence.  (MOL at 18-21; T. 432, 437-38, 441.)  However, a criminal defendant in
New York's courts cannot, through an initial constitutional objection to the exclusion
of evidence of another sort, thereby automatically bootstrap a constitutional claim to
any general objection he makes thereafter to the exclusion of other evidence.
Petitioner cites no authority for such a rule, and respondent is aware of none.  Indeed,
trial counsel's earlier preservation of a federal claim with respect to the other

evidence only highlights his awareness that he was required to do the same with respect to the expert testimony.[14]

Petitioner also argues at length that, because the right to present a defense is implicated whenever a witness is precluded from testifying, New York law did not (or could not) require that he explicitly invoke that right  (MOL at 23-31), but he is mistaken.   Not every preclusion of exculpatory evidence amounts to a Sixth Amendment violation, *see Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988), and it is up to the defense to alert the trial court that application of a state evidentiary rule to preclude any particular witness will impede his defense.   That various state court decisions have recognized a Sixth Amendment limit to a court's discretion in applying state evidentiary rules, *e.g People v. Berk*, 88 N.Y.2d 257 (1988), does not relieve a defendant of this obligation, despite petitioner's claim to the contrary. A court which fails to consider these limits adequately may commit constitutional error, but in the absence of an objection from the defense alerting the court to that fact, the error is unpreserved for review on the law. In such a case, the Appellate Division retains the

---

[14] Petitioner also argues untenably that Justice Jackson's statement during the earlier exchange that, "[w]e're not talking about constitutional rights," (T.432-33) was a blanket admonition that the judge "did not want to hear any constitutional arguments" for the remainder of trial.  (MOL 20-21.)  The court's statement applied to the particular arguments being made with regard to other evidence under discussion at that time.   The court said nothing to imply that constitutional arguments were off-limits for the remainder of the proceedings, and said nothing to deter petitioner from invoking the constitution or right to present a defense during the proffer of Dr. Thorpe's testimony six days later.

discretionary authority either to review such an unpreserved error in the interest of justice or to reach the merits of the claim in the alternative, as the court did here. *See Fay*, 170 A.D.3d at 406.[15]

The Second Circuit rejected an argument similar to petitioner's in *Wright v. Duncan*, 500 Fed. App'x 36, 38 (2d Cir. 2012). In *Wright*, the petitioner claimed that invocation of the contemporaneous objection rule was exorbitant because the trial court should have understood that defense counsel was raising a due process objection, even though he did not explicitly do so. The court declined to exempt the petitioner from the operation of the procedural bar on those facts, noting that "the New York Court of Appeals has long rejected invitations to review constitutional arguments purportedly raised implicitly in the trial court." *Id*. at 38 (citing *Angelo*, 88 N.Y.2d at 222). Accordingly, the court held that the application of the contemporaneous objection rule under those circumstances served the legitimate interests advanced by the rule: requiring parties to alert trial judges to potential error at a time when there is still an opportunity to cure it; and preventing the party who fails to raise a timely objection from "sandbagging" the opposing party and the trial

_____

[15] Nor is petitioner's contention supported by the fact that New York recognizes some errors to be so fundamental to a fair trial that they need not be preserved by objection, *e.g. People v. Ciaccio*, 47 N.Y.2d 431 (1979) (holding the absence of the defendant and counsel during supplemental jury instructions to be such an error), also relied upon by petitioner. (MOL at 28-29.) The New York Court of Appeals has never included infringements on the right to present a defense within the "tightly circumscribed class" of errors exempt from New York's preservation requirement. *People v. Mack*, 27 N.Y.3d 534, 540-41 (2016).

court on appeal. *Id.*; *accord Osborne*, 495 U.S. at 123 ("The state [contemporaneous objection rule] . . . serves the State's important interest in ensuring that counsel do their part in preventing trial courts from" committing error at trial); *Wainwright*, 433 U.S. at 89 (cautioning courts about the "sandbagging" that procedural forfeiture rules reasonably discourage); *Whitley*, 642 F.3d at 288; *Cotto*, 331 F.3d at 245; *Garcia*, 188 F.3d at 82. Requiring a party to state his federal constitutional claim with particularity served these purposes. *Wright*, 500 Fed App'x at 38.

As in *Wright*, here petitioner argued for the admission of the expert testimony only on the ground that he had provided sufficient notice. He interposed only a general objection to the court's ruling. (T.984-85.) At no time did he say anything to alert the trial court to the claim he now asserts – that preclusion of Dr. Thorpe's testimony would "undermine" his defense. For that reason, the trial court was not afforded a timely opportunity to consider that argument in connection with its decision. Under these circumstances, invoking the preservation requirement was entirely consistent with its purposes.

Petitioner also argues in the same vein that the trial court was on notice of a constitutional claim because, more than a decade earlier, she had written about the Sixth Amendment implications of precluding psychiatric evidence in another case. (MOL at 25-26) (citing *People v. George O.*, 10 Misc. 3d 462, 464-65 (1st Dep't App. Term 2005). Notwithstanding Justice Jackson's familiarity with a particular rule of the law, petitioner still had the obligation to inform the judge that he believed the rule applied here. Excusing this obligation simply because the judge at some point

discussed the rule of law in connection with a different case would leave little, if anything, left of New York's preservation rule.

Lastly, petitioner's argument that the Second Circuit's recent decision in *Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019), "fully supports" an exorbitant application of the preservation rule (MOL at 34) is puzzling.  That case presented no issue of adequate and independent state grounds because the constitutional claim was "fairly presented to the trial court" and the Appellate Division denied the claim on the merits alone.  *Scrimo*, 935 F.3d at 110, 112 (citing *People v. Scrimo*, 67 A.D.3d 825 (2d Dep't 2009)).  In *Scrimo*, the trial court excluded defense witnesses on the ground that their testimony constituted improper extrinsic proof on a collateral issue. On habeas, the petitioner argued that the ruling deprived him of his Sixth Amendment right to present a defense. A threshold question was whether the petitioner had fairly alerted the state court to the relationship between the proffered testimony and the defense theory the petitioner had opened on. The Second Circuit held that he had, and that the trial court "should have understood" the argument. *Id*. at 114.

Here, in contrast, petitioner confined his argument to the issue of notice, and there was no reason why the court "should have understood" him to be arguing the entirely distinct point that exclusion of the witness would impede his right to present his defense.  Accordingly, *Scrimo* does not support petitioner's claim that the Appellate Division wrongly applied the preservation rule to an argument the defense never made.  Therefore, the expert witness claim is procedurally defaulted.

### 3.     Petitioner cannot avoid application of the procedural bar.

This Court may not review a procedurally defaulted claim unless petitioner can show "cause for the default and prejudice from a violation of federal law," *Martinez*, 566 U.S. at 10 (citations omitted); *Coleman*, 501 U.S. at 729-30, or that "a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013) (fundamental miscarriage of justice exception "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons") (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  Here, petitioner does not, and cannot, demonstrate either.

Petitioner fails to allege a miscarriage of justice.  (MOL at 37 n.7.) Such cases are limited to a "narrow class" of "truly extraordinary" cases presenting "credible and compelling claims of actual innocence."  *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *Schlup v. Delo*, 513 U.S. 298, 315, 338 (1995)).  The Petition here is devoid of any allegations of "new evidence" tending to show that petitioner is actually innocent of his crimes.  *Schlup*, 513 U.S. at 325; *accord House v. Bell*, 547 U.S. 518, 536-37 (2006); *Hyman*, 927 F.3d at 657 (New evidence "must be sufficiently credible and compelling to allow a federal court to conclude that 'more likely than not, in light of the new evidence, no reasonable juror would find [petitioner] guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'") (quoting *House*, 547 U.S. at 538, and citing *Schlup*, 513 U.S. at 327).

31

Nor has petitioner demonstrated cause for his procedural default.  Petitioner claims that trial counsel "understandably believed" he had lodged a constitutional objection to the preclusion of the expert by invoking petitioner's right to present a defense *six days earlier*, in connection with unrelated objections to the exclusion of unrelated hearsay evidence.  (MOL at 37 n.7; T. 432, 437-38, 441.)  This argument simply repackages petitioner's earlier meritless claim that he was not required to lodge a contemporaneous constitutional objection to the preclusion of Dr. Thorpe's testimony, and it fails for the same reasons.

*Gutierrez v. Smith*, 702 F.3d 103 (2d Cir. 2012), on which petitioner relies, is inapposite.  There, the Second Circuit found cause for trial counsel to lodge only a general objection to the legal sufficiency of a depraved indifference murder conviction because a more specific objection would have been futile in light of New York law on depraved indifference murder at the time of trial, and trial counsel was not obliged to anticipate a subsequent "unlikely development" in New York law on that topic.  *Id.* at 112.  Here, in contrast, a specific objection that preclusion of the expert violated petitioner's right to present a defense would not have been not futile; petitioner identifies no significant and unforeseeable change in the law affecting the merits of the claim.  Nor does petitioner identify any other "'objective factor external to the defense [that] impeded counsel's efforts to comply" with New York's contemporary objection rule.  *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)) (alteration in *Gutierrez*).

Because petitioner fails to demonstrate cause, the Court need not address whether petitioner was prejudiced. *See Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Black v. Griffin*, No. 15 Civ. 8112 (ALC), 2019 U.S. Dist. LEXIS 7237, at *62 (S.D.N.Y. Jan. 11, 2019); *Dzebolo v. Perez*, No. 07 Civ. 3421 (ER)(GAY), 2012 U.S. Dist. LEXIS 144936, at *32 (S.D.N.Y. Jan. 12, 2012).   In any event, there is no prejudice because preclusion of the expert's testimony was an appropriate exercise of the trial court's discretion and did not violate petitioner's constitutional right to present a defense, as demonstrated below.[16]

## B.    The expert testimony claim is meritless.

Were this Court to conclude that petitioner's claim is not procedurally barred and review it on the merits, it should nonetheless conclude that petitioner is not entitled to habeas relief.   The Appellate Division correctly concluded that, as a matter of "state evidentiary law and trial management," the trial court had properly exercised its discretion to preclude the proffered expert testimony.   *Fay*, 170 A.D.3d at 405-06, and that holding was proportionate to the interests served by state law.

---

[16] Petitioner argues that he can establish prejudice because, "given the facts of this case," petitioner "had a basis to believe" that S.D. was a consenting sexual partner.   (MOL at 37 n.7.)   Petitioner's argument relies on the assumption – unsupportable on this record – that, had counsel asserted a constitutional objection, the expert would have been permitted to testify.

33

Even if that state law ruling were incorrect, preclusion did not violate petitioner's constitutional right to present a defense because Dr. Thorpe's testimony would not have created reasonable doubt. The jury heard petitioner's defense through his own testimony, as well as other evidence highlighted by the defense throughout trial. Given the many implausible aspects of petitioner's account, there is little, if any, possibility that the jury would have credited the defense even if the reliability of Dr. Thorpe's proffered testimony been properly established and the evidence received. In any event, there is nothing in the record showing that Dr. Thorpe's proffered testimony was supported by scientific evidence or that the expert was qualified to render an opinion on this subject. Accordingly, the Petition should be denied.

### 1. Clearly-established Supreme Court law.

The Appellate Division rejected petitioner's expert witness claim on the merits, as petitioner concedes. (MOL at 39-40.) Accordingly, the standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See* 28 U.S.C. § 2254(d); *Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012). To obtain habeas relief under AEDPA, petitioner must prove that the Appellate Division's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."[17]  28 U.S.C. § 2254(d).  To satisfy AEDPA's high bar for habeas relief, a petitioner must establish that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011).

A person accused of a crime has a right, grounded in the Fourteenth Amendment's due process clause and the Sixth Amendment's rights of confrontation and compulsory process, to a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003).  However, this right is subject to "reasonable restrictions."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).   States can exclude evidence through the application of rules that serve the interests of fairness and reliability in the ascertainment of guilt and innocence.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  A criminal defendant, therefore, "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

In the Second Circuit, courts utilize a two-step analysis to evaluate a claim by a habeas petitioner that the trial court's exclusion of evidence deprived him of the

---

[17] Petitioner correctly recognizes that the "unreasonable application" prong of the standard applies here.  (MOL at 39.)

right to present a defense.  First, the court determines whether the evidentiary ruling was proper under state law.  *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006).  While habeas relief is not available for state law errors, *id.* (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)), the analysis helps the court determine "'whether the appellate division acted within the limits of what is objectively reasonable'" in rejecting the constitutional claim.  *Id.* (quoting *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000)).

If evidence was correctly excluded pursuant to a state evidentiary rule, the second step involves a "limited" inquiry into "whether the evidentiary rule is 'arbitrary' or 'disproportionate to the purposes it is designed to serve.'"  *Hawkins*, 460 F.3d at 244 (quoting *Scheffer*, 523 U.S. at 308); *accord Redding v. NY State Dep't of Corr.*, No. 17 Civ. 7075 (CS)(JCM), 2020 U.S. Dist. LEXIS 8765, at *40-41 (S.D.N.Y. Jan. 16, 2020).  A state rule fails this test "only where it has infringed upon a weighty interest of the accused."  *Scheffer*, 523 U.S. at 308 (citing *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)).  If evidence was wrongfully excluded under state law, the court asks whether the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist.  *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996) (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *accord Hawkins*, 460 F.3d at 244; *Redding*, 2020 U.S. Dist. LEXIS 8765, at *40.

2.   **The Appellate Division correctly upheld the trial court's discretionary preclusion of expert testimony.**

Only the limited inquiry – whether the state rule was arbitrary or disproportionate to its purposes – is warranted here, because the preclusion of Dr. Thorpe's testimony was a correct application of state rules requiring the timely notice and reliability of expert testimony.

a.   **Relevant State Law**

In order to be admissible, expert testimony must be "relevant to an issue in the case." *People v. Allweiss*, 48 N.Y.2d 40, 50 (1979); *accord People v. Berry*, 27 N.Y.3d 10, 20 (2016). "[E]xpert opinions which are contingent, speculative, or indicative that something is merely possible are lacking in probative force and therefore inadmissible." *People v. Roth*, 139 A.D.2d 605, 607 (2d Dep't 1988); *accord People v. Robinson*, 174 A.D.2d 998, 999 (4th Dep't 1991).

In addition, when scientific principles are involved, expert testimony must have "the requisite scientific basis." *People v. Bennett*, 79 N.Y.2d 464, 473 (1992). The expert must be possessed of the requisite skill, training, knowledge or experience from which it can be assumed that the information and opinions he imparts are reliable. *Matott v. Ward*, 48 N.Y.2d 455, 459 (1979). And the witness' expertise must pertain to the specific question asked, and not merely to the general topic under discussion. *See*, *e.g.*, *People v. Heidelmark*, 214 A.D.2d 767, 770 (3rd Dep't 1995); *People v. Barrett*, 189 A.D.2d 879, 881 (2nd Dep't 1993). The decisions as to whether a witness qualifies as an expert, as well as the jury's need for expert testimony, are

37

left to the sound discretion of the trial court.  *See Werner v Sun Oil Co.*, 65 NY2d 839, 840 (1985); *accord People v. Santiago*, 17 N.Y.3d 661, 668-69 (2011); *People v. Mooney*, 76 N.Y.2d 827, 828 (1990); *People v. Aphaylath*, 68 N.Y.2d 945, 947 (1986); *People v. Cronin*, 60 N.Y.2d 430, 433 (1983).

Given the Appellate Division's finding that petitioner's expert proffer amounted to a request for a "lengthy midtrial continuance," *Fay*, 170 A.D.3d at 405, New York law governing continuances is also at issue.  As with the admission of expert testimony, adjournment requests are left to the court's sound discretion.  *See*, *e.g.*, *In re Anthony M.*, 63 N.Y.2d 270, 283-84 (1984) (citing *People v. Singleton*, 41 N.Y.2d 402, 405 (1977), and *People v. Oskroba*, 305 N.Y. 113, 117 (1953)); *compare Morris v. Slappy*, 461 U.S. 1, 11 (1983) ("broad discretion must be granted trial courts on matters of continuances").

### b.   The trial court acted within its discretion to preclude the testimony based on lack of notice

Here, the Appellate Division upheld the trial court's preclusion of Dr. Thorpe's testimony as well within the latter's discretion.  First, the court concluded correctly that petitioner had not provided the People with timely notice of the expert's proposed testimony.  The Appellate Division concluded that any "advance notice" petitioner had provided the People regarding the content of the proffered testimony "was inadequate under the circumstances."  *Fay*, 170 A.D.3d at 405.  This factual conclusion is "presumed to be correct," and petitioner bears the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

He cannot do so.  The only information trial counsel had provided to the prosecutor prior to trial was that he might be "hiring his sleep expert," a statement so vague that the prosecutor assumed that petitioner was contemplating a "sleepwalking" defense, that is, that petitioner was unaware of his own actions. (1/17/2018 Tr. at 2; T. 985; SR255-25.)  When the subject came up during jury selection, the only additional information counsel provided was that Dr. Thorpe's area of expertise included the pharmacological effects on "sleep [of] alcohol, drugs, things like that."  (1/17/2018 Tr. at 2.)  While counsel promised at that time to provide the prosecutor with Dr. Thorpe's C.V., he did not do so until the following week, in the middle of the People's case.  (T. 568.)  When the prosecutor followed up by e-mail inquiring into the substance of the proposed expert testimony, trial counsel did not respond.  (T. 985.)

Accordingly, by the time petitioner attempted to call Dr. Thorpe as a witness – after his last witness had testified, at the end of a two-week trial – he still had not informed the prosecutor, much less the court, the substance of Dr. Thorpe's proposed testimony.  And when he finally did make the proffer it was ambiguous and internally inconsistent, suggesting both that S.D. was awake or asleep during the encounter. Even if this confusing description was adequate to alert the People of the substance of the testimony, the People would not, without a substantial adjournment, have been able to test the scientific validity of that defense or find a competing expert to refute

39

it.  Accordingly, petitioner cannot rebut the presumption of correctness attached to the state court finding that petitioner had provided insufficient notice.[18]

Petitioner correctly notes that the statutory expert notice provisions under New York Criminal Procedure Law did not apply, as petitioner was not offering "psychiatric evidence" to support a defense of mental infirmity.  *See* N.Y. C.P.L. § 250.10 (MOL at 47.)  However, in enacting § 250.10, New York recognized that a defendant's "surprise" request to put on such a defense would unfairly disadvantage the People by depriving a prosecutor of a sufficient opportunity to refute it.  *Berk*, 88 N.Y.2d at 264.  The trial court's broad discretion to grant or deny a mid-trial continuance easily encompassed the freedom to take those same considerations into account.

### c.   The trial court acted within its discretion to preclude the testimony based on lack of reliability

Moreover, even if the Appellate Division's ruling that the expert proffer was untimely was an abuse of discretion, its alternative preclusion on the merits was not. Despite being given the opportunity to do so, trial counsel never met his obligation to demonstrate that there was a generally accepted basis in the scientific community for the reliability of that proposed expert testimony, whatever it was.  *See Frye*, 293 F. at 1013-14; *Bennett*, 79 N.Y.2d at 473.  Specifically, counsel never established a

---

[18] To the extent the discussion of the expert during voir dire was not before the Appellate Division when it first heard the appeal, that court had the full record at the time it denied reargument.  (SR264.)

scientific basis for either of the mutually exclusive theories he described to the trial court: that a sleeping intoxicated person could participate in physical activity such that, to outward appearances, they were "awake and conscious," or that an awake intoxicated person could participate in such activity "while thinking they're asleep." (T.983.)   Nor did counsel establish why Dr. Thorpe – an expert in sleep disorders generally – was qualified to provide expert opinion on either theory. *Heidelmark*, 214 A.D.2d at 770; *Barrett*, 189 A.D.2d at 881.   Petitioner never identified any studies that Dr. Thorpe had completed, or articles in any scientific journals on the topic of alcohol causing people "to engage unconsciously in physical activity while appearing to be awake, and to wake up unaware of the activity." *Fay*, 170 A.D.3d at 405.   When the prosecutor raised this dearth of support during trial, and invited counsel to direct her to any such studies (T.986), counsel's response was silence.   Petitioner has remained silent on the subject throughout the extensive appellate and collateral proceedings following conviction.   Accordingly, the trial court was well within its discretion to preclude the testimony. *See*, *e.g.*, *People v. Johnston*, 273 A.D.2d 514, 517-18 (3rd Dep't 2000) (affirming preclusion of expert testimony concerning children's susceptibility to suggestive interrogation where the record supported trial court's conclusion that such opinions were not generally accepted).

Petitioner argues, as he did on appeal, that he was not required to satisfy the *Frye* "general acceptance" test because he sought to introduce the expert's "personal opinions" only. (MOL at 45-46.) While the Appellate Division rejected that argument as unpreserved, *Fay*, 170 A.D.3d at 405-06, it is also meritless.   To be sure, *Frye* in

not implicated when expert testimony is "based on [the expert's] own personal 'experience' – meaning what he had observed, heard and read about particular cases." *People v. Oddone*, 22 N.Y.3d 369, 375 (2013) (homicide case where deputy medical examiner was permitted to estimate duration of neck compression based on discoloration on victim's face) (MOL at 46). However, unlike in *Oddone*, petitioner offered Dr. Thorpe's testimony as a scientific theory of S.D.'s behavior as described by petitioner, not an expert opinion. There is no evidence, either in the record or the instant Petition, that this theory is scientifically accepted. In any event, the testimony was not admissible as an expert opinion, either, because petitioner never established that Dr. Thorpe had personal experience with people drinking alcohol and then engaging in physical activity while asleep (or while thinking they were asleep when they were awake).

Lastly, petitioner did not establish that the proposed expert testimony had any relevance to this case. There was no evidence to support a theory that S.D.'s alcohol use led her mistakenly to believe herself asleep as she consented to a sexual encounter with petitioner who, by all accounts, was a complete stranger to her, or to appear to be awake and consenting while she was in fact asleep. Several witnesses testified that S.D. did not appear intoxicated when they saw her shortly after the assault. (O'Brien: 331; Cebulski: 651-52; Queen: 738.) Thus, the testimony was also properly precluded as irrelevant, since it would not have rested on any "facts in evidence or personally known to the expert." *People v. Kaplan*, 167 A.D.2d 273 (1st

42

Dep't 1990); *accord People v. Engel*, 48 A.D.3d 340 (1st Dep't 2008); *People v. Banks*, 33 A.D.3d 385 (1st Dep't 2006).

> **3.  In any event, the Appellate Division reasonably concluded that preclusion of the expert testimony did not violate the Sixth Amendment.**
>
> > **a.  New York's rules regarding notice and qualification of experts are not arbitrary and disproportionate to their purposes**

Because the trial court properly precluded Dr. Thorpe's testimony as a matter of state law, this Court's inquiry is limited to whether state rules regarding mid-trial adjournment requests and *Frye*'s "general acceptance" test are arbitrary or disproportionate to the purposes they are designed to serve. *Scheffer*, 523 U.S. at 308; *Hawkins*, 460 F.3d at 244.  Petitioner does not attempt to make this showing; nor can he plausibly do so.

With respect to the trial court's denial of petitioner's implicit request for a "lengthy midtrial continuance," *Fay*, 170 A.D.3d at 405, that denial was necessary in light of the court's trial management burden of "assembling the witnesses, lawyers, and jurors at the same place at the same time." *Morris*, 461 U.S. at 11.  Shortly after precluding the evidence, the trial court expressed concern over keeping the jury longer than anticipated and, indeed, spoke with several jurors about extending their service into the following week.  (T.1008-19.)  In light of the jurors expressed concerns about the length of the trial, the denial of a further "lengthy" continuance was more than warranted.

The same conclusion is true with respect to the trial court's preclusion based on petitioner's failure to satisfy the *Frye* requirements.   New York courts have identified various purposes served by these requirements, including: (1) ensuring that an "expert's conclusion is based upon accepted scientific principles, rather than simply the expert's own unsupported beliefs;" (2) protecting juries "from being misled by expert opinions that may be couched in formidable scientific terminology but that are based on fanciful theories;" and (3) determining "whether the proffered expert opinion properly relates existing data, studies or literature to the plaintiff's situation, or whether, instead, it is connected to existing data only by the ipse dixit of the expert." *Lugo v. NY City Health & Hosps. Corp.*, 89 A.D.3d 42, 56-57 (2d Dep't 2011) (internal citations omitted); *accord Marso v. Novak*, 42 A.D.3d 377, 378-79 (1st Dep't 2007).

As previously discussed, petitioner has never provided any scientific basis for a theory of defense that consumption of alcohol could have caused S.D. "to engage unconsciously in physical activity while appearing to be awake, and to wake up unaware of the activity," *Fay*, 170 A.D.3d at 405, or to be mistaken about her state of consciousness.  Accordingly, preclusion of Dr. Thorpe's testimony was a proportionate response to all of the above purposes. *See Redding*, 2020 U.S. Dist. LEXIS 8765 at *45-47 (discretionary evidentiary ruling not unconstitutionally arbitrary or disproportionate where it was "not the kind of blanket exclusion rule that traditionally risks running afoul of the Constitution") (quoting *DeVaughn v. Graham*, No. 14 Civ. 2322, 2017 U.S. Dist. LEXIS 7640 (E.D.N.Y. Jan. 18, 2017)).

### b.   Preclusion of the expert testimony did not remove reasonable doubt

Even were the court to conclude – in the absence of any record evidence that the defense's theory was generally accepted in the relevant scientific community or that Dr. Thorpe was qualified to deliver that theory to the jury – that the testimony should have been received in evidence, petitioner would still be unable to show that, in the context of the entire record, that testimony would have created a reasonable doubt that did not otherwise exist. *Agurs*, 427 U.S. at 112; *Hawkins*, 460 F.3d at 244.

First, preclusion of Dr. Thorpe's testimony did not prevent petitioner from presenting his defense that he believed his sexual activity with S.D. was consensual. Dr. Thorpe's testimony, even if demonstrated to be sufficiently reliable to be admitted and accepted by the jury, would merely have made it theoretically possible for the jury to credit petitioner's testimony without having to conclude that S.D. was lying. But that possibility would not amount to reasonable doubt in light of petitioner's testimony, which was in many respects implausible and replete with incredible claims.

Notwithstanding S.D.'s testimony that petitioner was a complete stranger to her, petitioner claimed that he and S.D. had introduced themselves to each other briefly at the bar that night; no doubt, an attempt to explain why S.D. consented to sex with a man she had never met.   But S.D.'s version was corroborated by a contemporaneous text message from Slye to S.D. at the bar reading, "[l]et's go I got the key." (S.D.: 215, 233-34; People's Exh. 2H.)  Of course, if S.D. had been with Slye

when he obtained the keys from petitioner, there would have been no need for him to text her about that fact.

Petitioner also claimed not to remember having made nine cell phone calls to eight different numbers associated with prostitution shortly before climbing into the bed where S.D. lay sleeping (Fay: 871-72), notwithstanding that, a few minutes earlier, he had the presence of mind to retrieve a spare key from the doorman, unlock the apartment door and return to the lobby to give the key back.

The jury also heard petitioner's testimony that he climbed into bed with his friend and a women he did not know because he "just wanted to sleep in [his] own bed" (Fay: 806-07) – in the apartment of a family friend that he had only been staying in for a month.  (Fay: 792.)  Both the top bunk of that bed and a second living room couch were unoccupied.  (Fay: 848-49.)  If a good night's sleep had really been petitioner's objective, there were far more comfortable places than a narrow bed already occupied by two sleeping adults who were unclothed and had obviously engaged in sex.

Finally, the jury had every reason to reject petitioner's outlandish tale of consensual sex. The jury saw photographs of the twin-sized bunk bed surrounded by walls on three sides, and plainly recognized that it was implausible for petitioner and S.D. to have engaged in mutual oral sex and intercourse in the manner petitioner described – during which petitioner got out of the bed to obtain lubricant, returned to the bed and resumed intercourse (Fay: 807-10) – while a third, full-sized adult was also in the bed and remained asleep throughout.

46

The prosecution's case was compelling.  In addition to S.D.'s credible testimony on both direct and cross examination (T.210-37), the People's other witnesses established that her outcry was immediate – moments after the rape, S.D. woke Slye who observed that she was "screaming," "physically shaking" and "convulsing."  (Slye: 45-47, 50-51, 127; Sobell: 466, 515.)  The doorman on duty confirmed that, minutes after the assault, S.D. was "very emotional," crying hysterically and reporting that she had been raped.  (Queen: 727-28, 731.)  When police arrived a few minutes later, S.D. was inconsolable.  (Ponce: 406; Polanco: 529.)  The People introduced video surveillance from the building and medical evidence of S.D.'s revulsion at having been violated by a stranger while she was asleep. (T.64; O'Brien: 340-42.)

S.D. lacked any reasonable motive to falsely claim that the best friend of her occasional sexual partner had raped her.  By telling the truth about the sexual assault, S.D. subjected herself to hours in the hospital, the indignities of a rape kit and the public disclosure of embarrassing details about her personal life and sexual habits.  At trial, S.D. was required to relive some of the most traumatic events of her life.

On this record, the jury would not have been moved to accept petitioner's highly unlikely account based on Dr. Thorpe's testimony – in response to one or more "hypothetical questions . . . based on some of the evidence" (T.984) – that S.D. might have been asleep (or awake, but thinking she was asleep) when she engaged in the acts described by petitioner.  Accordingly, there was no possibility that the preclusion of that testimony removed reasonable doubt from the case.

### c.   The Appellate Division reasonably rejected the expert witness claim on the merits

As noted above, a defendant's constitutional right to present a defense is subject to "reasonable restrictions." *Scheffer*, 523 U.S. at 308; *accord Clark v. Arizona*, 548 U.S. 735, 770-71 (2006) ("the right to introduce relevant evidence can be curtailed if there is a good reason for doing that"); *Crane*, 476 U.S. at 689-90 ("we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability") (citing *Chambers*, 410 U.S. at 302 (1973)). The Appellate Division's holding that petitioner's constitutional claim lacked merit, *Fay*, 170 A.D.3d at 406, reasonably applied this precedent.  At a minimum, petitioner fails to establish that the Appellate Division's holding is a constitutional error "well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 102-03.  Accordingly, habeas relief is unavailable.

Recently, Judge Dearie of the Eastern District of New York rejected a habeas claim based on a trial court's preclusion of expert testimony on false confessions, explaining that "[t]here is no Supreme Court case recognizing a right to introduce" expert testimony on that subject.  *Mutterperl v. Griffin*, No. 13 Civ. 6028 (RJD), 2019 U.S. Dist. LEXIS 140386, at *23-24 (E.D.N.Y. Aug. 16, 2019).  Here, too, petitioner has identified no Supreme Court case recognizing a right to introduce expert testimony of the type offered by petitioner at trial.  Nor has he identified any Supreme Court precedent establishing that a defendant's right to present a defense is violated

48

where, as here, an expert's proffered opinions are offered for the first time late in the trial, requiring a lengthy trial delay in order to determine admissibility of the proposed testimony.

Accordingly, because there is "[n]o holding" from the Supreme Court on the question presented, *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and Supreme Court cases "give no clear answer" to that question, the Appellate Division's rejection of the expert witness claim could not be contrary to nor an unreasonable application of clearly established federal law, and habeas relief is "unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008); *accord Watson v. Supt.*, No. 18 Civ. 0835 (VEC)(GWG), 2019 U.S. Dist. LEXIS 751, at *24-25 (S.D.N.Y. Jan. 2, 2019); *accord Redding*, 2020 U.S. Dist. LEXIS 8765 at *45-47; *Singh v. Greene*, No. 10 Civ. 4444, 2011 U.S. Dist. LEXIS 54417, at *57-59 (E.D.N.Y. May 20, 2011) (preclusion of expert testimony did not violate Sixth Amendment where, due to lack of notice, "petitioner placed the prosecution at a substantial disadvantage" and, in any event, "no permissible use of the evidence would have created a reasonable doubt of guilt given the record as a whole").

In support of his claim, petitioner relies primarily on the Second Circuit's recent decision in *Scrimo v. Lee*. (MOL 49-52.) *Scrimo* cannot independently provide a basis for habeas relief because "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and, accordingly, "cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (quoting § 2254(d)(1)); *accord Jackson v. Conway*, 763 F.3d 115, 134

(2d Cir. 2014); *Layne v. Capra*, No. 17 Civ. 6736 (AT)(GWG), 2018 U.S. Dist. LEXIS 159386, at *17 (S.D.N.Y. Sep. 14, 2018).

In any event, *Scrimo* is easily distinguishable.  In that case, the Second Circuit found that the petitioner's right to present a defense had been abridged by the exclusion of lay testimony in support of the petitioner's third-party culpability defense.  At trial, the People's evidence established that both petitioner and another man, Kane, were present in the apartment of Ruth Williams when she was strangled to death.  Kane testified for the People that Scrimo went to Williams' apartment to have sex with her but killed her after she balked and, in the process, made disparaging comments about the petitioner's wife.  *Scrimo*, 935 F.3d at 106-08.

In contrast, the defense theory was that Kane was responsible for the murder, and that he had killed Williams over a cocaine sale gone wrong.  While Scrimo did not testify at trial, he attempted to call three lay witnesses to establish that Kane was a drug dealer, that Williams had bought drugs from Kane on a prior occasion and that Kane had previously choked another female drug customer after she tried to get her money back.  *Id*. at 109-10.  The trial court excluded these witnesses as collateral and the state courts upheld that ruling on appeal.

The Second Circuit concluded that preclusion of the three fact witnesses was erroneous under state law because their evidence "was the opposite of collateral – it went to the obvious and decisive question of whether Kane committed the murder rather than Scrimo." *Id*. at 116.  Here, in contrast, the trial court properly precluded the expert testimony under state law because it was offered late in the defense case

and, barring a lengthy trial delay, the court could not determine whether the expert testimony was admissible.

The Second Circuit also concluded that the exclusion of Scrimo's witnesses had removed reasonable doubt, explaining that where "the marginal evidence pointing to the defendant over another person is flimsy, and the excluded evidence was the only independent source of facts essential to proving the defense's theory that the other person committed the crime, we must conclude that the wrongfully excluded testimony would have introduced reasonable doubt where none otherwise existed." *Id*. at 120.  As indicated by the Second Circuit's explanation, its analysis focused on the exclusion of third-party culpability evidence.  *See also id*. at 116-17 (examining New York law on the admissibility of third-party culpability evidence and concluding that the petitioner's evidence was admissible because undisputed evidence already connected Kane to the crime).  In particular, the Second Circuit appeared moved by the fact that "[t]he DNA under the victim's fingernails pointed toward Kane."  *Id*. at 106, 118; *see also id*. at 121 n.1 (Newman, J., concurring).

Unlike petitioner's case, *Scrimo* involved a trial raising the issue of which of two men committed a murder where the evidence pointing to the defendant was thin. Under those circumstances, the Second Circuit concluded that the jury should have heard evidence pointing to the other potential killer.  Here, in contrast, preclusion of the expert testimony did not prevent the jury from hearing the defendant's side of the story.  Petitioner testified in detail that S.D. seemed to him to be awake and in fact was awake and consented to their encounter.  At most, the preclusion of Dr. Thorpe's

testimony deprived the jury of further support for petitioner's story.  On this record, the value of that support was dubious at best.  *See supra* at 40-41, 44.

In any event, the "particular point in issue" in *Scrimo* was entirely different from the issue in the instant Petition.  *Jackson*, 763 F.3d at 134 (noting that, while circuit precedent is relevant "to the limited extent that we have 'already held that the particular point in issue is clearly established by Supreme Court precedent,' we must scrupulously avoid using our decisions (or those of other circuits) 'to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced'") (citations omitted).  Petitioner's case does not involve third-party culpability evidence; Dr. Thorpe was offered as an expert to opine either that S.D. apparently consented to the sexual conduct at issue while she was asleep, or that she was awake and thought she was asleep.  Accordingly, *Scrimo* does not support the grant of habeas relief here.

*     *     *

In sum, the Appellate Division's holding that petitioner failed to preserve his constitutional claim for appellate review provides an adequate and independent state law ground to preclude habeas review of the claim's merits.  But even on a review of the merits, petitioner is not entitled to habeas relief because he cannot establish that the excluded testimony constituted a violation of his constitutional right to present a defense.

52

## CONCLUSION

For the reasons set forth above, this Court should deny the petition for a writ of habeas corpus and should not issue a certificate of appealability.

Dated:   New York, New York
         July 10, 2020

                                        Respectfully submitted,

                                        LETITIA JAMES
                                        *Attorney General*
                                        *State of New York*
                                        Attorney for Respondent

                              By:    */s/ Matthew Keller*
                                        MATTHEW KELLER
                                        Assistant Attorney General
                                        28 Liberty Street
                                        New York, New York 10005
                                        (212) 416-6072

NIKKI KOWALSKI
 *Deputy Solicitor General*
  *for Criminal Matters*
MATTHEW KELLER
 *Assistant Attorney General*
   *of Counsel*