UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE FAY,<br><br>                              Petitioner,<br><br>          -v-<br><br>ANTHONY F. ANNUCCI, Commissioner, New York<br>State Department of Corrections and Community<br>Supervision,<br><br>                              Respondent. | CIVIL ACTION NO.: 20 Civ. 187 (PAE) (SLC)<br><br>**REPORT AND RECOMMENDATION** |

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE PAUL A. ENGELMAYER**, United States District Judge:

## I.  INTRODUCTION[1]

George Fay ("Fay") filed a counseled petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("Section 2254") challenging his 2013 conviction, following a jury trial, for first degree rape and related sexual offenses against a victim who was incapable of consent. (ECF No. 1 (the "Petition")).  Fay challenges his conviction on the ground that the trial court's preclusion of his expert violated the Sixth Amendment to the U.S. Constitution.  (Id. at 5–7). Respondent Anthony F. Annucci ("Respondent"), Commissioner of the New York State Department of Corrections and Community Supervision,[2] which has custody of Fay, opposes the Petition on the grounds that Fay's Sixth Amendment claim is procedurally barred and that the state court's adjudication of the claim did not result in a decision that was contrary to or an

---

[1] The reader is advised that this Report and Recommendation contains graphic discussions of sex offenses.
[2] Respondent is represented by Letitia James, Attorney General of the State of New York.  (ECF Nos. 13; 21 ¶ 2).

unreasonable application of clearly established Supreme Court precedent.  (ECF Nos. 20; 21 ¶¶ 6–7).  For the reasons set forth below, I respectfully recommend that the Petition be DENIED.

## II. <u>BACKGROUND</u>

### A.  <u>Factual Background</u>

During the summer of 2016, Fay was working in New York City and staying at an Upper East Side apartment owned by family friends (the "Apartment").  (<u>See</u> ECF No. 21-2 at 30; Jan. 24 Tr. 445, 506; Jan. 29 Tr. 791–92).[3]  On the evening of July 8, 2016, Charles "Jack" Slye ("Slye"), a student at a mid-Atlantic state university, traveled to New York City from Boston, where he was spending the summer, with two friends from his hometown in Massachusetts, Sam Reardon and Don Sobell.  (<u>See</u> Jan. 29 Tr. 17–18, 20, 22–24 78, 94–95; Jan. 24 Tr. 449).  The three friends planned to stay with Fay, whom Slye and Sobell had known since middle school and who had previously attended the same university as Slye.  (Jan. 29 Tr. 785–86; Jan. 24 Tr. 447, 449, 474, 480–81).

The victim in this case, S.D., attended college with Slye and was a "friend" with whom he would occasionally engage in sexual intercourse.  (Jan. 29 Tr. 821–22; Jan. 22 Tr. 169).  S.D. was living and working at an internship in New York City during the summer of 2016.  (Jan. 22 Tr. 170).  After leaving work around 4:30 p.m. on July 8, 2016, S.D. met some friends and had, approximately, a "beer and a half[.]"  (Jan. 22 Tr. 172, 226).  She and her friends traveled to

---

[3] Most of the transcripts of the trial, which occurred in January and February 2018, are under seal. (ECF Nos. 3–5).  The Court cites the trial transcript as "[date] Tr. [page]".

another establishment, where S.D. ate a pretzel and drank another beer, and then to another friend's residence, where S.D. had "two to three" vodka shots with chasers. (Jan. 22 Tr. 226–27).

After stopping at the home of a friend in Rye, New York, for dinner and several beers, Slye, Sobell, and Reardon took the train to Grand Central Terminal, continuing to drink en route. (Jan. 24 Tr. 449, 484). On arriving in New York City, Slye posted his location on Snapchat, which S.D. saw and responded to, suggesting that she and Slye meet that evening. (Jan. 19 Tr. 32–34, 103; Jan. 22 Tr. 173–75). Fay met Slye, Sobell, and Reardon at Grand Central Terminal, and the four traveled to the Apartment, where they drank for a few hours before going to a bar called Le Poisson Rouge ("LPR"). (Jan. 19 Tr. 25, 102–03; Jan. 24 Tr. 450, 453, 485, 490; Jan. 29 Tr. 796–97). Slye, Fay, Sobell, and Reardon arrived at LPR between 11:00 p.m. and 12:30 a.m. (Jan. 19 Tr. 106; Jan. 24 Tr. 454; Jan. 29 Tr. 797). By this time, Slye was drunk and texting S.D. about meeting at LPR. (Jan. 19 Tr. 37, 106–07, 115–16; Jan. 22 Tr. 177–79). While at LPR, Fay drank two tequila shots and two beers. (Jan. 29 Tr. 799).

S.D. arrived at LPR around midnight on July 9, 2016. (Jan. 19 Tr. 38–40; Jan. 22 Tr. 181). At Slye's request, Fay gave Slye the key to the Apartment; whether S.D. was with Slye at that moment and met Fay is disputed.[4] (Jan. 29 Tr. 800, 878). Slye bought S.D. a drink, which she did not finish, and Slye and S.D. left LPR "very shortly thereafter." (Jan. 19 Tr. 40, 112; Jan. 22 Tr. 182–83). Slye and S.D. took a taxi back to the Apartment, where they began kissing, made their way to Fay's bedroom, had sexual intercourse on the bottom bunkbed (which was

---

[4] According to Fay's testimony, he "briefly" introduced himself to S.D. when Slye asked for the key to the Apartment, but S.D. denied ever meeting Fay before. (Compare Jan. 29 Tr. 800 with Jan. 22 Tr. 182; see Jan. 19 Tr. 112 (Slye testifying that Fay and S.D. did not meet at LPR); Feb. 1 Tr. 1091 (DA's summation arguing that Fay "never met her before")).

Fay's), and fell asleep. (Jan. 19 Tr. 40–44, 118, 122–23; Jan. 22 Tr. 183, 185, 187). S.D. was "[m]ostly unclothed" when she fell asleep, on the side of the bed closer to the wall. (Jan. 19 Tr. 44; Jan. 22 Tr. 187–88; Jan. 24 Tr. 501).

Fay and Sobell left LPR around 3:00 a.m. to return to the Apartment. (Jan. 24 Tr. 457, 472; Jan. 29 Tr. 801). Because Fay had given Slye the key, Fay and Sobell were unable to get into the Apartment when they arrived around 3:40 a.m., despite ringing the doorbell, knocking, and calling Slye's cellphone. (Jan. 24 Tr. 458, 472, 496; Jan. 29 Tr. 802). Fay retrieved a master key from the doorman, Troy Queen ("Queen"). (Jan. 24 Tr. 458; Jan. 26 Tr. 726; Jan. 29 Tr. 803). Fay and Sobell entered the Apartment to find Slye and S.D., in her bra and underwear, asleep in Fay's bed. (Jan. 24 Tr. 459–60; Jan. 29 Tr. 803–04). After unsuccessfully trying to wake Slye, Fay and Sobell returned to the living room, where they watched television and smoked marijuana. (Jan. 24 Tr. 461–63, 499; Jan. 29 Tr. 803–05). When Sobell fell asleep, Fay was on the adjacent couch. (Jan. 24 Tr. 464; Jan. 29 Tr. 805).

S.D. testified at trial about what happened next:

Waking up that morning, first thing I remember when I was coming out of sleepiness, the first feeling and the thought I had, I was confused. I remember feeling someone. I remember feeling something put in my mouth and feeling someone's hand behind my head. I thought I was dreaming. But I also remember thinking what is [Slye] doing. My eyes aren't open. So I was just – I didn't understand what was happening.

And from there it's a little hazy in terms of timeframe, but I know what woke me up and when I realized it wasn't a dream is when I felt someone put their – they're having sex with me, and that's when I really was awake and when I opened my eyes I thought it was [Slye], who else would it have been, and I looked and I saw his face and I realized it wasn't [Slye]. And I looked to my left and [Slye] was sleeping and that's when I realized what was happening and I jumped out.

(Jan. 22 Tr. 188–89).  S.D. testified that her eyes were closed when she felt something in her mouth, and what woke her up was when she felt someone "having sex with [her]." (Jan. 22 Tr. 189, 239).  She thought she "was dreaming[,]" but when she opened her eyes, someone—who was not Slye—was "[o]n top of [her]." (Jan. 22 Tr. 190, 238).  S.D. "immediately jumped out over [Slye] and just managed to go in full hysterical panic [sic], grabbing [her] clothes[,]" and "when [she] turned around, [the person who had been on top of her] wasn't there." (Jan. 22 Tr. 190).  Slye was still asleep, but S.D. pinched him "until he finally woke up." (Jan. 22 Tr. 190–91).  Slye remembered waking up when he heard a lamp being thrown and S.D. screaming in the hallway. (Jan. 19 Tr. 44–45, 124–25).  S.D. was "very upset[,]" yelling that "there was someone else in the room[,]" and "physically shaking, convulsing[.]" (Jan. 19 Tr. 47). S.D. explained to Slye "what just happened" and that they "had to leave[.]" (Jan. 22 Tr. 191). S.D. saw a condom wrapper at the end of the bed, although Slye had not used a condom when they had intercourse before falling asleep. (Jan. 22 Tr. 193).  While S.D. stood "crying, just trying to process it and put it together[,]" she saw a person—Fay—standing in the kitchen and became "furious" and "started screaming." (Jan. 22 Tr. 191–92).  S.D. had not seen Fay before and asked who he was. (Jan. 22 Tr. 192).  S.D. told Slye that she wanted to call the police. (Jan. 22 Tr. 193). Fay told Slye, "It's not what it seems." (Jan. 19 Tr. 47, 129).  Slye told S.D. that they "need[ed] to get out of the apartment[,]" "grabbed [their] stuff and then left the apartment." (Jan. 19 Tr. 49).

Throughout this time, Sobell remained asleep on the living room couch. (Jan. 19 Tr. 50). At some point, Fay shook Sobell awake and said, "[s]he kissed my neck, so I started going with it and then one thing led to another and she was giving me a blow job." (Jan. 24 Tr. 464–65, 509,

513).  Fay appeared anxious and upset.  (Jan. 24 Tr. 509).  Sobell heard S.D. call Fay "scum[,]" and heard Fay say, "[t]his is not good."  (Jan. 24 Tr. 466, 515).

Slye and S.D. took the elevator to the lobby, where Queen, seeing how upset S.D. was, asked her what happened.  (Jan. 19 Tr. 51, 136; Jan. 24 Tr. 194).  S.D. told Queen that she had been raped, and Queen called the police, shortly before 6:00 a.m.  (Jan. 26 Tr. 642, 727, 731).  Slye and S.D., "[s]till shaking" and "crying hysterically[,]" waited in the lobby for the police and ambulance.  (Jan. 19 Tr. 51–52; Jan. 26 Tr. 732).  New York City Police Department ("NYPD") Lieutenant Garcia ("Garcia"), and Officers Cesar Ponce ("Ponce"), James Cebulski ("Cebulski"), and Jaily Polanco ("Polanco"), arrived around 6:00 a.m., to find S.D. "upset" and "crying" and Slye comforting her.  (Jan. 23 Tr. 394, 398; Jan. 24 Tr. 529; Jan. 26 Tr. 650, 668).  Slye led Garcia and Polanco to the Apartment, where they placed Fay under arrest.  (Jan. 19 Tr. 53–54, 141; Jan. 23 Tr. 396; Jan. 24 Tr. 467, 518, 531–32).  Cebulski and Ponce arrived in the Apartment after Garcia and Polanco had already placed Fay in handcuffs, and Ponce looked for, but did not see, a used condom or wrapper in the bedroom.  (Jan. 23 Tr. 404, 413; Jan. 24 Tr. 539–41, 561; Jan. 26 Tr. 647–48, 682).

The EMTs asked S.D. what happened, tried to calm her down, and took her to the hospital, with Slye accompanying her.  (Jan. 22 Tr. 195).  In the ambulance, S.D.'s blood pressure was 144 over 80, and then 132 over 70, both of which were high for someone of her age and indicative of "stress [or] anxiety."  (Jan. 23 Tr. 340–41).  On arriving at the hospital, S.D. stated "that she woke up with someone having vaginal intercourse with her and also oral intercourse."  (Jan. 23 Tr. 279).  The emergency room nurse (the "ER Nurse") observed that S.D. "was visibly upset, anxious, but completely alert, oriented, aware of her surroundings," and did not appear intoxicated.

(Jan. 23 Tr. 331).  S.D. gave a narrative of the incident to the ER Nurse.  (Jan. 23 Tr. 336).  S.D. spoke to a sexual assault advocate and a nurse who had been trained to provide an objective assessment of sexual assault victims (the "Sexual Assault Nurse").  (Jan. 22 Tr. 196; Jan. 23 Tr. 280, 337–38, 362).  The Sexual Assault Nurse collected evidence using a New York State Sexual Offense Evidence Collection Kit (the "Rape Kit") and conducted a vaginal examination.  (Jan. 22 Tr. 219; Jan. 23 Tr. 281, 284, 362).  While the Sexual Assault Nurse was administering the Rape Kit, S.D. stated that she did not feel any bruises or pain, but noticed "dry secretions" on her chest.  (Jan. 22 Tr. 197, 219; Jan. 23 Tr. 282, 319).  A sample of the secretions was collected as part of the Rape Kit.  (Jan. 23 Tr. 298).  The Sexual Assault Nurse recorded the following narrative from S.D.:

> I was in town to meet a friend.  We went out for drinks.  Had four drinks during the course of many hours and went back to a friend's apartment where we were staying for the night . . . I had consensual sex with my friend, [Slye], that I came into the city to visit with.  I woke up at 5:00 a.m. this morning to find someone on top of me.  I thought it was [Slye] at first.  And when I opened my eyes I saw it was a stranger.  He was inside of me.  I remember that he put his penis in my mouth.  I kept trying to push him off.  [Slye] was asleep beside me.  I tried to nudge him to wake him up.  I finally pushed the stranger off of me, and he left.  I became hysterical.  [Slye] woke up, and I told him we have to get out of here.  The person was the guy's apartment we were staying at.  We went downstair[s], and a guy at the front desk said I will call the police.  And he was arrested.  I'm not sure if he ejaculated.  I had saw [sic] a condom wrapper on the floor.  I don't feel any pain. It was like I saw it happening to me far away.  I have dry secretion[s] on right upper arm and right breast.

(Jan. 23 Tr. 377).  S.D., crying, told Cebulski, "I am confused.  I can't believe this happened.  I need to process this."  (Jan. 23 Tr. 377–78; see Jan. 22 Tr. 200; Jan. 26 Tr. 654).  The NYPD's Special Victims Unit did not respond to the incident involving S.D.  (Jan. 26 Tr. 661).

A physician conducted a pelvic examination of S.D. and prescribed her several medications:  Ceftriaxone (to prevent gonorrhea), Azithromycin (to prevent syphilis and other

bacterial infections), Levonorgestrel (to prevent pregnancy), and Zofran (for nausea). (Jan. 23 Tr. 316, 345, 347).  S.D. declined to have blood work done because she thought it would take several hours to receive the results, and she "wanted to go home."  (Jan. 22 Tr. 198, 215, 320, 348–49).  At that time, S.D. declined to sign a release for the Rape Kit to be analyzed by the Office of the Chief Medical Examiner ("OCME"), but eventually, she did sign the release and Cebulski retrieved the Rape Kit on July 16, 2016.   (Jan. 22 Tr. 232–33, 237, 289, 321; Jan. 26 Tr. 664).  The discharge instructions recommended that S.D. follow up with her private physician, but S.D. did not do so.  (Jan. 22 Tr. 219; Jan. 23 Tr. 321).

Meanwhile, at the Apartment, after taking Fay into custody, NYPD officers escorted Sobell out of the Apartment, and he went to a nearby hotel, and later to a bar with friends. (Jan. 24 Tr. 468–69).  That same day—Saturday, July 9, 2016—Dennis McCreight ("McCreight"), a private investigator hired by Fay's defense counsel, questioned Sobell, Reardon, and Slye, separately.  (Jan. 24 Tr. 469; Jan. 30 Tr. 965–66).  On July 11, 2016, McCreight searched the Apartment, and, between the mattress and frame of Fay's bunkbed, found two pieces of a surgical lubricant package.  (Jan. 30 Tr. 968–69).

## B.  **Procedural Background**

### 1.  **State Court Proceedings**

#### a.  **Indictment**

An indictment filed on August 26, 2016 (the "Indictment") charged Fay with three offenses:  (i) first degree rape in violation of N.Y. Penal Law § 130.35(2) (the "Rape Count");[5]

---

[5] This statute provides that "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person: . . . (2) [w]ho is incapable of consent by reason of being physically helpless[.]"  N.Y. Penal L. § 130.35(2).

(ii) first degree criminal sexual act in violation of N.Y. Penal Law § 130.50(2) (the "Criminal Sexual Act Count");[6] and (iii) first degree sexual abuse in violation of N.Y. Penal Law § 130.65(2) (the "Sexual Abuse Count").[7]   (ECF Nos. 1-1 at 4–5; 21-2 at 83).   The Indictment charged that Fay engaged in each of the offenses on July 9, 2016 with a person who "was incapable of consent by reason of being physically helpless."  (ECF No. 1-1 at 4–5).

### b.  Pretrial Proceedings

Throughout pretrial, trial, and sentencing, Fay was represented by Daniel Bibb ("Bibb"), Stephen Saracco ("Saracco"), and Noreen Travers.  (See, e.g., Jan. 8 Tr. 2; Jan. 19 Tr. 1; Apr. 17 Tr. 2).  At a Molineux[8] hearing on January 8, 2018, the trial court heard argument on the admissibility of Fay's phone records and several Backpage advertisements,[9] (see Jan. 8 Tr. 1–27), to show Fay's "mindset at the time leading up to the crime[.]"  (Jan. 8 Tr. 7).[10]  During the hearing, Bibb asserted that "alcohol consumption on all parties is going to be an issue in th[is] case."  (Jan. 8 Tr. 11).  The trial court reserved decision on the issue.  (Jan. 8 Tr. 18).  Asked how many defense witnesses Bibb intended to call, he answered, "[f]our, potentially five[,]" but did not identify them.  (Jan. 8 Tr. 24–25).

---

[6] This statute provides that "[a] person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct . . . with another person: . . . (2) [w]ho is incapable of consent by reason of being physically helpless[.]"  N.Y. Penal L. § 130.50(2).

[7] This statute provides that "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact: . . . (2) [w]hen the other person is incapable of consent by reason of being physically helpless[.]"  N.Y. Penal L. § 130.65(2).

[8] Under People v. Molineux, evidence of a defendant's prior criminal and bad acts may be admitted as direct evidence in the prosecution's case in certain circumstances.  168 N.Y. 264 (1901); see Liggins v. Burge, 689 F. Supp. 2d 640, 644 n.2 (2010).

[9] Backpage is "a website that advertises commercial sex to potential customers[.]"  See United States v. Purcell, 967 F.3d 159, 167 (2d Cir. 2020).

[10] Unless otherwise noted, all internal quotation marks and citations are omitted from case citations.

### c.  **Trial and Sentencing**

#### i.  **Jury Selection**

Jury selection began on January 10, 2018, at which time Bibb provided the Honorable Melissa Jackson, Justice of the Supreme Court, New York County, with a list of defense witnesses that included Dr. Michael Thorpe ("Dr. Thorpe").[11]  (ECF No. 21-2 at 122; see Jan. 10 Tr. 1–12). On January 17, 2018, during jury selection, the Assistant District Attorney (the "ADA") noted that she had received from Bibb the week before a list of defense witnesses that included Dr. Thorpe, as to whom she demanded "any reports he's generated as well as [a] CV."  (ECF No. 1-6 at 20 (the "January 17 Proceedings"); Jan. 17 Tr. 2).  The ADA noted that, based on her "brief interview" of Dr. Thorpe, he appeared to be "a sleep disorder doctor," and therefore, she was inquiring whether "the defense is going to go into a sleepwalking defense."  (ECF No. 1-6 at 20; Jan. 17 Tr. 2).  Bibb responded that he was not asserting a sleepwalking defense, but added that Dr. Thorpe's "area of expertise is not just sleep disorder, it is pharmacological [e]ffects on sleep [of] alcohol, drugs, things like that[,]" and acknowledged that there had "been no reports" on the topic.  (ECF No. 1-6 at 20; Jan. 17 Tr. 2).  Bibb said he would provide the ADA with Dr. Thorpe's CV the next day.  (ECF No. 1-6 at 20; Jan. 17 Tr. 2).  The trial court noted that the ADA was "entitled" to the CV.  (ECF No. 1-6 at 21; Jan. 17 Tr. 3).

The trial began with opening statements on January 19, 2018.  (Jan. 19 Tr. 1–16).  During the defense opening statement, Saracco told the jury that S.D.:

> gave several versions of what occurred that evening, versions she told the police, versions she told the hospital staff, both nurses and doctors, [about] what occurred in the apartment on July 9th.  She told the ambulance attendant what

---

[11] Dr. Thorpe's name is spelled at least three different ways in the record; the Court uses "Dr. Thorpe," the spelling that Fay uses.  (See ECF No. 10 at 21).

happened.  She told the [ADA] what happened.  And, yes, it would be – you could assume that [there] would be various inconsistencies in the various accounts that she gave.  Minor, maybe.  But you'll see by way of evidence that there was substantial, material, and critical differences in the various statements that she gave to both the police and the other individuals involved.  You will hear that there were omissions, additions, distortions; that she had made certain allegations or assertions that just fly in the face of both reason and common sense.

(Jan. 19 Tr. 11–12).  Saracco told the jury that they would hear evidence "that [S.D.] told a nurse

at the hospital some sort of mystical explanation, not that she was asleep."  (Jan. 19 Tr. 13).

### ii.    The Prosecution's Case

During the prosecution's case in chief, the ADA called as witnesses:   (i) Slye,

(Jan. 19 Tr. 16–147), (ii) S.D. (Jan. 22 Tr. 166–244); (iii) an AT&T representative to authenticate

phone records (Jan. 23 Tr. 258–71); (iv) a Verizon representative to authenticate phone records

(Jan. 23 Tr. 385–90); (v) an expert on sexual assault forensic examinations (the "Expert")

(Jan. 23 Tr. 271–327); (vi) the ER Nurse (Jan. 23 Tr. 327–53, 358–84); (vii) Ponce (Jan. 23 Tr. 390–

422); (viii) Sobell (Jan. 24 Tr. 443–524); (ix) Polanco (Jan. 24 Tr. 524–67); (x) Amanjot Singh

("Singh"), an expert in DNA analysis from the OCME (Jan. 26 Tr. 578–637)[12]; (xi) Cebulski

(Jan. 26 Tr. 637–717); and (xii) Queen (Jan. 26 Tr. 718–51).

Following Sobell's testimony on January 24, 2018, the parties addressed two evidentiary

issues, i.e., the admissibility of:  (i) Fay's statement to Sobell; and (ii) a statement that Sobell

allegedly heard over the police radio that S.D. was "changing her story[.]"  (ECF No. 1-6 at 23–41

(the "January 24 Proceedings"); Jan. 24 Tr. 425–34).  In connection with the latter, Bibb argued

that precluding him from asking Sobell about what he heard over the police radio would violate

---

[12] Singh testified that the OCME's testing revealed that the secretions taken from S.D.'s chest contained components of semen that matched Fay's DNA.  (Jan. 26 Tr. 614–15, 620, 622, 628, 636).

Fay's "constitutional right to present a defense and . . . to place witnesses on the stand, [and] the right to compulsory process" under Chambers v. Mississippi, 410 U.S. 284 (1973).  (ECF No. 1-6 at 30).  The following colloquy occurred:

> THE COURT: We're not talking about constitutional rights now.  We're talking about due process on the rules of law and evidence.
> MR. BIBB: But [Chambers] stands for the proposition that constitutional rights often can supersede local evidentiary rules, such as hearsay.
> THE COURT: You can argue due process.  You can make that argument to me.  However, my ruling, I am probably going to exclude it.  Let's see what you are going to try to introduce, and you are going to have to give me some good argument.

(Id. at 30–31).  The parties also debated Bibb's request to re-call Slye regarding his alleged statement to Fay's father that "he really didn't know what happened, but [S.D.] had been changing her story while he was with her[,]" which Bibb sought to admit "under [Chambers] and [People v. Robinson, 89 N.Y.2d 648 (1997)] for the truth of the matter asserted because it goes directly to the defendant's right to present a defense."  (Jan. 24 Tr. 437; see Jan. 24 Tr. 441 (referencing Chambers, 410 U.S. 284)).  At the conclusion of the January 24 Proceedings, the third day of trial, outside the presence of the jury, the ADA noted that Bibb had yet to provide her with Dr. Thorpe's CV, adding that she might have an objection to his testimony, and Bibb promised to send it that evening.  (Jan. 24 Tr. 568).

### iii.   **The Defense Case**

After the prosecution rested on January 29, 2018, Fay testified on his own behalf.  (ECF No. 21-2 at 123; Jan. 29 Tr. 776, 780–887).  Fay's testimony differed from S.D.'s, in that he stated that S.D. was the instigator of sexual intercourse, said "yes" twice during the act, and appeared to him to be awake and conscious.  (Jan. 29 Tr. 806–821).  On cross-examination, Fay

acknowledged that outgoing calls to Backpage had been made from his phone around 4:00 a.m. on July 9, 2016, although he denied making such calls himself.  (Jan. 29 Tr. 870–72).

As part of the defense case, Fay called two character witnesses:  the dean of Fay's high school, and  a friend of Fay's family.  (ECF No. 21-2 at 123; Jan. 30 Tr. 911–39, 941–62).  Fay also called McCreight, the investigator who recovered from Fay's bedroom the surgical lubricant package.  (Jan. 30 Tr. 963–982).

As a final defense witness, Bibb announced his intention to call Dr. Thorpe. (Jan. 30 Tr. 983).  Bibb stated that he had provided to the ADA a CV for Dr. Thorpe, who was:

> an expert in sleep disorders and pharm[a]cological effects that alcohol intake consumption can have on a person [a]sleep.  The specifics of it would be that there are situations where alcohol intake consumption and intoxication have such an effect on a person that they can be actually be [sic] sleeping but participating in physical activities that make[] them appear to be awake and conscious.

(Jan. 30 Tr. 983).  Bibb stated that he "would probably pose hypothetical questions of him based on some of the evidence that's been brought out at trial."  (Jan. 30 Tr. 984).  Justice Jackson asked the ADA "[h]ow much notice" she had, to which the ADA responded, "[t]his is the first I've heard." (Jan. 30 Tr. 984).  Bibb claimed to have given the ADA the CV "months ago"—even though the record showed that as of January 24, 2018 he had not—and had explained to her:

> that it wasn't just sleep disorder – if maybe not months, at least a couple of weeks ago, not sleep disorders.  I told her of the pharmacological effects that alcohol can have on sleep and behavior.  So there's – I didn't know if I'm under a duty to get absolutely one hundred percent specific, but [the ADA] was aware of the expertise of Dr. Thorpe and potential for expert testimony in this area, and I specifically used the term the pharmacological effects of alcohol and potentially other substances because I was not aware if there was going to be any testimony about any ingestion of narcotics during the—well obviously there was not –[]but this was not on an e-mail but in a telephone conversation.

(Jan. 30 Tr. 984–85).  The ADA responded:

I received the CV for the first time last Wednesday and that was after I asked Mr. Bibb in court. I followed up in the same email and he did not respond as to asking what the opinions the expert would be testifying to and what the basis of those opinions were.

We had one conversation, months ago, where he told me he might be hiring his sleep expert and that was – that was the total of that conversation.

In looking at Dr. Thorpe's resume, while it is extensive, his expertise based on this, as well as my researching[] him[,] seems to be in sleep disorders, namely, narcolepsy, insomnia, and sleep apnea.

I know that there is absolutely nothing in here in his history of where he's worked or from publications he's put out that says anything about his even knowledge of the pharmacological effects of alcohol. So[,] I would have had no notice of this whatsoever so I would move to preclude this on that ground[].

Second, I would move to preclude it because I've looked as extensively as I could.

And my attention, based on the limited information that I had is if there's going to be any expert testimony, it would be on the effect of alcohol on sleep, mainly, which appears to be people consume alcohol, they fall asleep in a deep sleep at first, and then, when the blood alcohol content [wears] off, the oftentimes get a more aggressive sleep.

Everything I've look[ed] into says, at most, that I have seen no information about this sleepwalking alcohol, so I would move to preclude that I see no studies on that unless counsel po[]ints to it otherwise.

(Jan. 30 Tr. 985–86). Bibb did not then point to any "studies" in response to the ADA's comments,

and the following colloquy between Justice Jackson and Bibb ensued:

THE COURT: There would have to be proof that it's scientifically reliable; otherwise, any expert could "testify" on any matter.
[The ADA]: That's the first thing I'm thinking. There is no prior hearing or written application to the Court asking, to wit, notice to the defense and prosecution asking for the Court to rule on this and hold a hearing.[13]
MR. BIBB: I did tell [the ADA], months ago, what area that [] Dr. Thorpe would be testifying about. There was no objection [by] her at that time, and we've had –

---

[13] Based on the text of the transcript, the Court infers that the speaker was the ADA, not the trial court. (See Jan. 30 Tr. 984–87).

> And it is true, that I've only provided her the CV last week. But whatever the CV contains, or doesn't, goes to the weight of his testimony, not the admissibility.
>
> THE COURT: At the very minimum, Mr. Bibb[], as you're well aware, this kind of evidence or testimony has to be done in a written form with plenty of notice and a ruling by the Court before I would permit it. So to just proffer this now when you've already had several witnesses testify, I'm at a loss to understand such a late notice that you're trying to do this.
>
> MR. BIBB: I – unfortunately, this is one I could get to –
>
> THE COURT: That's not an excuse. I'm precluding this. I'm not going to allow it. The inadequate notice to both the prosecution, to the Court to get a ruling whether there is indeed expert testimony that's permissible in the scientific community along the lines of whatever, and what you've just told me that someone can actually be intoxicated and not be aware they're participating, and the particular credentials of this witness, so I'm precluding it.
>
> MR. BIBB: I have an exception.

(Jan. 30 Tr. 986–87). During this colloquy, Bibb did not reference any Supreme Court decision, the Sixth Amendment, or other legal authority to support his effort to call Dr. Thorpe at this stage of Fay's trial.

During the defense closing argument, Fay's counsel highlighted S.D.'s statement to the Sexual Assault Nurse that she "saw it happening to me from far away[,]" her statement to Slye that she "thought it was" him, and her statements to the NYPD that she "was half-awake" and "groggy." (Feb. 1 Tr. 1045–46). Following summations, Fay's counsel moved for a mistrial based on the ADA's arguments during summation, which Justice Jackson denied. (Feb. 1 Tr. 1097–1104). Included in the jury charge were the following instructions as to the Rape Count:

> A person is incapable of consent means when a person is physically helpless. Physically helpless means when a person is unconscious or physically unable to communicate unwillingness to an act. Under our law, sexual intercourse with a physically helpless person is deemed to be without that person's consent.
>
> So, in order for you to find the defendant guilty of this crime the People are required to prove from all of the evidence in the case, beyond a reasonable doubt, both of the following two elements:

> One, that on or about July 9, 2016, in the Count of New York, the defendant, George Fay, had sexual intercourse with [S.D.].
>
> And two, that [S.D.] was incapable of consent by reason of being physically helpless.
>
> Therefore, if you find that the People have proven beyond a reasonable doubt both those elements you must find the defendant guilty of this crime.

(Feb. 1 Tr. 1129–30). The trial court incorporated the instruction as to physical helplessness for the Criminal Sexual Act and Sexual Abuse Counts. (Feb. 1 Tr. 1130–32). Fay did not object to the jury charge. (Feb. 1 Tr. 1136). After deliberating for part of an afternoon and the next morning, the jury returned a verdict finding Fay guilty of all three counts. (Feb. 2 Tr. 1148).

On April 17, 2018, Justice Jackson sentenced Fay to ten years' imprisonment and five years of post-release supervision on both the Rape Count and the Criminal Sexual Act Count, and seven years' imprisonment and five years of post-release supervision on the Sexual Abuse Count, all to run concurrently. (ECF No. 1-1 at 8, 28–29 (the "Judgment"); see ECF Nos. 1 at 1 ¶ 2; 21 ¶¶ 1, 3(a); 21-1 at 83–84). In addition, Fay was certified as a sexual offender and became subject to a ten-year order of protection requiring him to stay away from S.D. (ECF No. 1-1 at 29).

### d.  Direct Appeal

In his brief to the Appellate Division, First Department (the "First Department") on direct appeal, Fay argued, inter alia, that, by precluding Dr. Thorpe's testimony, the trial court violated his Sixth Amendment right to present a defense. (ECF Nos. 1-2 at 4–13; 1-3 at 4–20; 21-2 at 11, 51–61). On March 5, 2019, the First Department unanimously affirmed the Judgment. People v. Fay, 170 A.D.3d 404 (1st Dep't 2019). (See ECF Nos. 1-3 at 22–26; 22-2 at 1–5). After finding that "[t]he verdict was supported by legally sufficient evidence[,]" and that S.D. "was incapable of

consent as a result of being physically helpless[,]" the First Department rejected as "implausible"

and "contradicted by" both SD's and Fay's testimony Fay's "theory" that S.D. "mistook" Fay for

Slye "and unwittingly engaged in consensual sex with him[.]"  <u>Fay</u>, 170 A.D.3d at 404–05.  As to

the trial court's exclusion of Dr. Thorpe's testimony, the First Department held that:

> [t]he court providently exercised its discretion in denying [Fay]'s request, made
> late in the trial, to call an expert on sleep disorders, who would have testified
> about the effects of alcohol on sleep and behavior, including that consumption of
> alcohol can cause persons to engage unconsciously in physical activity while
> appearing to be awake, and to wake up unaware of the activity.  To the extent the
> record establishes that the People had any advance notice of the content of this
> testimony, that notice was inadequate under the circumstances.  This request
> would have required a lengthy midtrial continuance for a [<u>Frye v. United States</u>,
> 293 F. 1013, 1013 (D.C. Cir. 1923)] hearing . . . and for the People to obtain their
> own expert.  Accordingly, the untimeliness of the request by itself thus warranted
> denial (<u>see</u> <u>Matter of Anthony M.</u>, 63 N.Y.2d 270, 283–[]84 [1984]).

<u>Id.</u> at 405.  In the alternative, the First Department held that Fay "failed to offer any scientific

basis for the proposed testimony" and,

> did not preserve his contention that <u>Frye</u> is inapplicable because he only sought
> to introduce his expert's opinions based on personal experience, rather than
> explanation of a scientific theory, and we decline to review it in the interest of
> justice.  As an alternative holding, we find that there is no evidence that the
> proposed expert had any experience with the proffered theory.

<u>Id.</u> at 405–06.  Finally, after observing that Fay "never asserted that, as a matter of constitutional

law, he was entitled to introduce the expert testimony, [and] his request to do so only raised

questions of state evidentiary law and trial management[,]" the First Department "decline[d] to

review [his] unpreserved constitutional claim in the interest of justice[,]" but "[a]s an alternative

holding, [] reject[ed] it on the merits (<u>see</u> <u>Crane v. Kentucky</u>, 476 U[.]S[.] 683, 689–90 [1986])."

<u>Id.</u> at 406.

Fay filed with the First Department a motion to reargue, citing a "newly obtained transcript" of the January 17 Proceedings. (ECF Nos. 1-4 at 7–23; 21-2 at 189–206 (the "Motion to Reargue")). Fay argued that the transcript of the January 17 Proceedings contradicted the ADA's statement that she had not previously heard of Fay's proffer of Dr. Thorpe, and "undercut[] the [First Department's] procedural finding that the request for the defense expert was not made until 'late in the trial' and would have therefore required a 'midtrial continuance.'" (Id. at 18). On July 16, 2019, the First Department denied the Motion to Reargue. (ECF Nos. 1-5 at 13; 22-2 at 6).

Fay also sought leave to appeal to the Court of Appeals (the "Application"). (ECF Nos. 1-4 at 4–5; 1-6 at 4–18). In the Application, Fay cited the transcript of the January 17 Proceedings and raised three grounds: (1) whether "a request to call a defense expert at trial[] ipso facto implicate[d] a defendant's Sixth Amendment right, and thereby preserve[d] the issue for appellate review, absent a need to specifically reference the constitutional right to present a defense"; (2) whether Bibb "implicitly indicate[d] that he was only offering the expert's personal opinion, rather than a scientific theory that would have warranted a Frye hearing"; and (3) whether the ADA had "sufficient notice of the expert witness who had been called when his name was included on a list given prior to the commencement of trial, yet the [DA] never inquired as to the purpose of that individual's anticipated testimony[.]" (ECF No. 1-4 at 5). On August 20, 2019, the Court of Appeals denied Fay's Application. People v. Fay, 34 N.Y.3d 930 (2019). (See ECF Nos. 1-5 at 15; 22-2 at 7).

### 2. **Federal Habeas Corpus Petition**

On January 9, 2020, Fay filed the Petition, arguing that the trial court's preclusion of Dr. Thorpe violated his Sixth Amendment right, and that this claim was not procedurally defaulted. (ECF No. 1 at 5–7; <u>see</u> ECF No. 10). Following an order to answer (ECF No. 12), on July 10, 2020, Respondent filed a response and memorandum of law in opposition to the Petition (the "Opposition"). (ECF Nos. 20–22). On August 9, 2020, Fay filed a reply in further support of the Petition. (ECF No. 23). The Honorable Paul A. Engelmayer referred the Petition for this Report and Recommendation. (ECF No. 6).

### III. **LEGAL STANDARDS**

#### A. **Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A claim is 'adjudicated on the merits' if the state court ruled on the substance of the claim rather than on a procedural ground." <u>Jordan v. Lamanna</u>, 33 F.4th 144, 150 (2d Cir. 2022) (quoting <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001)). Thus, a state court's ruling on the merits of a constitutional claim, rather than a procedural ground, constitutes adjudication on the merits for purposes of AEDPA. <u>See</u> <u>Zarvela v. Artuz</u>, 364 F.3d 415, 417 (2d

Cir. 2004) (applying AEDPA review to appellate court's ruling, in the alternative, that petitioner's unpreserved claim was "in any event, without merit"); Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002) (same). "A decision is 'contrary to' clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Brown, 283 F.3d at 498 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "A decision is an 'unreasonable application' of clearly established [federal] law if a state court 'identifies the correct governing legal principle from [the Supreme Court's] decision but unreasonably applies that principle to the facts of [a] prisoner's case.'" Id. at 501 (quoting Williams, 529 U.S. at 413). In this context, unreasonableness is an objective standard. See Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000) (quoting Williams, 529 U.S. at 409).

The Second Circuit recently reiterated the Supreme Court's instruction to district courts that "[a] writ cannot be granted 'simply because . . . the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Jordan, 33 F.4th at 150 (quoting Williams, 529 U.S. at 411). "Rather, whether a decision is 'contrary to' or an 'unreasonable application of' clearly established federal law is a 'substantially higher threshold' than mere incorrectness." Id. (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). Under AEDPA's "highly deferential" standard of review, Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015), "an incorrect application of federal law is not necessarily an unreasonable one." Adams v. Keyser, No. 16 Civ. 129 (GBD) (AJP), 2018 WL 2089337, at *2 (S.D.N.Y. May 3, 2018) (citing Grayton v. Ercole, 691 F.3d 165, 174 (2d Cir. 2012)). Rather, a district court should grant a writ as an unreasonable application of clearly established Supreme Court precedent only if "the state

court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). "In other words, the existence of 'reasonable arguments on both sides' is 'all [the state] needs to prevail in [an] AEDPA case.'" Jordan, 33 F.4th at 151 (quoting White v. Woodall, 572 U.S. 415, 427 (2009)); see Fulton v. Sup't, No. 20 Civ. 21 (GBD) (SLC), 2020 WL 3250594, at *3 (S.D.N.Y. June 16, 2020) ("The question under the AEDPA 'is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable, which is a substantially higher threshold.'") (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)); Adams, 2018 WL 2089337, at *2 ("If 'fairminded jurists could disagree on the correctness of the state court's decision[,]' the state court's determination is not objectively unreasonable.") (quoting Harrington, 562 U.S. at 101).

Finally, under the AEDPA, the factual findings of state courts are presumed to be correct. See 28 U.S.C. § 2254(e)(1); see also Nelson v. Walker, 121 F.3d 828, 833–34 (2d Cir. 1997). To overcome this presumption, a petitioner must present "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. **Exhaustion**

AEDPA also prevents a federal court from considering a petition for a writ of habeas corpus by a prisoner in state custody unless the petitioner has exhausted all state remedies. See 28 U.S.C. § 2254(b)(1)(A); see also Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014). To satisfy the exhaustion requirement, the petitioner must have "fairly presented" his claims in federal constitutional terms to the state courts, thereby affording those courts the opportunity to correct the alleged violations of federal rights. Picard v. Connor, 404 U.S. 270, 275 (1971). "To satisfy

[Section] 2254's exhaustion requirement, a petitioner must present the substance of 'the same federal constitutional claim[s] that he now urges upon the federal courts[.]'" Aparicio v. Artuz, 269 F.3d 78, 89 (2d Cir. 2001) (quoting Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001)).  The exhaustion requirement is fulfilled once the federal claims have been presented to "the highest court of the state." Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005).

In New York, a "defendant must first appeal . . . to the Appellate Division, and then must seek further review . . . by applying to the Court of Appeals for a certificate granting leave to appeal." Galdamez, 394 F.3d at 74.  "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on direct appeal but were not presented to the Court of Appeals." Sparks v. Burge, No. 06 Civ. 6965 (KMK) (PED), 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 28, 2012); see N.Y. Crim. P. L. § 440.10(2)(c).  For claims involving matters "not reflected in, or fully explained by, the record," People v. Moreno-Grantini, 167 A.D.3d 471, 472 (1st Dep't 2018) ("Moreno-Grantini I"), "a petitioner must assert the claim in a [Section] 440.10 motion.  If that motion is denied, he must then seek leave to appeal to the Appellate Division in order to exhaust his state court remedies." Moreno-Gratini v. Sticht, No. 19 Civ. 5964 (GHW) (SN), 2022 WL 1425712, at *7 (S.D.N.Y. Apr. 18, 2022) ("Moreno-Gratini II"), adopted by, 2022 WL 1423298 (S.D.N.Y. May 5, 2022); see N.Y. Crim. Proc. L. § 450.90; see also Cosey v. Lilley, 460 F. Supp. 3d 346, 370 (S.D.N.Y. 2020) (noting that no further appellate review is available after Appellate Division denies leave to appeal denial of a Section 440.10 motion).

A court may excuse the failure to exhaust "if the petitioner demonstrates either cause for the default and actual prejudice from the alleged violation of federal law[,] or that the failure to

consider the claims will 'result in a fundamental miscarriage of justice.'"  Acosta v. Giambruno, 326 F. Supp. 2d 513, 520 (S.D.N.Y. 2004) (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991)).  In this context, "cause" means "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court."  Id. (quoting McCleskey v. Zant, 499 U.S. 467, 493 (1991)).  "Actual prejudice" requires the petitioner to show "'actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  Id. (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  "A miscarriage of justice occurs 'in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]'"  Id. (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).  "To establish actual innocence, petitioner must demonstrate that 'in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him."  Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002); see Bousley v. United States, 523 U.S. 614, 623–24 (1998) ("'Actual innocence' means factual innocence, not mere legal insufficiency").

### C.  Adequate and Independent State Grounds

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  Walker v. Martin, 562 U.S. 307, 315 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)); see Rizzo v. Capra, No. 18 Civ. 1185 (GBD) (KNF), 2019 WL 2511349, at *2 (S.D.N.Y. June 18, 2019) ("It is well established that federal habeas courts may not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and thought adequate to support the judgment.'") (quoting Coleman, 501 U.S. at 729).  "The state-law ground may be substantive

or procedural." <u>Moreno-Gratini II</u>, 2022 WL 1425712, at *5; <u>see</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 138 (2d Cir. 2006) ("When the state court's decision rests on an independent procedural bar . . . a federal court must still determine whether that state procedural ground is adequate to support the judgment."); <u>see</u> <u>Rizzo</u>, 2019 WL 2511349, at *2 ("The independent and adequate state ground doctrine applies whether the state-law ground is 'a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.'") (quoting <u>Walker</u>, 562 U.S. at 315).  "Even where the state court has ruled on the merits of a federal claim 'in the alternative,' federal habeas review is foreclosed where the state court has also expressly relied on the petitioner's procedural default."  <u>Murden v. Artuz</u>, 497 F.3d 178, 191 (2d Cir. 2007) (quoting <u>Green v. Travis</u>, 414 F.3d 288, 294 (2d Cir. 2005)); <u>Velasquez v. Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990) (explaining that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim").

Only if the state court's decision rests on an "independent procedural bar" that is "'adequate to support the judgment'" will federal habeas review be barred.  <u>Murden</u>, 497 F.3d at 191–92 (quoting <u>Jimenez</u>, 458 F.3d at 138).  "A state procedural bar is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the 'specific circumstances presented in a case.'"  <u>Moreno-Gratini II</u>, 2022 WL 1425712, at *6 (quoting <u>Monroe v. Kuhlman</u>, 433 F.3d 236, 241 (2d Cir. 2006)); <u>see</u> <u>Rizzo</u>, 2019 WL 2511349, at *2 ("'To be considered an independent and adequate state ground, the state law must be firmly established and regularly followed in the specific circumstances presented in the case.'") (quoting <u>Williams v. Artus</u>, 691 F. Supp. 2d 515, 524 (S.D.N.Y. 2010)).  The exceptions to this rule are where the petitioner

establishes either "'cause for the default and prejudice'" or that he is "'actually innocent' of the crime for which he was convicted." Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) (quoting Aparicio, 269 F.3d at 90).

In addition, there exist "exceptional cases in which [the] exorbitant application of a generally sound rule renders the state ground inadequate" to preclude federal habeas corpus review. Lee v. Kemna, 534 U.S. 362, 376 (2002); see Cotto v. Herbert, 331 F.3d 217, 239–40 (2d Cir. 2003) (assessing whether petition fell within "'the small category of cases in which [the] asserted state grounds are inadequate to block adjudication of the federal claim' or 'in which the exorbitant application of a generally sound rule renders the state ground inadequate' to bar consideration of the federal constitutional claim") (quoting Lee, 534 U.S. at 376). To determine whether the procedural bar is an "adequate" independent state ground to bars review, courts analyze:  "(1) whether the trial court actually relied on the alleged procedural violation, and 'whether perfect compliance with the state rule would have changed the trial court's decision'; (2) whether compliance with the rule was required by the governing caselaw under the 'specific circumstances presented'; and (3) 'whether petitioner had substantially complied with the rule given the realities of trial, and therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest.'" Chodakowski v. Annucci, No. 19 Civ. 248 (LTS) (KBP), 2020 WL 9065795, at *6 (S.D.N.Y. Apr. 28, 2020) (quoting Cotto, 331 F.3d at 240).

## IV.  DISCUSSION

### A.  Sixth Amendment Claim

#### 1.  Exhaustion

On his direct appeal to the First Department, Fay argued, among other grounds, that the trial court's preclusion of Dr. Thorpe violated his Sixth Amendment right to present a defense. (ECF Nos. 1-2 at 4–13; 1-3 at 4–20; 21-2 at 11, 51–61).  The First Department "decline[d] to review" this claim as unpreserved, but, in the alternative, "reject[ed] it on the merits[.]"  Fay, 170 A.D.3d at 406.  In his unsuccessful Application to the Court of Appeals, Fay likewise asserted his Sixth Amendment claim.  (ECF Nos. 1-5 at 9; 1-6 at 12–15).  Because Fay presented to the First Department and the Court of Appeals "the substance of the same federal constitutional claim[] that he now urges upon the federal courts," he has met Section 2254's exhaustion requirement. Aparicio, 269 F.3d at 89; see Galdamez, 394 F.3d at 74.

#### 2.  Adequate and Independent State Grounds

The First Department deemed Fay's Sixth Amendment claim "unpreserved" because he "never asserted that, as a matter of constitutional law, he was entitled to introduce the expert testimony," and therefore, "his request to do so only raised questions of state evidentiary law and trial management[.]"  Fay, 170 A.D.3d at 406.  While "declin[ing] to review [Fay's] unpreserved constitutional claim in the interest of justice," the First Department went on to "reject [the claim] on the merits[,]" citing Crane v. Kentucky, 476 U.S. 683, 689–90 (1986).  Fay, 170 A.D.3d at 406.  Respondent argues that the First Department's holding that Fay's Sixth Amendment claim was unpreserved constitutes an adequate and independent state ground that forecloses federal habeas corpus review of the claim.  (ECF No. 20 at 19–33).  Fay responds that,

because the First Department "exorbitantly" applied a state procedural rule, its holding does not

bar this Court from reviewing the merits of his Sixth Amendment claim, and, in the alternative,

the cause and prejudice exception to procedural default applies.  (ECF Nos. 10 at 21–48; 23 at

16–26; see ECF No. 10 at 48 n.7).

### a.   The Contemporaneous Objection Rule

Although the First Department did not cite a New York statute in concluding that Fay

failed to preserve his Sixth Amendment claim, the parties agree that the court was referring to

New York Criminal Procedure Law § 470.05(2) ("Section 470.05"), which requires that "an

objection to a ruling or instruction of a criminal court [] be raised contemporaneously with the

challenged ruling or instruction in order to preserve the objection for appellate review."  Green,

414 F.3d at 294; see N.Y. Crim. P. L. § 470.05(2).[14]  As the New York Court of Appeals has

explained, the contemporaneous objection rule "require[s], at the very least, that any matter

which a party wishes the appellate court to decide have been brought to the attention of the trial

court at a time and in a way that gave [the trial court] the opportunity to remedy the problem

and thereby avert reversible error."  People v. Luperon, 85 N.Y.2d 71, 78 (1995).  The Second

Circuit has recognized the contemporaneous objection rule as "a firmly established and regularly

---

[14] This statute provides:  "For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.  Such protest need not be in the form of an 'exception' but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in response to a protest by a party, the court expressly decided the question raised on appeal.  In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered."  N.Y. Crim. P. L. § 470.05(2).

followed New York procedural rule."  Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011); see Smith v. Lee, No. 11 Civ. 8376 (PAE), 2013 WL 2467988, at *12 (S.D.N.Y. June 7, 2013) (collecting cases holding that New York's contemporaneous objection rule is "'adequate—i.e., firmly established and regularly followed'") (quoting Richardson v. Greene, 497 F.3d 212, 219 (2d Cir. 2007)).

Here, when the trial court ruled that Fay could not call Dr. Thorpe as a witness, Bibb stated only, "I have an exception."  (Jan. 30 Tr. 986–87).  Neither in objecting to the trial court's ruling, nor in the colloquy that preceded it, did Bibb assert any constitutional grounds for calling Dr. Thorpe.  (Jan. 30 Tr. 984–87).  In finding Fay's Sixth Amendment claim "unpreserved[,]" the First Department then expressly relied on Fay's failure to argue "as a matter of constitutional law, [that] he was entitled to introduce the expert testimony" as the basis for the conclusion that Fay's "request to do so only raised questions of state evidentiary law and trial management[.]"  Fay, 170 A.D.3d at 406.  The First Department thus "'clearly and expressly state[d] that its judgment rest[ed] on a state procedural bar[,]'" thereby precluding federal habeas corpus review.  Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996) (quoting Harris v. Reed, 489 U.S. 255, 263 (1989)).  The First Department's subsequent rejection of the merits of Fay's claim "[a]s an alternative holding[,]" Fay, 170 A.D.3d at 406, does not undermine the Court's conclusion that the First Department expressly relied on Fay's procedural default.  See Glenn, 98 F.3d at 725 (rejecting petitioner's argument that appellate court waived procedural bar by "not [] mak[ing] clear that its holding on the merits was an alternative holding" and noting that, "to require a state court to use specific talismanic phrases when ruling in the alternative would be undue formalism"); Velasquez, 898 F.2d at 9 (explaining that state court's reliance on adequate and independent state ground bars Section 2254 review "even where the state court has also ruled

in the alternative on the merits of the federal claim"). Accordingly, the Court finds that the First Department relied on an adequate and independent state ground in rejecting his Sixth Amendment claim—Fay's procedural default in failing to object on Sixth Amendment grounds to the trial court's preclusion of Dr. Thorpe's testimony. See Smith, 2013 WL 2467988, at *12.

### b. Exorbitant Application of State Procedural Bar

To avoid the preclusive effect of the First Department's reliance on a procedural default, Fay argues that his request to call Dr. Thorpe was not untimely and that the First Department "exorbitantly applied" the contemporaneous objection rule. (ECF Nos. 10 at 21–25; 23 at 9–15). Fay's argument invokes the Supreme Court's recognition in Lee v. Kemna that "[t]here are . . . exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." 534 U.S. at 376. Following Lee, the Second Circuit has instructed district courts to determine "the adequacy of a state procedural bar . . . with reference to the 'particular application' of the rule; it is not enough that the rule 'generally serves a legitimate state interest.'" Cotto, 331 F.3d at 240 (quoting Lee, 534 U.S. at 387). Thus,

> the Second Circuit has recited three factors to be "used as guides in evaluating the state interest in a procedural rule against the circumstances of a particular case[]"[:] . . . (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Smith, 2013 WL 2467988, at *12 (quoting Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007));

see Cotto, 331 F.3d at 240 (describing three "guidepost[]" factors). Applying these guideposts,

the Court finds that the First Department's reliance on the contemporaneous objection rule in Fay's circumstances was not an exorbitant application of state law.

As to the first guidepost, the trial court itself could not have relied on Fay's violation of the contemporaneous objection rule because "by definition, such a violation cannot occur until a party reaches the appellate court and attempts to raise an argument that has not been preserved." Yara v. Ercole, 558 F. Supp. 2d 329, 337 (E.D.N.Y. 2008); see Cotto, 331 F.3d at 242 (finding first guidepost "less applicable . . . because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court"); Smith, 2013 WL 2467988, at *13 (quoting Cotto, 331 F.3d at 242). The Court must nevertheless inquire "whether perfect compliance with the state rule would have changed the trial court's decision." Smith, 2013 WL 2467988, at *13 (citing Garvey, 485 F.3d at 719); see Yara, 558 F. Supp. 2d at 337 (same). Here, although Bibb's "exception" advised the trial court of Fay's general objection to the denial of his request to call Dr. Thorpe, (see Jan. 30 Tr. 986–87), that "exception" did not specifically advise the trial court of Fay's Sixth Amendment argument and therefore "prevented the [trial] court from addressing head-on the issue [Fay] now raises." Smith, 2013 WL 2467988, at *13; see Richardson, 497 F.3d at 218 (holding that Batson challenge was procedurally defaulted where "[t]he most that can be said for defense counsel's objections at the state trial is that he complained that the prosecution's reasons were 'specious' and not race neutral") (citing Batson v. Kentucky, 476 U.S. 79 (1986)). Even if Bibb had recast the objection in constitutional terms, however, that would not have meant that the trial court necessarily would have allowed Dr. Thorpe to testify, let alone that his testimony "would have changed the outcome," thus "weigh[ing] against a finding of exorbitant application here." Smith, 2013 WL 2467988, at *13.

The record demonstrates that, at most, the ADA had reviewed Dr. Thorpe's CV and interviewed him, but had no written report or opinions from him, nor any studies supporting whatever amorphous theory of alcohol's effects on sleep that he planned to offer, and Bibb provided no further clarity about or foundation for Dr. Thorpe's testimony.  (Jan. 30 Tr. 985–87).  As a result, even if Bibb had argued and the trial court had expressly acknowledged that Fay had a Sixth Amendment right to call an expert, Fay appeared to fall short of meeting the New York standard for admissibility of this expert.  See Sullivan v. Lee, No. 10 Civ. 425 (CBA), 2017 WL 3634598, at *10 & n.6 (E.D.N.Y. Aug. 22, 2017) (noting that New York courts assessing admissibility of expert testimony follow test in Frye, 293 F. 1013).  Nevertheless, "it is at least conceivable that perfect compliance with the procedural rule might have affected the ultimate outcome[,]" for example, by leading the trial court to conduct a Frye hearing or grant a continuance, and therefore, "the first Lee consideration provides no significant support for finding that this application of [S]ection 470.05[] was exorbitant."  Yara, 558 F. Supp. 2d at 337–38; see Garvey, 485 F.3d at 719 (finding that "perfect compliance with the state rule would have had an impact on the trial court's decision" by giving the trial court "the opportunity to consider" the specific legal issue and therefore "d[id] not indicate that this application of [Section] 470.05[] was exorbitant"); Smith, 2013 WL 2467988, at *13 ("Whether or not that failure [to object] would have changed the outcome, it weighs against a finding of exorbitant application here.").

        "The second Lee factor directs the Court to consider New York law and determine whether the contemporaneous objection rule is firmly established and regularly followed in the particular circumstances of [Fay]'s case," Yara, 558 F. Supp. 2d at 338, i.e., when defense counsel objects to the exclusion of an expert's testimony without specifically referencing the Sixth

Amendment or <u>Chambers</u>.  410 U.S. 284.  Fay does not contend—and in fact concedes—that in

the trial court he did not explicitly object on Sixth Amendment grounds to the exclusion of

Dr. Thorpe's testimony.  (ECF No. 10 at 26 (Fay acknowledging that "the underlying constitutional

basis had not been specifically articulated")); Jan. 30 Tr. 984–87).  See <u>Richardson</u>, 497 F.3d at

219 (noting that "petitioner implicitly concedes that he never preserved the argument he makes

in his habeas petition").  Rather, Fay argues that the trial court—and subsequently, the First

Department—should have understood that he was <u>implicitly</u> making a constitutional objection

because the exclusion of <u>any</u> expert "ipso facto" implicated Fay's Sixth Amendment right-to-

defense under <u>Chambers</u>, which Bibb had referenced in the context of <u>other</u> evidentiary rulings

earlier in the trial.  (ECF No. 20 at 28–29, 48; <u>see</u> ECF No. 1-6 at 30–31; Jan. 24 Tr. 437, 441).  As

the Second Circuit has observed, however, "the New York Court of Appeals has long rejected

invitations to review constitutional arguments purportedly raised <u>implicitly</u> in the trial court."

<u>Wright v. Duncan</u>, 500 F. App'x 36, 38 (2d Cir. 2012) (citing <u>People v. Angelo</u>, 88 N.Y.2d (1996),

which held that due process claims were unpreserved where defendant did not present them to

trial court along with evidentiary objections)) (emphasis added).  Under New York law, therefore,

Fay needed to lodge a constitutional objection with sufficient specificity to enable the trial court

to consider and respond to that argument, but failed to do so.  See <u>Garvey</u>, 485 F.3d at 714–15

(explaining that "[a] general objection is not sufficient to preserve an issue since such would not

alert the court to defendant's position[]" and "to preserve a particular issue for appeal,

defendant must specifically focus on the alleged error"); <u>People v. Jackson</u>, 76 N.Y.2d 908, 909

(1990) (holding that defendant's objection to jury charge on one ground did not preserve

objection on alternate ground raised on appeal); <u>People v. McLane</u>, 256 A.D.2d 10, 10–11

(1st Dep't 1998) (holding that "fail[ure] to elaborate on the basis for [] objection . . . failed to provide the court with a fair opportunity to rectify any error and failed to preserve the issue for appellate review" under Section 470.05); see also Richardson, 497 F.3d at 220 (explaining that "the trial judge must have a shot (however remote) at correcting the allegedly erroneous exercise of authority . . . and to have a shot [s]he must know what the alleged error is"). Sixth Amendment claims are among the claims that New York courts deem unpreserved if not specifically raised. See People v. Lopez, 82 A.D.3d 1264, 1264 (2d Dep't 2011) (holding that defendant failed to preserve for appellate review Sixth Amendment right-to-defense claim by not objecting on that ground in the trial court, citing Section 470.05); People v. Schindler, 27 Misc.3d 127(A), at *1 (Sup. Ct. App. Term 2010) (holding that Sixth Amendment right-to-defense claim was unpreserved where "[t]hroughout defense counsel's offer of proof and the [trial court's] rulings thereon, there was no reference to the constitutional principles invoked on this appeal"); see also People v. Kinard, 187 A.D.3d 936, 936 (2d Dep't 2020) (holding that defendant failed to preserve Sixth Amendment Confrontation Clause claim by not objecting on that basis in the trial court, citing Section 470.05); People v. Webb, 163 A.D.3d 880, 881 (2d Dep't 2018) (holding that, where defendant's counsel "did not articulate any objection that the [witness's] testimony violated the Confrontation Clause[,]" that claim was unpreserved for appellate review). Therefore, the First Department's application of the contemporaneous objection rule in Fay's case was neither "unyielding[,]" Lee, 534 U.S. at 380, nor an "exorbitant" misapplication, but instead fell "well within the parameters of its routine and generally unquestionable application to bar review" of unpreserved Sixth Amendment claims. Whitley v. Ercole, 642 F.3d 278, 288 (2d Cir. 2011).

Third, and "'most important,' the court considers 'the realities of trial,'" and whether Fay "substantially complied with the rule in question so as to effectuate the rule's underlying purpose[.]" Smith, 2013 WL 2467988, at *14 (quoting Lee, 534 U.S. at 379).  In other words, "the court asks 'whether anything would be gained by requiring' perfect compliance[]" with the contemporaneous objection rule.  Id. (quoting Lee, 534 U.S. at 379).  As the Second Circuit has recognized, one of the purposes of the contemporaneous objection rule is "to ensure that the parties draw the trial court's attention to any potential error while there is still an opportunity to address it." Cotto, 331 F.3d at 245; see Garvey, 485 F.3d at 720 ("The basis of [Section] 470.05[] is that the trial court must be given a fair opportunity to rule on an issue of law before it can be raised on appeal.").  As noted above, Bibb's unspecified "exception" to the exclusion of Dr. Thorpe did not draw the trial court's attention to a potential constitutional error in time to address it.  See Garvey, 485 F.3d at 715 (holding that defendant's objection to testimony on one ground did not "put the trial court on notice that there might be a legal issue" on another ground, which was therefore unpreserved).  The Court also observes that, in New York courts, "[a]s a general rule, the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court[,]" and the decision to exclude expert testimony is reviewable only for an abuse of that discretion.  People v. Lee, 96 N.Y.2d 157, 162 (2001).  Here, Fay gave the trial court little more than a bare assertion of Dr. Thorpe's expertise and opinions, which was far from sufficient for the trial court to conduct the necessary "assess[ment] whether the proffered expert testimony 'would aid a lay jury in reaching a verdict.'"  Id. (quoting People v. Taylor, 75 N.Y.2d 277, 288 (1990)).  Under these circumstances, the Court has no trouble concluding that Fay's "general objection [was] not sufficient to preserve" his Sixth Amendment claim.  Garvey, 485 F.3d

at 714; see Smith, 2013 WL 2467988, at *15 (holding that application of contemporaneous objection rule was not exorbitant where defendant "never expressed to the [trial] court, either explicitly or implicitly" the claim raised in his habeas corpus petition); Yara, 558 F. Supp. 2d at 338 (holding that application of contemporaneous objection rule was not "exorbitant" where petitioner's trial counsel "only made a general objection" that "did not focus specifically on the alleged error" raised in his habeas corpus petition).

Fay's disagreement with the First Department's finding that his request to call Dr. Thorpe was "untimely" does not alter the Court's analysis of the three Lee guideposts. (ECF No. 10 at 22). Fay challenges the First Department's finding as an error of New York State law (see id. at 22–25 (disputing First Department's application of New York State cases)), but "evidentiary rulings, even if erroneous, are matters of state evidence law, not federal constitutional law" and are not "cognizable on habeas review." Olivares v. Ercole, 975 F. Supp. 2d 345, 356 (S.D.N.Y. 2013); see Wright, 500 F. App'x at 37 ("A federal habeas court generally does not review purported errors of state law.") (citing Estelle v. McGuire, 502 U.S. 62, 67–68 (1991)); Garcia v. Lewis, 188 F.3d 71, 82 (2d Cir. 1999) (noting that "it is not for us to second-guess a state court's determination as to which there is a fair and substantial basis in state law"). Moreover, the Court must defer to the state courts' findings as to whether his request was, in fact, timely. See 28 U.S.C. § 2254(e)(1); cf. Cosey, 460 F. Supp. 3d at 363–64 ("The presumption of correctness in Section 2254(e) is not limited to a decision on the merits of the petition."). And, as the Court explains further below, (see § IV.A.3.b, infra), the trial court's preclusion of Dr. Thorpe did not, ultimately, deprive Fay "of a fundamentally fair trial." Howard v. McGinnis, 632 F. Supp. 2d 253, 270 (W.D.N.Y. 2009). Thus, even if the trial court and the First Department erred in deeming his

request to call Dr. Thorpe untimely, that error does not provide a basis for federal habeas corpus

relief.  See Olivares, 975 F. Supp. 2d at 356 (finding that, even if state court's exclusion of

petitioner's expert had been erroneous, habeas corpus review was not warranted).

Accordingly, after considering all three Lee guideposts, the Court concludes that the First

Department's application of the contemporaneous objection rule was not exorbitant, and

therefore, that rule provided an adequate and independent state law ground precluding federal

habeas corpus review of the Sixth Amendment claim.  See Richardson, 497 F.3d at 220 ("Where

the case law interpreting New York's preservation rule in criminal proceedings displays consistent

application in a context similar to the one before [the court], that rule is firmly established,

regularly followed, and hence adequate for purposes of the independent and adequate state

ground doctrine.").

### c.  Cause and Prejudice

Despite his procedural default, Fay may obtain federal habeas corpus review of his Sixth

Amendment claim by demonstrating either "'cause and prejudice for the procedural default,' or

that the 'constitutional violation has probably resulted in the conviction of one who is actually

innocent of the substantive offense.'"  Murden, 497 F.3d at 194 (quoting Dretke v. Haley,

541 U.S. 386, 393 (2004)); see Coleman, 501 U.S. at 750.

The only cause that Fay asserts here is Bibb's belief "that he had adequately preserved

the record by repeated references to Chambers."  (ECF No. 23 at 16; see ECF No. 10 at 48 n.7

("With all his repeated references to Chambers [], certainly counsel understandably believed that

he had injected the relevant constitutional issues into the case with the trial judge.")); see also

ECF No. 1 at 49 ¶ 97 (asserting that "the constitutional nature of [Fay's] arguments was

abundantly clear")).  A "default resulting from [trial counsel's] inadvertence or negligence[,]" however, "is not considered 'cause' for a default." Yara, 558 F. Supp. 2d at 339 (quoting Coleman, 501 U.S. at 753); see Shinn v. Ramirez, 142 S. Ct. 1718, 1733 (2022) (same); Washington v. James, 996 F.2d 1442, 1447 (2d Cir. 1993) (same).  Here, Fay has not shown that any "'objective factor external to the defense impeded counsel's efforts' to raise the claim in state court.'" McCleskey, 499 U.S. at 493–94 (quoting Carrier, 477 U.S. at 488).  Indeed, Bibb's references to Chambers in arguments about other evidentiary issues during the trial undermine any suggestion that an external factor presented him from raising it with respect to Dr. Thorpe.[15]

Having failed to establish cause, "it is unnecessary to make an inquiry into the question of prejudice." Edwards v. Fischer, 414 F. Supp. 2d 342, 365 (S.D.N.Y. 2006).  Were the Court to consider Fay's argument that he was prejudiced by the inability to present an expert who "would have bolstered [Fay]'s own perceptions and given plausibility to his testimony as consistent with his understanding[,]" (ECF No. 23 at 16, 19), the Court would find no such prejudice for the reasons set forth below.  (See § IV.A.3.b, infra).  See also Felder v. Goord, 564 F. Supp. 2d 201, 213 (S.D.N.Y. 2008) ("To demonstrate prejudice, a petitioner must show more than that errors 'created a possibility of prejudice, but [instead] that they worked to his actual and substantial disadvantage.'") (quoting Frady, 456 U.S. at 170).

Finally, while the Court may make "an exception to the cause and prejudice requirement . . . if necessary to avoid a fundamental miscarriage of justice," Edwards, 414 F. Supp. 2d at 365 (citing Carrier, 477 U.S. at 495–96), a fundamental miscarriage of justice

---

[15] Notably, Fay does not claim that Bibb's representation was so constitutionally deficient as to be "an external factor" providing cause to excuse the default.  Coleman, 501 U.S. at 754 (noting that a violation of the right to counsel "must be seen as an external factor").

occurs only in an extraordinary case "where a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" Dixon, 293 F.3d at 81 (quoting Carrier, 477 U.S. at 496). "To establish actual innocence, petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Id. The Petition does not include an actual innocence claim, see Read v. Sup't Mr. Thompson, No. 13 Civ. 6962 (KMK) (PED), 2016 WL 165716, at *6 (S.D.N.Y. Jan. 13, 2016) (noting that fundamental miscarriage of justice exception "is expressly limited to situations where a petitioner presents a claim of actual innocence"), let alone "put forward any new evidence suggesting that he is innocent of the underlying" claims, and therefore, has not shown that a miscarriage of justice would result if his claim were not heard. Yara, 558 F. Supp. 2d at 339; see Schlup v. Delo, 513 U.S. 298, 321 (1995) (explaining that actual innocence requires "new reliable evidence" that demonstrates that "more likely than not . . . no reasonable juror would have found petitioner guilty beyond a reasonable doubt").

I therefore respectfully recommend that Fay's Sixth Amendment claim be denied as procedurally defaulted. See Edwards, 414 F. Supp. 2d at 366 (recommending dismissal of claim as procedurally defaulted where petitioner failed to show cause and prejudice or fundamental miscarriage of justice).

### 3. **Merits**

Even if Fay's Sixth Amendment claim were not procedurally defaulted, I would also respectfully recommend that the claim be denied on the merits. See Wright, 500 F. App'x at 38 (considering merits of petitioner's due process claim notwithstanding procedural default); Smith, 2013 WL 2467988, at *16 (notwithstanding procedural default, considering claims "in the interest

of thoroughness"); <u>Yara</u>, 558 F. Supp. 2d at 339 (considering merits of petitioner's claim notwithstanding failure to exhaust and procedural default); <u>Diaz v. Greiner</u>, 110 F. Supp. 2d 225, 232–33 (S.D.N.Y. 2000) (same).

Fay argues that the First Department's alternative holding that his Sixth Amendment claim failed on the merits was an objectively unreasonable application of Supreme Court precedent.  (ECF No. 10 at 49).[16]  Pointing to the "physically helpless" element of each of the crimes of which he was convicted, <u>see</u> N.Y. Crim. P. L. §§ 130.35(2), 130.50(2), 130.65(2), Fay argues that the trial court's preclusion of Dr. Thorpe's testimony unfairly deprived him of "an expert witness who could well have helped convince the jury that the crucial element of physical helplessness had not been established."  (ECF No. 10 at 50).  For the reasons set forth below, Fay has not shown that the First Department's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Harrington</u>, 562 U.S. at 103.

### a.  Supreme Court Precedent

In <u>Chambers v. Mississippi</u>, the Supreme Court held that

> [t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.  The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.

---

[16] Fay does not argue the alternative ground for relief under AEDPA, <u>i.e.</u>, that the First Department's alternative holding "was contrary to" Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  (<u>See generally</u> ECF No. 10; <u>see also</u> ECF No. 1 at 50 ¶ 98 (arguing that the state court's rulings "amounted to unreasonable applications of[] federal constitutional law addressing the Sixth and Fourteenth Amendments as determined by the Supreme Court")).

410 U.S. 284, 294 (1973); see Scrimo v. Lee, 935 F.3d 103, 112 (2d Cir. 2019) ("The Supreme Court has clearly and repeatedly held that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense[.]") (collecting cases).  The Supreme Court subsequently elaborated on these rights in Crane v. Kentucky,[17] explaining that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" that derives from "the Due Process Clause of the Fourteenth Amendment, Chambers . . . , [and] the Compulsory Process or Confrontation clauses of the Sixth Amendment[.]"  476 U.S. at 690 (citing Washington v. Texas, 388 U.S. 14, 23 (1967) and Davis v. Alaska, 415 U.S. 308 (1974)); see Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001) ("The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.").   The Second Circuit has recognized the applicability of these principles to expert witnesses.  See id.; see also Redding v. N.Y.S. Dep't of Corr., No. 17 Civ. 7075 (CS) (JCM), 2020 WL 614835, at *15 (S.D.N.Y. Feb. 10, 2020) (citing Schriver, 255 F.3d at 56).

A criminal defendant's "right to present relevant testimony is not without limitation[,]" however, Rock v. Arkansas, 483 U.S. 44, 55 (1987), and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  Chambers, 410 U.S. at 295.  Thus, "a criminal defendant's right to present evidence . . . may be limited by evidentiary and procedural rules 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence[.]'"  Scrimo, 935 F.3d at 112 (quoting Chambers, 410 U.S. at 32).  Those rules may not be "arbitrary or disproportionate to the purposes they are designed to serve."  Rock, 483 U.S.

---

[17] The First Department cited Crane in rejecting Fay's claim on the merits.  See Fay, 170 A.D.3d at 406.

at 56; see Wade v. Mantello, 333 F.3d 51, 57 (2d Cir. 2003) (noting that the Supreme Court "has found unconstitutional the rigid application of state evidentiary rules prohibiting presentation" of potentially exculpatory evidence). Of course, a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988); see Clark v. Arizona, 548 U.S. 735, 770 (2006) ("[T]he right to introduce relevant evidence can be curtailed if there is a good reason for doing that.").

### b. First Department's Application of Supreme Court Precedent

In Hawkins v. Costello, the Second Circuit provided district courts with guidance for evaluating "whether the exclusion of evidence violated a criminal defendant's right to present a complete defense[]" under the Supreme Court precedent set forth above. 460 F.3d 238, 244 (2d Cir. 2006). The Second Circuit explained that a court must "start with 'the propriety of the trial court's evidentiary ruling.'" Id. at 244 (quoting Wade, 333 F.3d at 59). If the evidence was erroneously excluded, the court then "look[s] to 'whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" Id. (quoting Justice v. Hoke, 90 F.3d 43, 47 (2d Cir. 1996)). If the evidentiary ruling was not erroneous, the court "consider[s] whether the evidentiary rule is 'arbitrary or disproportionate to the purposes [it is] designed to serve.'" Id. (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). "A state evidentiary rule will be deemed 'unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.'" Redding, 2020 WL 614835, at *15 (quoting Scheffer, 523 U.S. at 308).

**i.      Propriety of the Trial Court's Evidentiary Ruling**

The Court does not find that the trial court's preclusion of Fay's proffered expert was erroneous as a matter of New York evidentiary law.  As noted above, "the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court."  People v. Lee, 96 N.Y.2d at 162.  Thus, "[i]t is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness."  Id.  Ultimately, the trial court must determine "whether the proffered expert testimony 'would aid a lay jury in reaching a verdict.'"  Id. (quoting Taylor, 75 N.Y.2d at 288).  To the extent that Fay's request to call Dr. Thorpe represented a request for a "lengthy midtrial continuance[,]" Fay, 170 A.D.3d at 405, such an adjournment request was also "a matter of discretion for the trial court."  People v. Singleton, 41 N.Y.2d 402, 405 (1977).  In neither respect did the trial court abuse its discretion in Fay's case.

First, while the Court acknowledges that, shortly before trial, Bibb listed Dr. Thorpe as a defense witness and, during trial, provided Dr. Thorpe's CV to the ADA, who interviewed him (ECF Nos. 1-6 at 20; 21-2 at 122; see Jan. 17 Tr. 2; Jan. 24 Tr. 568; Jan. 30 Tr. 984–85), the First Department nevertheless concluded that this "advance notice . . . was inadequate under the circumstances."  Fay, 170 A.D.3d at 405.  This Court must "presume" this factual conclusion to be correct absent clear and convincing evidence from Fay to the contrary.  28 U.S.C. § 2254(e)(1).  Fay has not met that burden.  The extent of the defense proffer about Dr. Thorpe's opinions consisted of Bibb's statements that:

(1) "Dr. [Thorpe]'s area of expertise is not just sleep disorder, it is pharmacological [e]ffects on sleep [of] alcohol, drugs, things like that[]"; and

(2) Dr. Thorpe was "an expert in sleep disorders and pharm[a]cological effects that alcohol intake consumption can have on a person [a]sleep. The specifics of it would be that there are situations where alcohol intake consumption and intoxication have such an effect on a person that they can be actually be sleeping but participating in physical activities that make[] them appear to be awake and conscious."

(ECF No. 1-6 at 6, 20; Jan. 17 Tr. 2; Jan. 30 Tr. 983). At the same time, however, Bibb disavowed any reliance on "a sleepwalking defense[,]" and admitted that there had "been no reports" on this topic—whether from Dr. Thorpe or anyone else. (ECF No. 1-6 at 20; Jan. 17 Tr. 2). Furthermore, Fay does not—and cannot—dispute that he never requested a hearing or made a written application to the trial court concerning Dr. Thorpe's testimony. (See Jan. 30 Tr. 986). As Respondent correctly observes, "by the time [Fay] attempted to call Dr. Thorpe as a witness—after his last witness had testified, at the end of a two-week trial—he still had not informed the [ADA] much less the [trial] court, the substance of Dr. Thorpe's proposed testimony." (ECF No. 20 at 39). Given Bibb's ambiguous and shifting descriptions of Dr. Thorpe's testimony both before and during trial, Fay has not shown by clear and convincing evidence that the First Department erred in concluding that Fay did not give adequate notice of Dr. Thorpe's testimony and that the trial court did not abuse its discretion in not granting a continuance of the nearly complete trial.

Second, even setting aside the timing of Fay's request to call Dr. Thorpe, Fay did not meet his burden of showing that Dr. Thorpe's opinions—whatever their substance—were "generally accepted in the relevant scientific community[.]" People v. Bennett, 79 N.Y.2d 464, 472 (1992). As noted above, apart from Dr. Thorpe's CV, Fay did not provide any studies or other basis from which the trial court could have concluded that Dr. Thorpe was qualified to provide an expert opinion for the jury's consideration. See id. at 473 (explaining that a trial court may not admit

expert's opinion absent "the requisite scientific foundation"); see also People v. Heidelmark, 21 A.D.2d 767, 770 (3d Dep't 1995) (holding that trial court did not abuse its discretion in precluding expert from offering opinion on topic with which "he had no experience").

Third, "[e]ven if the trial court's preclusion of [Fay]'s proffered expert was erroneous, it did not rise to the level of constitutional error because, 'in the context of this case, the admission of the testimony would not have created an otherwise non-existent reasonable doubt about [Fay]'s guilt." Redding, 2020 WL 614835, at *16 (quoting Schriver, 255 F.3d at 60). Here, Fay "has not formally challenged the sufficiency of the evidence used to convict him—and in fact raises no other claim besides the one concerning the exclusion of his expert witness." Schriver, 255 F.3d at 60. Had he made such a challenge, the Court would be required to "view the evidence in the light most favorable to the prosecution." Id. (collecting cases). Under New York law, "a person who is sleeping is 'physically helpless' for the purposes of consenting to sexual intercourse, particularly where the sleep was drug and alcohol induced[.]" People v. Dunham, 172 A.D.3d 1462, 1463 (3d Dep't 2019) (citing People v. Williams, 40 A.D.3d 1364 (2007)). Given S.D.'s testimony, inter alia, that "what woke [her] up" was when she felt someone "having sex with [her]," and that her eyes were closed when she felt something in her mouth (Jan. 22 Tr. 188–89, 239), her testimony was not inconsistent with New York courts recognizing that "an individual in an alcoholic stupor could be awakened by painful or frightening stimuli but would remain confused and without motor control." Dunham, 172 A.D.3d at 1463. Therefore, any challenge to the sufficiency of the evidence thus "would have failed[.]" Schriver, 255 F.3d at 60 (noting that victim's testimony about petitioner raping her undermined any challenge to sufficiency of the evidence). At a minimum, the inference that S.D. was physically helpless under the circumstances

was not "beyond the knowledge of the jurors" to draw without the aid of expert testimony. Schriver, 255 F.3d at 60.   Furthermore, the Court's careful review of the trial transcript demonstrates that issues relating to whether S.D. was "physically helpless" under New York law were presented to the jury in several ways during the trial, including in the defense opening statement and summation, cross-examinations of S.D., the Expert, and the ER Nurse, and in the jury instructions.  (Jan. 19 Tr. 13; Jan. 22 Tr. 220; Jan. 23 Tr. 376–77; Feb. 1 Tr. 1035, 1045).  See Mutterperl v. Griffin, No. 13 Civ. 6028 (RJD), 2019 WL 3859400, at *9 (E.D.N.Y. Aug. 16, 2019) (denying challenge to exclusion of false confession expert where record demonstrated that petitioner "fully utilized the meaningful opportunities afforded [to] him" to challenge the voluntariness of his confession).  The fact that S.D.'s "account was open to question" does not undermine the conclusion that, "when viewed in the light most favorable to the People, there was legally sufficient evidence that the victim was physically helpless and unable to consent to any of the charged conduct[.]"  Dunham, 172 A.D.3d at 1464.  Therefore, the Court concludes that "admission of the proposed expert testimony would not have created an otherwise non-existent reasonable doubt about [Fay]'s guilt."   Schriver, 255 F.3d at 61; see Redding, 2020 WL 614835, at *16 (holding that "any purported error in the preclusion of expert testimony was harmless"); see also Wright, 500 F. App'x at 38–39 (holding that trial court's exclusion of defense witness did not violate due process and therefore did not warrant habeas corpus relief).

Fourth, to the extent that Fay contends that the Frye standard was inapplicable because Dr. Thorpe would offer only his "personal opinions," (ECF No. 10 at 56–58), the First Department found this argument also unpreserved.  Fay, 170 A.D.3d at 405–06.  In any event, although New York courts recognize that expert testimony "based on [the expert's] personal 'experience'—

meaning what he had observed, heard[,] and read about particular cases" does not implicate the Frye standard, People v. Oddone, 22 N.Y.3d 369, 375 (2013), at no point before or during the trial did Fay establish that Dr. Thorpe had any personal experience with people drinking alcohol and then engaging in physical activities while asleep—or thinking they were asleep—let alone sufficient personal experience on which the trial court could have concluded that Dr. Thorpe's testimony would aid the jury at all. This argument therefore does not alter the Court's conclusion that Dr. Thorpe's testimony was properly excluded under New York evidentiary standards.

Finally, in support of his argument that the trial court erred in precluding Dr. Thorpe's testimony, Fay relies heavily on the Second Circuit's decision granting a habeas corpus petition in Scrimo. 935 F.3d at 103. (See ECF No. 10 at 60–63). There, the petitioner was convicted of murdering a woman, "chiefly on the testimony of the only person who was in the room with them when she was killed: John Kane." Scrimo, 935 F.3d at 105. The trial court excluded the petitioner's request to call three witnesses to testify about Kane's prior drug transactions, which would have established Kane's motive to murder the victim, on the ground that their testimony was "extrinsic evidence on a collateral matter." Id. at 115. The Second Circuit held that not only was that ruling erroneous as a matter of New York evidentiary law, but that it was not harmless because "the State's case was thin[,]" and no other evidence of Kane's motive was presented to the jury, thus depriving the petitioner "of his constitutional right to present a complete defense[.]" Id. at 120. Scrimo is distinguishable, of course, not only because, as the Court has found, the trial court did not err in excluding Dr. Thorpe's testimony, but also because, as noted above, the jury heard other arguments and evidence concerning whether S.D. was "physically helpless," and thus, unlike the petitioner in Scrimo, Fay was not deprived of his constitutional

right to present a complete defense.  The Second Circuit's holding in that case therefore does not alter the Court's conclusion.

### ii.    Arbitrariness of the Evidentiary Rule

Having concluded that the trial court did not make any evidentiary error, the Court next considers whether the evidentiary rule was "arbitrary" or "infringed upon a weighty interest" of Fay.  Hawkins, 460 F.3d at 244; see Redding, 2020 WL 614835, at *16.  "In evaluating claims of violation of the right to present a complete defense, the Supreme Court has found the Constitution to be principally (but not always) concerned with state evidentiary rules leading to the blanket exclusion . . . of categories of evidence when their application is arbitrary or disproportionate to the purposes the [rules] are designed to serve."  Wade, 333 F.3d at 60.  Here, the trial court's ruling was not a blanket exclusion, but rather "one of those 'ordinary evidentiary rulings by state trial courts' concerning the admissibility of evidence, upon which the Court is 'traditional[ly] reluctan[t] to impose constitutional constraints.'"  Id. (quoting Crane, 476 U.S. at 690).  This is therefore a case in which "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence[.]"  Id.

While the trial court's analysis of Fay's request to call Dr. Thorpe was not particularly lengthy, that is largely the result of Fay's decisions to delay a proffer until after he and all his other witnesses had testified and to refrain from providing the trial court with any formal motion or other substantive materials regarding Dr. Thorpe or any legal authority supporting his testimony.  (Jan. 30 Tr. 983–87).  The trial court's evidentiary ruling, (see § II.B.1.c.iii, supra), was tailored to the circumstances of Dr. Thorpe's testimony, and did not amount to a wholesale preclusion of Fay from introducing any evidence or otherwise vigorously contesting whether S.D.

was physically helpless.  Therefore, the evidentiary ruling did not involve "the rigid application of state evidentiary rules prohibiting presentation of defense evidence[,]" Wade, 333 F.3d at 57, and was not "unconstitutionally arbitrary or disproportionate[.]" Redding, 2020 WL 614835, at *16; see DeVaugn v. Graham, 14 Civ. 2322 (NGG), 2017 WL 244837, at *14 (E.D.N.Y. Jan. 18, 2017) (holding that trial court's exclusion of evidence under state rule requiring balancing probative value against risks of delay, prejudice, and confusion was not unconstitutionally arbitrary or disproportionate); Monk v. Bradt, 778 F. Supp. 2d 352, 374 (W.D.N.Y. 2011) (holding that trial court's exclusion of evidence was not unconstitutionally arbitrary or objectively unreasonable).

Accordingly, the First Department's holding that the trial court properly precluded Fay's request to call Dr. Thorpe was not "an unreasonable application of[] clearly established federal law." Redding, 2020 WL 614835, at *17; see Paccione v. New York, 353 F. Supp. 2d 358, 370 (E.D.N.Y. 2005) (denying petition where appellate court's affirmance of trial court's preclusion of defense expert was neither contrary to nor an unreasonable application of Supreme Court precedent); Gil v. Mazzuca, 91 F. Supp. 2d 586, 592 (S.D.N.Y. 2000) (denying habeas corpus relief where petitioner failed to show that "the expert testimony offered [] [was] constitutionally mandated").

## V. CONCLUSION

For the reasons set forth above, I respectfully recommend that Fay's Petition be DENIED.

Dated:      New York, New York
            February 14, 2023

_____
SARAH L. CAVE
**United States Magistrate Judge**

*          *          *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Engelmayer.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).