UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE FAY,

                                        Petitioner,

                    -v-

ANTHONY F. ANNUCCI, *Commissioner,*
*New York State Department of Corrections*
*and Community Supervision,* and EARL BELL,
*Superintendent, Clinton Correctional Facility,*

                                        Respondents.

20 Civ. 187 (PAE) (SLC)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves a counseled habeas corpus petition filed by New York State

prisoner George Fay (the "Petition") pursuant to 28 U.S.C. § 2254.  It also resolves motions to

stay the case and amend the Petition that Fay made after a Report from the Magistrate Judge had

issued that recommended denial of the Petition.

Fay was convicted in New York State court of first-degree rape and other offenses arising

out of a July 2016 incident.  On January 9, 2020, Fay filed the Petition, challenging these

convictions.  *See* Dkt. 1 ("Pet.").  The Petition was opposed by respondent Anthony Annucci,

Commissioner of the New York State Department of Corrections and Community Supervision.

On February 14, 2023, the Honorable Sarah L. Cave, United States Magistrate Judge, to whom

the Court had referred the Petition, issued a Report and Recommendation recommending denial

of the Petition.  *See* Dkt. 31 ("Report").  Fay did not object to the Report.  However, on May 22,

2023, while the Report was pending with this Court, Fay moved to amend the Petition and stay

this case while he initiated and pursued a state claim of ineffective assistance of trial counsel.

*See* Dkt. 48.  On June 16, 2023, Judge Cave issued a Report and Recommendation,

recommending denial of both motions. *See* Dkt. 51 ("Second Report"). On July 7, 2023, Fay objected to the Second Report. Dkt. 54 ("Obj."). On August 9, 2023, Annucci responded. Dkt. 60 ("Resp.").

Following review of the Reports, the objections, and response, the Court adopts Judge Cave's recommendations. The Court denies the Petition and the motions to amend and stay it.

## I.    Factual Background

The Court adopts the Reports' detailed accounts of the factual background and procedural history of this case, to which no party objects. The following summary, drawn from the Report and Second Report, and from the state-court record, *see* Dkt. 21 & Exs. 1–3; Dkt. 22 & Exs. 1–2, presents the limited facts necessary to assess the issues presented.[1]

### A.    Fay's Rape of S.D. in July 2016

The evidence at trial established the following.

In June 2016, Fay began a summer internship in New York City. 01/19/2018 Tr. at 792. He lived in an Upper East Side apartment owned by a family friend. *Id.* The night of July 8, 2016, Fay met up with Jack Slye, Don Sobell, and Sam Reardon at a bar. *Id.* at 796. Slye, Sobell, and Reardon were visiting from out-of-town and had made plans with Fay to stay in his apartment. *Id.* at 25.

That night, Slye also invited S.D. to the bar. *Id.* at 35. Slye and S.D. knew each other from college and had a sexual history together. *Id.* at 21. S.D. met Slye around midnight at the bar where he, Fay, Sobell, and other friends were drinking. *Id.* at 39. Almost immediately after S.D. met up with Slye, they left together, and took a taxi to Fay's apartment. *Id.* at 39–40. There, Slye and S.D. had sex in Fay's bed and fell asleep. *Id.* at 42–43.

---

[1] In citing here to the Report and Second Report, the Court omits embedded record citations.

Around 3 a.m., Fay and Sobell took an Uber back to the apartment. 01/29/2018 at 801. After watching television and smoking marijuana, Fay went to his bedroom where Slye and S.D. were sleeping. *Id.* at 804–06. Fay crawled into bed with them and had sex with S.D. while she was asleep. *Id.* at 806; 01/22/2018 Tr. at 188–90. S.D. testified that her eyes were closed when she felt something in her mouth, and that what woke her up was when she felt someone "having sex with [her]." 01/22/2018 Tr. at 188. At that point, she immediately "jumped out" of bed when she "realized it wasn't a dream" and realized that someone she did not recognize—not Slye—was "[o]n top of [her]." *Id.* at 190. S.D. went into a "full hysterical panic, grabbing [her] clothes," and awakened Slye. *Id.* Slye remembered waking up and that S.D. was screaming in the hallway, "very shaky and jittery and upset," 01/19/2018 Tr. at 46, yelling that "there was someone else in the room," and "physically shaking, convulsing," *id.* at 47; S.D. told Slye "what [had] just happened" and stated that they "had to leave," 01/22/2018 Tr. at 191. Seeing Fay, whom she recognized as her assailant, standing in the kitchen, S.D. asked who he was, and told Slye she wanted to call the police. *Id.* at 192–93. Fay told Slye, "it's not what it seems." 01/19/2018 Tr. at 47. Slye told S.D. that they "need[ed] to get out of the apartment," and they "grabbed [their] stuff and then left the apartment." *Id.* at 49. Before S.D. left the apartment, Fay shook Sobell, who had been asleep on the living room couch, awake, and said "[s]he kissed my neck, so I started going with it and then one thing led to another and she was giving me a blow job." 01/24/2018 Tr. at 465. Fay looked anxious and upset, *id.* at 509; Sobell heard S.D. call Fay "scum," and heard Fay say, "[t]his is not good," *id.* at 466.

Shortly thereafter, Slye and S.D. left the apartment. The doorman, seeing how upset S.D. was, asked her what happened. *See* 01/22/2018 at 194; 01/26/2018 at 731. S.D. responded that she had been raped. 01/26/2018 at 731. The doorman, shortly before 6 a.m., called the police,

3

while S.D., shaking and crying hysterically, waited. 01/26/2018 Tr. at 642, 731–32. Police arrived around 6 a.m. *Id.* at 668. S.D. was taken by ambulance to the hospital where she reported to the emergency room nurse having awakened to find "someone having vaginal intercourse with her and also oral intercourse." 01/23/2018 Tr. at 279. She presented as "visibly upset, anxious, but completely alert, oriented, [and] aware of her surroundings." *Id.* at 331. A nurse administered a rape kit. *Id.* at 362. Forensic data revealed that Slye's and Fay's DNA matched the DNA of the swabs collected from the rape kit. 01/26/2019 Tr. at 620, 624.

Fay was arrested in the apartment. 01/23/2019 Tr. at 377. That day, a private investigator hired by Fay's defense counsel questioned Slye, Sobell, and Reardon, and searched the apartment and found pieces of a surgical lubricant package. 01/24/2019 Tr. at 441, 469.

## B. State Court Proceedings

### 1. Pre-Trial, Trial, and Sentencing

The Indictment, filed on August 26, 2016, charged Fay with: first-degree (1) rape in violation of New York Penal Law § 130.35(2); (2) criminal sexual act in violation of New York Penal Law § 130.50(2); and (3) abuse in violation of New York Penal Law § 130.65(2). Dkt 1., Ex. 1. As to each offense, the indictment charged that Fay had had sex with a person who "was incapable of consent by reason of being physically helpless." *Id.*

Trial began on January 19, 2018. 01/19/2018 Tr. The prosecution's witnesses at trial included S.D., Slye, Sobell, the doorman, the emergency room nurse, police officers who responded to the call the morning of July 9, an expert on sexual assault forensic examinations, an expert in DNA analysis, and phone company representatives who authenticated phone records. Report at 10–11.

4

On the defense case, Fay testified, stating that S.D. had instigated the sexual intercourse, had said "yes" twice during the act, and had appeared to him to be awake and conscious. 01/29/2018 Tr. at 807–10.  On cross-examination, Fay admitted that outgoing calls to Backpage, a website that advertises commercial sex to potential customers, had been made from his phone at about 4 a.m. on July 9, but denied making such calls himself. *Id.* at 868–72.  The defense also called two character witnesses, and its investigator who had found the lubricant package. 01/30/2018 Tr. at 912, 941, 963.  In opening statements, Fay's counsel stated that S.D. had given "several versions" of what happened that evening.  01/19/2018 at 11.  In closing argument, Fay's counsel highlighted S.D.'s statement to a nurse that she "saw it happening to me from far away," her statement to Slye that she had originally "thought it was" him, and her statements to the NYPD that she "was half-awake" and "groggy."  02/01/2018 at 1045–46.

Salient to Fay's present motion, an issue litigated at trial involved his counsel's bid to call Dr. Michael Thorpe as a defense witness.  Fay was represented at trial by Daniel Bibb, Stephen Saracco, and Noreen Travers.  At a pretrial hearing on January 8, 2018, Bibb told the presiding Justice, Hon. Melissa Jackson, that he intended to call "[f]our, potentially five" witnesses, but he did not identify them.  01/08/2018 Tr. at 24.  On January 10, 2018, when jury selection began, Bibb gave the court a list of defense witnesses that included Thorpe.  01/10/2018 Tr. at 7.  On January 17, 2018, with jury selection ongoing, the Assistant District Attorney ("ADA") asked Bibb for "any reports" Thorpe had "generated as well as [a] C.V."  01/17/2018 at 2.  The ADA noted that based on her "brief interview" of Thorpe, he appeared to be "a sleep disorder doctor" and asked whether "the defense is going to go into a sleepwalking defense." *Id.*  Bibb responded that the defense would not assert such a defense, and that Thorpe's "area of expertise is not just sleep disorder, it is pharmacological [e]ffects on sleep [of] alcohol, drugs, things like that," and

stated that there had "been no reports" on the topic. *Id.* Bibb promised, however, to provide Thorpe's CV the following day. *Id.* The court noted that the ADA was entitled to the CV. On January 24, 2018, at the conclusion of a hearing on other evidentiary issues, the ADA noted that Bibb had not yet provided her with Thorpe's CV and that she might object to his testimony; Bibb promised to send it that evening. 01/24/2018 Tr. at 568.

On January 30, 2018, at the close of the defense case, Bibb stated that he intended to call Thorpe as a final defense witness, as "an expert in sleep disorders and pharmacological effects that alcohol intake consumption can have on a person [a]sleep." 01/30/2018 Tr. at 983. Bibb stated that he had given Thorpe's CV to the ADA. *Id.* Bibb stated that he anticipated that Thorpe would testify that "there are situations where alcohol intake consumption and intoxication have such an effect on a person that they can actually be [sic] sleeping but participating in physical activities that make[] them appear to be awake and conscious." *Id.* Bibb stated that he "would probably pose hypothetical questions of [Thorpe] based on some of the evidence that's been brought out at trial." *Id.* at 984.

Asked by Justice Jackson "[h]ow much notice" she had been given of Thorpe's proposed testimony, the ADA responded that "[t]his is the first I've heard" of it. *Id.* Bibb (although later recanting on this point) claimed to have given the ADA the CV "months ago." *Id.* Bibb stated that he had explained to the ADA that Thorpe would testify about the "pharmacological effects that alcohol can have on sleep and behavior." *Id.* The ADA disputed those claims. She stated that she had first received the CV "last Wednesday" and only after she pressed Bibb in court; that Bibb had not responded to her query about the opinions as to which he proposed to call Thorpe to testify; and that in their one conversation "months ago" on the subject, Bibb had described Thorpe as a "sleep expert." *Id.* at 985. The ADA noted that Bibb's CV indicated that

6

his expertise was on "sleep disorders, namely, narcolepsy, insomnia, and sleep apnea"; that the

CV did not disclose where Thorpe had worked; that the CV did not say anything about Thorpe's

"knowledge of the pharmacological effects of alcohol"; and that she had not found any studies or

publications by Thorpe to the effect that alcohol could cause a person to appear to be awake and

conscious while in fact sleeping. *Id.* at 985–86. The ADA moved to preclude Thorpe's

testimony on the grounds of inadequate notice and that the defense had not established a

sufficient basis for his claimed expertise. *Id.* Bibb, in response, did not identify any studies or

writings by Bibb on this point, or any written notice or application previewing such testimony,

and admitted giving the CV to the ADA "last week." *Id.* at 986.

Justice Jackson excluded the proposed testimony. She stated: "At the very minimum, Mr.

Bibb[], as you're well aware, this kind of evidence or testimony has to be done in a written form

with plenty of notice and a ruling by the court before I would permit it. So to just proffer this

now when you've already had several witnesses testify, I'm at a loss to understand such a late

notice." *Id.* at 986–87. She noted the unclear "credentials of this witness." *Id.* at 987. And she

noted that the lack of notice to the prosecution and the Court had prevented the Court from

making a ruling whether there is "indeed expert testimony" recognized in the scientific

community along the lines" that "someone can actually be intoxicated and not be aware they're

participating." *Id.* at 987.

After deliberating during the afternoon of February 1 and the morning of February 2,

2018, the jury returned a verdict finding Fay guilty on all three counts. 02/02/2018 Tr. at 6–10.

On April 17, 2018, Justice Jackson sentenced Fay to 10 years' imprisonment and five years of

post-release supervision on the rape count and the criminal sexual act count, and seven years'

imprisonment and five years of post-release supervision on the sexual abuse count, the terms to

run concurrently. 04/17/2018 Tr. at 21–22. She also found Fay a sexual offender and imposed an order of protection requiring him to stay away from S.D. for 10 years. *Id.* at 22.

### 2. Direct Appeal

On direct appeal, Fay was represented by a new lawyer, Mark M. Baker. Second Report at 6.

On March 5, 2019, the Appellate Division (First Department) affirmed. *People v. Fay*, 170 A.D.3d 404 (1st Dep't 2019). It held that the evidence was legally sufficient, and that the verdict was not against the weight of the evidence. *Id.* at 404. It held that the record did not support Fay's theory that S.D., while semiconscious as a result of intoxication and fatigue, had mistaken Fay for Slye and had unwittingly engaged in consensual sex with Fay. *Id.* at 405. That theory, it held, was both "implausible" and "contradicted by the victim's testimony, as well as by defendant's own testimony." *Id.*

Salient here, the First Department rejected Fay's argument that the trial court violated his Sixth Amendment right to present a defense when it precluded Thorpe's testimony. The court, it held, had "providently exercised its discretion" in denying Fay's request "to call an expert on sleep disorders, who would have testified about the effects of alcohol on sleep and behavior." *Id.* The First Department explained that Fay had given the trial court inadequate notice, inhibiting it from conducting a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and effectively precluding the prosecution from retaining a rebuttal expert. Further, the First Department held, Fay had not proffered a scientific basis for the proposed testimony. *Id.* Finally, because Fay had "never asserted that, as a matter of constitutional law, he was entitled to introduce the expert testimony, his request to do so only raised questions of state evidentiary law and trial management." *Id.* at 406. The First Department therefore declined to review Fay's

unpreserved constitutional claim, while stating, in the alternative, that it would reject any such claim on the merits. *Id.*

On April 3, 2019, Fay filed a motion to reargue with the Appellate Division, citing a "newly obtained transcript" that ostensibly contradicted the ADA's claim not to have heard Fay's proffer of Thorpe's testimony before January 17, 2018. Dkt. 1, Ex. 4 at 7, 15. On July 16, 2019, the First Department denied the motion to reargue. *Id.*, Ex. 5 at 12–15.

Fay also sought leave to appeal to the New York Court of Appeals, proposing to raise a series of claims relating to the preclusion of Thorpe's testimony. On August 20, 2019, the Court of Appeals denied Fay's application. *People v. Fay*, 34 N.Y.3d 930 (2019); *see* Report at 18.

Fay's conviction became final on November 18, 2019.[2]

### C. This Federal Habeas Corpus Proceeding

#### 1. Fay's § 2254 Petition

On January 9, 2020, Fay, represented by appellate counsel Baker, timely brought the Petition for a writ of habeas corpus under § 2254, challenging his convictions on all counts.[3] *See* Pet. at 4–5. Fay argued that precluding Thorpe's testimony violated his Sixth Amendment right to present a defense. *See generally* Dkt. 10 ("Pet. Mem."). The Court referred the Petition to Judge Cave. Dkt. 6.

#### 2. Judge Cave's Report

On February 14, 2023, Judge Cave issued the Report. It recommended that the Petition's Sixth Amendment claim be denied as both procedurally barred and deficient on the merits.

---

[2] A New York State conviction becomes final 90 days after the final order of the Court of Appeals (*i.e.*, when the time to seek U.S. Supreme Court review has expired.). *Espiritu v. Haponik*, No. 05 Civ. 7057 (RJS), 2012 WL 161809, at \*9 (S.D.N.Y. Jan. 19, 2012).

[3] The one-year statute of limitations to file a petition under § 2254, imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244, expired on November 18, 2020.

As to the procedural bar, the Report explained, the First Department had rejected Fay's Sixth Amendment claim because Fay had failed to contemporaneously object to the preclusion of Thorpe's expert testimony based on the Sixth Amendment. This adequate and independent state ground for affirmance barred that claim as a basis for relief under § 2254. Report at 26–36. And Fay did not identify cause and prejudice for the procedural default. *Id.* at 36 (citing *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991)). Bibb's ostensible belief that he had preserved the claim was not "cause for a default." *Id.* at 36–37. And the Report did not find prejudice to Fay from precluding Thorpe's testimony, or that making an exception to the cause and prejudice requirement was necessary "to avoid a fundamental miscarriage of justice." *Id.* at 37–38 (citations omitted). The Petition, Judge Cave noted, did not claim actual innocence, let alone put forward new evidence to that effect. *Id.* at 38.

The Report also found that the Sixth Amendment claim failed on the merits. *Id.* at 38. Fay did not argue that the First Department's holding "was contrary to" Supreme Court precedent. *Id.* at 39 n.16 (citing 28 U.S.C. § 2254(d)(1)). And, for five reasons, the Report rejected Fay's argument that, in denying his Sixth Amendment claim, the First Department had unreasonably applied Supreme Court precedent. *Id.* at 39–40.

First, the Report noted, a criminal defendant's right to present relevant testimony "is not unlimited" and must accommodate evidentiary and procedural rules "designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* at 40 (citing, *inter alia, Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Scrimo v. Lee*, 935 F.3d 103, 112 (2d Cir. 2019)); *see also* Report at 41 (a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence" (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). The Report, like the Appellate Division, found the

trial court's preclusion of Fay's proffered expert, Thorpe, not erroneous as a matter of New York evidentiary law. Report at 42 (citing, *inter alia*, *People v. Singleton*, 41 N.Y.2d 402, 405 (1977)). Fay had given inadequate notice of Thorpe's testimony; had never requested a hearing or made an application to receive that testimony until the close of the defense case; and his counsel had made ambiguous and shifting previews of Thorpe's testimony. *Id.* at 42–43.

Second, the Report found, independent of the defense's faulty notice and timing, Fay had not shown that Thorpe's opinions were "generally accepted in the relevant scientific community," as required for admission under state rules of evidence. *Id.* at 43 (cleaned up) (citing *People v. Bennett*, 79 N.Y.2d 464, 472 (1992)). Fay did not provide the trial court with any studies or basis on which to conclude that Thorpe was qualified to provide the proposed expert opinion for the jury to consider. *Id.* at 43–44.

Third, the Report found, the Sixth Amendment claim failed because, even if precluding of Thorpe's testimony had been error, in the context of the case, admitting that testimony would not have given rise to a reasonable doubt. *Id.* at 44. Fay had not challenged the sufficiency of the evidence of his guilt. Had he made such a challenge, the court would be required to "view the evidence in the light most favorable to the prosecution." *Id.* at 44 (citations omitted). Viewing the evidence in the light most favorable to the State, such a claim would have failed, the Report found, including in light of New York law that a sleeping person "is 'physically helpless' for the purpose of consenting to sexual intercourse, particularly where the sleep was drug and alcohol induced." *Id.* at 44 (citing *People v. Dunham*, 172 A.D.3d 1462, 1463 (3d Dep't 2019)). Here, the Report noted, there had been ample and varied evidence at trial that S.D. had been "physically helpless," and the defense opening had said as much. *Id.* at 44–45. Therefore, "admission of the proposed expert testimony would not have given rise to an otherwise non-

11

existent reasonable doubt about [Fay]'s guilt." *Id.* (citing *Washington v. Schriver*, 255 F.3d 45, 61 (2d Cir. 2001)).

Fourth, the Report found, to the extent that Fay contended that the *Frye* standard for expert testimony was inapplicable because Thorpe would have offered only his "personal opinions," the First Department had found that argument unpreserved. And to the extent New York law permitted expert testimony based on the expert's personal experience to be received, "at no point before or during the trial did Fay establish that Dr. Thorpe had any personal experience with people drinking alcohol and then engaging in physical activities while asleep—or thinking they were asleep—let alone sufficient personal experience on which the trial court could have concluded that Dr. Thorpe's testimony would aid the jury at all." Report at 46.

Fifth, the Report found easily distinguishable a Second Circuit precedent, *Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019), that granted a habeas corpus petition. Report at 46. Among other distinctions, the petitioner there had been convicted based chiefly on one eyewitness's testimony; the State's case was thin; and the trial court had erroneously excluded three defense witnesses who would have impeached that witness. *Id.* In contrast, the Report noted, the trial court here had not erred in excluding Thorpe's testimony; there was varied evidence about S.D.'s physically helpless state; and Fay had not shown a denial of his right to present a complete defense. *Id.* at 46–47.

The Report accordingly recommended that Fay's § 2254 Petition be denied. Fay did not object to the Report.

### 3. Fay's Letter-Motions to Stay and to Amend

On April 24, 2023, with the Report under review by this Court, Fay, again through Baker, filed a letter-motion to stay the case and hold the Petition in abeyance under *Rhines v. Weber*,

544 U.S. 269 (2005), so that he could raise, in state court, a claim of ineffective assistance of trial counsel under New York Criminal Procedure Law ("CPL") § 440.10(1)(h). Dkt. 38. Baker wrote: "Given the essence of the Magistrate's report and recommendation (R&R), which was predicated in its entirety on the failures of trial counsel, [Fay and his father] have elected to now proceed in Supreme Court, New York County, in order to litigate a [§ 440.10] motion." *Id.* at 1.

On May 4, 2023, Baker submitted another letter. It stated that "there is a serious question about whether [he] may have erred" by not first bringing a state-court CPL § 440.10 motion. Dkt. 44 at 1. It stated that Baker had asked attorney Joel Rudin to research the issue. He added: "If Mr. Rudin concludes that I have acted unreasonably and hence, that he could successfully seek an amendment and an abatement of the petition by raising an issue of ineffective assistance of counsel, I have encouraged him to move to substitute [] me as habeas counsel and to so move." *Id.* at 2. Baker sought time to file a motion to amend the Petition, to enable Fay to consult with Rudin and determine to substitute Rudin for Baker as counsel. *Id.* at 1. The Court granted the extension request. Dkt. 45.

On May 22, 2023, Rudin, newly retained, filed a letter seeking: (1) leave to amend the Petition to add an ineffective assistance of counsel ("IAC") claim with respect to Fay's trial counsel, and (2) an order staying the Petition while Fay exhausted the IAC claim in state court. Dkt. 48. On May 30, 2023, Annucci filed a letter in opposition. Dkt. 49. This Court referred these motions to Judge Cave. Dkt. 50.

### 4. Judge Cave's Second Report

On June 16, 2023, Judge Cave issued the Second Report. She recommended denial of both motions.

*The motion to amend*:  Such motions, the Report noted, are governed by Federal Rule of

Civil Procedure 15(a), under which a court may deny leave to amend to thwart "tactics that are

dilatory, unfairly prejudicial or otherwise abusive," or on grounds of futility.  Second Report at

15 (citing *Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001)).  A habeas petition must be filed

within one year of the state court judgment becoming final, although this period is tolled while

state post-conviction proceedings are pending after final judgment, *id.* at 16 (citing 28 U.S.C.

§ 2244(d)(1)–(2)); after AEDPA's one-year limitations period has expired, a timely filed habeas

petition may be amended only where the new claim "relates back" to the original petition, *id.*

(citations omitted).  The Report found Fay's IAC claim timely because, although filed well after

the one-year limitations period, it related back to the timely Petition because it shared common

operative facts with the right-to-defense claim in the Petition.  *Id.* at 18–20.  But, the Report

noted, Fay had not brought, and thus had not exhausted as § 2254 required, the IAC claim in

state court.  Thus, unless the Court was prepared to stay and hold in abeyance the Petition while

Fay brought and exhausted an IAC claim in state court, the proposed amended Petition would be

futile.  *Id.* at 20–21.

*The motion to stay*:  Under *Rhines*, the Report noted, a court may stay a mixed habeas

corpus petition—containing exhausted and unexhausted claims—if the petitioner has shown:

(1) "good cause" for failing to exhaust his claims first in state court; (2) that his claims are not

"plainly meritless"; and (3) that he has not engaged in "intentionally dilatory litigation tactics."

*Id.* at 14 (citing *Rhines*, 544 U.S. at 277–78).  As to good cause, Fay argued that his appellate

counsel had been ineffective in failing to bring a post-conviction claim on direct appeal or as a

CPL § 440.10 motion, in which he would have faulted trial counsel for failing to make an

adequate proffer as to Thorpe's testimony.  Report at 21.  The Report rejected that appellate

14

counsel's asserted lapse, itself an unexhausted IAC claim, constituted "good cause." *Id.* at 22.  It rejected that Fay's appellate counsel Baker's performance was "so constitutionally deficient as to demonstrate good cause for failing to exhaust the IAC [c]laim" as to trial counsel. *Id.* at 22–23. It noted that under *Strickland v. Washington*, 466 U.S. 668, 689 (1984), a petitioner must first show that counsel's performance "fell below an objective standard of reasonableness," that an appellate counsel need not "raise every 'nonfrivolous' argument, 'if counsel, as a matter of professional judgment, decides not to present these points,'" and that the assessment of counsel's performance is not to be made with the benefit of hindsight. *Id.* at 23 (citations omitted).  But the Report, drawing upon Baker's submission in support of a stay, found that Baker had had a "reasoned, strategic basis for not asserting the IAC claim" on direct appeal: that such "would have been inconsistent with the [right-to-defense] claim on the merits." *Id.* at 24 (citing Dkt. 38 at 10) (case citations omitted).

In any event, the Report found, Fay did not satisfy *Strickland*'s second prong, which required him to show a "reasonable probability that [the IAC] claim would have succeeded." *Id.* at 24 (citing *Claudio v. Scully*, 982 F.2d 798, 805 (2d Cir. 1992)).  The First Department, it noted, had found the verdict supported by the weight of the evidence, and had rejected as implausible—and as contradicted by the testimony of both the victim and Fay—the theory underlying Thorpe's proffered testimony that S.D., "while in a semiconscious state resulting from intoxication and fatigue . . . mistook [Fay] for the other man, who was her sex partner, and unwittingly engaged in sex with him." *Id.* at 25–26 (citing *Fay*, 170 A.D.3d at 405).  "Because the First Department rejected the theory on which Dr. Thorpe's testimony would have been based, Fay cannot show that an ineffective assistance claim based on trial counsel's allegedly deficient proffer [of that testimony] would have succeeded on direct appeal." *Id.* at 26.  And

therefore, appellate counsel's failure to raise the IAC claim "would similarly have failed on direct appeal." *Id.* at 27.  The same applied to an IAC claim brought under § 440.10, and Fay's "unexplained delay" to bring which "provides an additional reason to deny the Stay motion." *Id.* at 28.

Concluding, the Report noted that where a defendant is represented by different counsel on appeal than at trial, counsel's strategic choices as to what issues to raise on appeal "made after thorough investigation of law and facts . . . are virtually unchallengeable." *Id.* at 28 (quoting *Strickland*, 466 U.S. at 690–91).  The Report accordingly found that Fay had failed to show good cause for his failure to raise an IAC claim in the New York state courts. *Id.*  And, it found, even if Fay had established good cause, the IAC claim was "plainly meritless," and thus did not satisfy the second *Rhines* factor. *Id.* at 29 (citations omitted).  The Report accordingly recommended denying the motions to stay and amend. *Id.* at 30.

### 5.  Fay's Objections

On July 7, 2023, Fay filed objections to the Second Report.  Dkt. 54 ("Obj").  On August 9, 2023, Annucci filed a memorandum in opposition to the objections.  Dkt. 59.  On November 16, 2023, Rudin filed a letter reporting that Fay had filed a CPL § 440.10 motion in state court, and attached the motion and its supporting papers.  Dkt. 62 & Ex. 1.

## II.  Discussion

### A.  Report Recommending Denial of § 2254 Petition

The Court first considers Judge Cave's initial Report, issued February 14, 2023.  In reviewing such a Report, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When specific objections are made, "[t]he district judge must determine *de novo* any part of the

magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).  To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)).

Here, Judge Cave's Report recommended denial of Fay's § 2254 Petition, which alleged that precluding Thorpe's testimony had violated his Sixth Amendment right to present a defense. The Report found the Sixth Amendment claim procedurally and substantively deficient.  Fay had procedurally defaulted this claim.  *See* Report, at 26–38.  And the claim also failed on the merits, the Report found, because precluding Thorpe's testimony was not an unreasonable application of clearly established federal law, and because any error in precluding it was harmless.  *See* id. at 38–48.  Fay did not object and has not objected to this first Report.  As such, review for clear error is appropriate.

The Court's careful review of Judge Cave's thorough and well-reasoned Report reveals no facial error in its conclusions.  Quite to the contrary, the Report is a model of conscientious and perceptive analysis, reflecting close attention to the trial record and the governing law, state and federal.  The Court accordingly adopts the unobjected-to Report without modification and adopts its full analysis recommending rejection of Fay's Sixth Amendment claim and dismissal of the Petition.  Because the Report states that the parties' failure to file objections within 14 days from service of the First Report "will result in a waiver of objections and will preclude appellate review," *id.* at 49, Fay's failure to object operates as a waiver of appellate review, *see Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (citing *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)).

### B. Report Recommending Denial of Fay's Motions to Amend and Stay

The Court next considers Judge Cave's Second Report, issued June 16, 2023, which recommends denying Fay's April 24 and May 22, 2023 motions (1) to amend the Petition to add an IAC claim; and (2) to stay the case while Fay exhausts the IAC claim in state court. These motions were made possible only because this Court did not adopt Judge Cave's initial Report and dismiss the Petition promptly after the deadline to object passed on February 28, 2023. Had the Court done so, consistent with its usual practice of promptly adopting well-reasoned Reports to which there has been no objection, there would not have been an opportunity for Fay's two motions, which together effectively seek leave for a do-over § 2254 petition.

In all events, the Court adopts Judge Cave's recommendation to deny both motions, substantially for the reasons set out in her equally thoughtful Second Report. The parties dispute whether these recommendations are subject to *de novo* review, as befitting a dispositive motion, *see* Fed. R. Civ. P. 72(b)(3), or clear error review, as befitting a non-dispositive motion, *see* Fed. R. Civ. P. 72(a). As the parties recognize, courts in this Circuit have applied varied standards of review to Reports addressing such motions. *Compare Mitchell v. Superintendent*, No. 20 Civ. 1189 (JLS), 2022 WL 856752, at *1 (W.D.N.Y. Aug. 9., 2021) (treating petitioner's motion to stay and hold the petition in abeyance as non-dispositive), *with Wright v. Poole*, No. 02 Civ. 8669 (KMK), 2012 WL 4478393, at *1–2 (S.D.N.Y. Sept. 28, 2012) (treating such motions as dispositive). The Court need not resolve this dispute, however, because it finds Judge Cave's recommendation to deny the motions correct under even the more rigorous standard of *de novo* review.

Fay's objections only concern Judge Cave's recommendation to deny the motion to stay. As to the motion to amend, Judge Cave's account of the governing legal standards undisputedly

was correct.  So, too, was her conclusion that Fay's IAC claim was timely insofar as that claim shared common elements with, and hence related back to, the Petition's failed Sixth Amendment claim.  Judge Cave recommended denying the motion to amend.  She found that amending the Petition to add an IAC claim would be futile because Fay had not exhausted—or even brought—such a claim in state court.  That futility could be cured only if this Court were to grant Fay a stay—so as, effectively, to defer dismissal of the Petition notwithstanding its present deficiency—until Fay had brought and exhausted a state IAC claim.  Fay does not dispute this analysis, or that his motion to amend the § 2254 Petition thus necessarily fails unless the motion to stay is granted.

As to the motion to stay, the standard is not in dispute.  A petitioner must show that: (1) he had "good cause" for his failure to exhaust; (2) his unexhausted claims are not "plainly meritless"; and (3) he did not engage in "intentionally dilatory litigation tactics."  *See Rhines*, 544 U.S. at 277–78.  As noted, Judge Cave found that Fay did not satisfy the first two *Rhines* factors.  Fay's objections are to these findings.

### 1.  Lack of Good Cause for a Stay

Fay argued that his appellate counsel had been ineffective in failing to bring an IAC motion under § 440.10 and that such constituted "good cause" for a stay.  Judge Cave rejected that argument.  She noted that Fay's appellate counsel, Baker, had explained his decision to forgo such a motion as tactical, to avoid undercutting the right-to-defense claim on which Fay's direct appeal centered, and while that tactic might not be compelling, it was defensible.  Second Report at 24 (citing Dkt. 38 at 10).  She further noted that Fay was making a two-layer IAC claim, faulting trial and appellate counsel for ineffectiveness, without having exhausted either claim.  Second Report at 22–23.  In all events, applying the *Strickland* test to Fay's claim that

appellate counsel lapsed in failing to bring a § 440.10 motion with an IAC claim, she found, did

not rise to the level of constitutionally deficient representation, and such a claim would not have

succeeded. *Id.* at 24–27.

There is a division of authority as to what constitutes "good cause" under *Rhines*. *See*

*Ramirez v. Superintendent of Shawangunk Corr. Facility*, No. 17 Civ. 7185 (PAE) (HBP), 2019

WL 3714992, at *2 (S.D.N.Y. Aug. 6, 2019).  Some courts require "an objective factor external

to the petitioner which cannot fairly be attributed to him." *Ramdeo v. Phillips*, No. 04 Civ. 1157

(SLT), 2006 WL 297462, at *5–7 (E.D.N.Y. Feb. 8, 2006) (petitioner's ignorance of the law,

although inadvertent and in good faith, insufficient to show good cause because he failed to

"allege, or even suggest, that there exist[ed] an external cause for his delay"); *Corbin v. Perez*,

No. 14 Civ. 3200 (ER) (MHD), 2015 WL 3972252, at *3 (S.D.N.Y. June 26, 2015) ("[C]ourts

that have considered the issue generally require that some factor external to the petitioner gave

rise to his failure to assert the claims in court." (internal quotation marks and citations omitted));

*Garcia v. Laclair*, No. 06 Civ. 10106 (SES) (DF), 2008 WL 801278, at *4 (S.D.N.Y. Mar. 24,

2008) ("Petitioner has not credibly demonstrated that there were any external factors preventing

him from either appealing the decision denying his state habeas petition or promptly filing a

Section 440.10 motion.").  Others, relying on dicta in *Pace v. DiGuglielmo*, 544 U.S. 408 (2005),

have construed "good cause" more liberally, holding, for example, that a petitioner's "reasonable

confusion" whether a state filing would be timely may constitute good cause. *See Rivera v.

Kaplan*, No. 17 Civ. 2257 (RA), 2017 WL 3017713, at *3–4 (S.D.N.Y. July 13, 2017) (granting

stay of habeas petition in light of later filed § 440.10 motion where petitioner asserted confusion

as to timeliness of state-law claim); *Henry v. Lee*, No. 12 Civ. 5483 (JG), 2013 WL 1909415, at

*7 (E.D.N.Y. May 8, 2013) (granting stay where there had been "reasonable confusion" about

petitioner's state claims and their viability).  In objecting to the Second Report's finding of a lack of good cause, Fay urges this broader reading, contending that his appellate counsel blundered in not earlier pursuing an IAC claim by bringing a § 440.10 motion, and that this supplies "good cause" for his failure to exhaust state remedies before bringing his § 2254 claim.

Under either a broad or narrow reading of "good cause," Fay has not shown good cause for his failure to pursue an IAC claim in state court, whether on direct appeal or via a § 440.10 motion.

To the extent that a cause extrinsic to the petitioner must be shown, Fay does not point to one.  And the record would not support any such claim.  Assuming *arguendo* that Thorpe's testimony had the capacity to be admitted and impactful, the existence of a possible challenge to trial counsel's representation for failing to secure admission of such testimony was apparent to Fay even before trial was complete, let alone to the new counsel who represented him on appeal. The trial court had precluded Thorpe's testimony in part because trial counsel Bibb had failed to give the required notice of such testimony.  By appellate counsel's admission, however, Fay deliberately elected on direct appeal to forego such a claim, viewing as the more promising appellate course to cast the error leading to exclusion of the testimony as a violation by the trial court of his right to present a defense.  Appellate counsel pursued the same strategy in the § 2254 Petition, recasting the ostensible "right to defend" violation now in Sixth Amendment terms.  It was not until Judge Cave's Report rejected that theory, signaling the imminent dismissal of his § 2254 Petition, that Fay proposed to pursue an ineffective assistance claim in an amended

§ 2254 Petition, while moving to stay that Petition in deference to a § 440.10 motion he proposed to file in state court that would make substantively the same claim.[4]

Under these circumstances, Judge Cave's Report, although surely the proximate cause of Fay's belated decision to bring an ineffective assistance claim, does not qualify as an extrinsic factor supplying "*good* cause" for Fay's failure earlier to pursue such a claim. The Report did not reveal any new facts or legal analysis. It merely underscored that casting the evidentiary exclusion as a federal constitutional violation would fail under § 2254, much as it had been rejected by the Appellate Division.

In his objections, Fay alternatively argues that his appellate counsel's failure to exhaust the IAC claim in state court constitutes good cause. Obj. at 31–34. Even assuming that such a lapse by appellate counsel could alone supply good cause, the facts here do not support such a finding. Several factors undermine that theory, as Judge Cave recognized. Fay's appellate counsel was different from his trial counsel. He thus was not blinded, or conflicted in his ability, to claim IAC on the part of trial counsel. *See, e.g.*, *Ortiz v. Heath*, No. 10 Civ. 1492 (KAM), 2011 WL 1331509, at *15 (E.D.N.Y. Apr. 6, 2011) ("[W]hile some courts have found good cause to exist where a petitioner received ineffective assistance of appellate counsel, those cases have generally involved situations where the same counsel represented petitioner during trial and on appeal because it is reasonable to conclude that an appellate attorney will not claim his own ineffective assistance of counsel." (citations and internal quotation marks omitted)); *Martinez v. Artus*, No. 06 Civ. 5401 (ERK), 2010 WL 1692454, at *4 (E.D.N.Y. Apr. 26, 2010)("[T]he

---

[4] Fay admits that Judge Cave's Report catalyzed the motions to amend and stay and the § 440.10 motion. In his April 24, 2023 letter, Baker wrote: "Given the essence of the Magistrate's report and recommendation (R&R), which was predicated in its entirety on the failures of trial counsel, [Fay and his father] have elected to now proceed in Supreme Court, New York County, in order to litigate a [§ 440.10] motion." Dkt. 38.

lower federal courts have primarily applied the term [good cause] in the context of ineffective assistance of counsel claims where it is reasonable to conclude that an appellate attorney will not claim his own ineffective assistance on appeal." (citations omitted)); *Pena v. Bell*, No. 18 Civ. 4849 (ALC), 2021 WL 517778, at *5 (S.D.N.Y. Feb. 11, 2021) (court noting, but ultimately rejecting, petitioner's explanation for the cause of default: "that appellate counsel could not have argued trial counsel was ineffective because they are the same person").  In addition, appellate counsel has admitted that his was a deliberate choice to bring the right-to-defend claim on direct appeal over an IAC claim, and to proceed with that claim on § 2254 without bringing (and awaiting resolution of) an IAC claim on § 440.10.  *See* Dkt. 38 at 10 (Baker letter of April 24, 2023) ("An earlier motion, based on allegations of ineffective assistance of counsel, would have been inconsistent with this claim on the merits.").  Appellate counsel thus was not ignorant of a potential IAC claim so much as that he made a conscious decision to pursue a different path. *See, e.g.*, *United States v. Choudhry*, 330 F. Supp. 3d 815, 858 (E.D.N.Y. 2018), *aff'd*, 813 F. App'x 4 (2d Cir. 2020) (petitioner's ineffective assistance of appellate counsel claim failed where appellate counsel "reasonably chose to focus on other issues she believed were more important," instead of challenging district court's admission of expert testimony proffered by the government); *Redd v. Woughter*, No. 09 Civ. 9819 (JGK), 2010 WL 4983169, at *2 (S.D.N.Y. Dec. 3, 2010) ("[T]he fact that appellate counsel knew of trial counsel's mistake but chose to raise the issue as part of an argument that the petitioner should have been allowed to withdraw his guilty plea indicates that appellate counsel made a strategic choice that that claim was more advantageous than an independent claim for ineffective assistance of counsel."); *Giraldi v. Bartlett*, 108 F. Supp. 2d 321, 337 (S.D.N.Y. 2000), *aff'd*, 27 F. App'x 75 (2d Cir. 2001) (appellate attorney's decision to pursue one *Rosario* claim over a related *Rosario* claim on appeal

"appears to be precisely the type of strategic decision which the Supreme Court cautioned should not be second guessed."). An appellate "counsel has no duty to raise every non-frivolous issue that could be raised." *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015). To establish constitutionally inadequate performance of an appellate counsel, a petitioner instead must show "that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Id.*

With the benefit of hindsight, it is easy to fault appellate counsel's decisions to elevate other claims over the IAC claim. And appellate counsel Baker's decision not to preserve the ability to claim IAC on federal habeas review by first bringing it in a § 440.10 motion, which left Fay with a state but not a federal forum to claim IAC, is particularly apt for hindsight criticism, in this Court's assessment. But when ineffective assistance is claimed, a counsel's decisions "must be assessed in light of the information known at the time of the decisions, not in *hindsight*." *Strickland*, 466 U.S. at 680 (emphasis added). "A fair assessment of attorney performance requires that every effort be made to *eliminate the distorting effects of hindsight*, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689 (emphasis added); *see, e.g.*, *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (court reviewing an ineffective assistance of counsel claim "may not use hindsight to second-guess [defense counsel's] strategy choices"); *Baran v. United States*, 160 F. Supp. 3d 591, 598 (S.D.N.Y. 2016) (rejecting IAC claim because defense counsel "made a strategic decision not to hire a medical expert" and "[t]his strategic decision, whether wise in retrospect or not, is among professional judgment calls that fall squarely within the category of those that are 'unchallengeable' under *Strickland*"); *Gluzman v. United States*, 124 F. Supp. 2d 171, 173 (S.D.N.Y. 2000) (denying IAC claim and rejecting the attempt of appellate counsel

24

"emboldened by the clarity of hindsight" to "second guess[] various difficult strategic and tactical" decisions made by trial counsel). And the case law on claims of ineffective appellate representation affords independent counsel wide berth to make strategic choices before such conduct can be termed ineffective. *See, e.g., United States v. Wilbert*, 609 F. Supp. 3d 209, 218 (W.D.N.Y. 2022) (finding appellate counsel engaged in "strategic, informed decisionmaking" in forgoing petitioner's desired suppression argument on appeal after counsel explained to petitioner: "We raised the issues that had the most merit. Your issues lacked merit."); *Smalls v. McGinnis*, No. 04 Civ. 301 (AJP) , 2004 WL 1774578, at *32 (S.D.N.Y. Aug. 10, 2004) (failure to file reply brief not ineffective assistance of counsel where petitioner "has not demonstrated that a reply brief or oral argument would have changed the outcome of his appeal"); *Washington v. Walsh*, No. 10 Civ. 7288 (RJS) (JCF), 2015 WL 4154103, at *28 (S.D.N.Y. July 9, 2015) (same).

With hindsight bias removed, the Court finds that Baker's decision to favor a right-to-defense claim challenging the trial court's exclusion of Thorpe over an IAC claim was within the scope of an appellate defense counsel's professional judgment. *See, e.g., Richburg v. Hood*, 794 F. Supp. 75, 78–79 (E.D.N.Y. 1992) ("the decision of appellate counsel to choose among plausible options of appellate issues is preeminently a strategic choice and is 'virtually unchallengeable'"); *Tsirizotakis v. LeFevre*, 736 F.2d 57, 65 (2d Cir. 1984) (appellate counsel's decision to devote only one page of brief to argument that district court failed to properly instruct on the burden of proof did not constitute ineffective assistance of counsel because court cannot "second-guess reasonable professional judgments by appellate attorneys as to what are the most promising issues for appellate review" (citation and internal quotation marks omitted)). Viewing Baker's appellate representation as a whole, this Court cannot find his choices, and his

evaluation of his appellate options, so outside the realm of the defensible to constitute ineffective assistance. Baker's appellate representation thus cannot serve as good cause to justify staying a Petition that is otherwise ripe for dismissal.

And given the posture of this § 2254 litigation, accepting Fay's claim, via yet a new lawyer, of "good cause" would invite unacceptable gamesmanship: At the time Fay moved to stay, the unobjected-to Report recommending dismissal of the Petition was pending this Court's review. A likely imminent dismissal was apparent to all. Fay's bid to revive his Petition by terming its author ineffective after a Magistrate Judge had found the Petition meritless would invite similar bids. It presents an unusually egregious example of seeking "a second bite at the apple"—something "a petition for *habeas corpus* may not provide." *Gotti v. United States*, 622 F. Supp. 2d 87, 92 (S.D.N.Y. 2009).

This case is thus very far afield from those finding "good cause" for a petitioner's failure to exhaust a claim in state court, including those cited by Fay. Fay does not, for example, claim to have been "reasonably confused" before Judge Cave's initial Report about whether "a state filing would be timely" or about any other aspect of New York's post-conviction scheme. *Pace*, 544 U.S. at 416; *see McCrae v. Artus*, 10 Civ. 2988 (RRM), 2012 WL 3800840, at *10 (E.D.N.Y. Sept. 2, 2012) (not finding reasonable confusion where petitioner did not have "reasonable uncertainty about whether a state proceeding is 'properly filed' for purposes of the AEDPA limitations period"). Nor does Fay point to an external impediment that prevented him from exhausting his state court remedies via a § 440.10 motion before the Report issued. *See, e.g., Schouenborg v. Superintendent, Auburn Corr. Facility*, No. 08 Civ. 2865 (JS), 2013 WL 5502832, at *10 (E.D.N.Y. Sept. 30, 2013) (good cause found where trial counsel did not provide petitioner with requested legal documents and transcripts necessary to bring unexhausted

claim); *Nieves v. Conway*, No. 09 Civ. 3710 (SLT) (LB), 2011 WL 2837428, at *2 (E.D.N.Y. July 14, 2011) (good cause may be found when "state proceedings are delayed by the prosecution and other circumstances beyond petitioner's control" or when "unexhausted claims are based on documented evidence discovered after petitioner brought his habeas petition" (cleaned up)).

The Court thus adopts the Report's finding on the first *Rhines* factor. Fay has not shown good cause for his failure to exhaust state remedies with respect to an IAC claim. That finding alone defeats his bid for a stay to permit him now to do so.

### 2. The Meritless Nature of Fay's Claim

Even where a petitioner has good cause for his failure to exhaust a claim in state court, "the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Rhines*, 544 U.S. at 277. Under this second element of the *Rhines* test, a claim is "plainly meritless" when "it is perfectly clear that the petitioner has no hope of prevailing." *Duwe v. Bell*, No. 20 Civ. 05403 (EK), 2021 WL 4480555, at *2 (E.D.N.Y. Sept. 30, 2021) (quoting *Linares v. New York*, No. 04 Civ. 2973 (KMW), 2008 WL 2115231, at *2 (S.D.N.Y. May 14, 2008)).

On this point, Fay argues that if the trial counsel had made a timely and adequate proffer, the trial court would have admitted Thorpe's proposed testimony. Obj. at 30–31. He argues that sexsomnia—a condition in which people engage in sex while asleep—has been diagnostically recognized as a real condition, and that Thorpe's testimony about such a phenomenon would have accorded with generally accepted scientific principles. *Id.* at 8–9. He argues that Thorpe's testimony had a reasonable probability of affecting the outcome, as such testimony would have

been consistent with S.D.'s testimony that she did not consent to sex and Fay's testimony that

S.D. appeared awake and to do so. *Id.* at 31.

The Court, joining Judge Cave, holds otherwise—that Fay's claim of ineffective

assistance cannot prevail because trial counsel's asserted lapse did not lead to the exclusion of

evidence that otherwise would have been admitted or impactful here.  Notably, in recommending

denial of Fay's § 2254 petition based on the Sixth Amendment claim in the initial Report, Judge

Cave explained at length why Thorpe's testimony was incapable of being received.  Apart from

the lack of notice, Fay did not establish Thorpe's qualifications to provide an expert opinion

about the phenomenon of sexsomnia.  Report at 42–44.  At no point before or during the trial had

Fay established that Thorpe had had "*any* personal experience with people drinking alcohol and

then engaging in physical activities while asleep—or thinking they were asleep." *Id.* at 46.

Judge Cave there also canvassed the evidence at trial, and concluded that, even had such

testimony been received, in the context of the trial evidence, it could not have given rise to a

reasonable doubt.  Under New York law, she noted, "a person who is sleeping is 'physically

helpless' for the purpose of consenting to sexual intercourse, particularly where the sleep was

drug and alcohol induced." *Id.* at 44 (citations omitted). And S.D.'s testimony was that she had

been asleep, and awakened to find someone having sex with her. *Id.* (citation omitted).  This and

other evidence gave rise to the inference, within the ken of ordinary jurors to reach, that S.D. had

been physically helpless under the circumstances under which Fay had had oral and vaginal sex

with her while she slept. *Id.* at 45.  The expert testimony about sexsomnia "would not have

created an otherwise non-existent reasonable doubt about [Fay]'s guilt." *Id.* at 44 (citation

omitted).  Fay did not object to the Report, including Judge Cave's careful assessment of why, in

the context of the trial proof, expert evidence about sexsomnia would not have changed the outcome. This Court here too has accepted those unchallenged conclusions.

In any event, considering the question afresh without deference to the unobjected-to analysis in Judge Cave's first Report, Fay has not demonstrated either that the trial court would have admitted Thorpe's testimony even upon a proper and timely proffer, or that, if admitted, such testimony stood to change the outcome. As proffered by Fay now, Thorpe would have given general testimony about sexsomnia and opined that because the victim, S.D, had been drinking heavily, a sexsomnia disorder could explain why she purportedly presented to Fay as awake during the sexual encounter. Obj. at 30. But Fay has not proffered any evidence that would tie that disorder to S.D., including evidence indicating that S.D. actually suffered from sexsomnia, had been diagnosed with sexsomnia, or had had sexsomnia episodes or exhibited behavior consistent with sexsomnia in the past. As respondent notes, the authorities that Fay cites establish that the disorder is rare and primarily affects males. *See* Resp. at 22 (citing Brian J. Holoyda et al., *Forensic Evaluation of Sexsomnia*, J. AM. ACAD. PSYCHIATRY L. (2021)).

In numerous cases, New York courts have excluded expert defense testimony about rarely-occurring conditions or human mental operations where the evidence did not support that these phenomena played a role in the case. *See, e.g.*, *People v. Anderson*, 36 N.Y.3d 1109, 1110 (2021) (trial court properly excluded evidence regarding adolescent brain development offered in support of justification defense by 14-year old who fired a gun at rival gang members on a public bus, killing a bystander, and then continued to shoot at them as he pursued them on the street); *People v. Engel*, 851 N.Y.S.2d 540, 541 (1st Dep't 2008) (expert testimony based on review of medical records about how possible continuing effects of facial surgery might have given defendant a motive to protect himself from being reinjured was properly excluded where the

defendant did not offered any evidence establishing a connection between the surgery and his state of mind at the time of the incident). And courts elsewhere have excluded general testimony about sexsomnia where only speculation tied that condition to the pending case. *See, e.g., State v. Stewart*, 222 N.C. App. 319 (2012) (affirming exclusion of expert testimony regarding sexsomnia disorder because, absent a diagnosis that defendant suffered from it, the probative value was substantially outweighed by the dangers of unfair prejudice, confusion, or misleading the jury); *State v. Pratt*, 11 Wash. App. 2d 450, 464 (2d Div. 2019), *aff'd*, 196 Wash. 2d 849 (2021) (affirming exclusion of expert testimony on sexsomnia and finding that "[t]he fact that this disorder exists is irrelevant" when the expert "could not testify that [defendant] suffered from sexsomnia either on the night of the sexual molestation or ever"). For these reasons, the Court finds, as did Judge Cave in the Second Report, that the trial court would not have received Thorpe's testimony.

Second, the Court finds, even if Thorpe's general testimony about sexsomnia had been received, it would not have altered the jury's verdict. Thorpe had never examined S.D.; he did not know anything about her medical history; and there was no evidence supporting that she had the rare condition of sexsomnia. The implicit premise of Thorpe's testimony, that for the first time in her life S.D. experienced sexsomnia on July 9, 2016, and as a result, while sleeping, mistook Fay for her regular sexual partner, Slye, was far-fetched. It is not persuasive that a jury would have credited it.

And the contrary narrative—that S.D. did not consent or manifest such consent—was overwhelmingly established by the trial proof. It established that Fay crawled into a small bed with S.D. and Slye without their permission, when the two were asleep, drunk, and mostly naked. S.D. denied consenting or manifesting consent to sex with Fay, a virtual stranger to her,

and attested that she had been taken advantage of while asleep and drunk. Slye corroborated S.D.'s account of an unconsented-to sexual encounter. And the prosecution's other trial witnesses powerfully described statements and actions by S.D. in the aftermath of awakening that corroborated her account of having been startled and horrified to awaken during the rape. *See, e.g., United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008) (in assessing prejudice, "the strength of the Government's case is probably the single most critical factor") (cleaned up); *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (finding no prejudice from defense counsel's allegedly deficient performance "given the overwhelming evidence of guilt adduced at trial"); *Krasniqi v. United States*, 195 F. Supp. 3d 621, 638 (S.D.N.Y. 2016) (same).

On cross-examination, the prosecution also elicited from Fay the damaging admission that outgoing calls from his phone to the commercial sex website Backpage had been made at about 4 a.m. on July 9, shortly before the rape occurred. The prosecution also established prior statements by Fay seeking to exculpate himself that were blatantly at odds with the trial testimony, including his statement to Sobell shortly before S.D. left the apartment that S.D. had initiated the encounter by "kiss[ing] my neck" and "giving me a blow job." Report at 5 (citing 01/24/2018 Tr. at 464–65, 509).

Fay thus has not shown that Thorpe's testimony would have been received or that, if received, it would have altered the trial outcome. As a result, Fay has not established the second element under *Rhines*.

The Court accordingly denies Fay's motion to stay the Petition. And, because there is no basis for a stay, the Court denies Fay's motion to amend the Petition as futile.

**CONCLUSION**

For the reasons stated above, the Court adopts Judge Cave's two Reports; dismisses Fay's § 2254 Petition; and denies Fay's motions to amend the Petition and to stay consideration of the Petition pending disposition of his recently filed § 440.10 motion in New York State Court.

The Clerk of the Court is respectfully directed to terminate the motions pending at Dockets 38 and 48 and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: February 5, 2024
New York, New York